# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

LORILLARD, INC.
714 Green Valley Road
Greensboro, NC  27408,

LORILLARD TOBACCO COMPANY
714 Green Valley Road
Greensboro, NC  27408,

and

R.J. REYNOLDS TOBACCO COMPANY
401 N. Main Street
Winston-Salem, NC  27101,

     Plaintiffs,

    v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD  20993,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue S.W.
Washington, DC  20201,

KATHLEEN SEBELIUS,
Secretary of Health and Human Services
U.S. Department of Health and Human Services
200 Independence Avenue S.W.
Washington, DC  20201,

MARGARET A. HAMBURG, M.D.,
Commissioner of Food and Drugs
10903 New Hampshire Ave.
Silver Spring, MD  20993,

    and

   )
   )  Civil Action No. _____
   )
   )
   )  **COMPLAINT FOR**
   )  **DECLARATORY AND**
   )  **INJUNCTIVE RELIEF**

LAWRENCE R. DEYTON, M.S.P.H., M.D.,          )
Director, Center for Tobacco Products          )
United States Food and Drug Administration          )
9200 Corporate Blvd., Rm. 100          )
Rockville, MD  20850,          )
          )
                             Defendants          )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Lorillard, Inc. and Lorillard Tobacco Company (collectively, "Lorillard") and R.J. Reynolds Tobacco Company ("Reynolds") (the three plaintiffs collectively, "Plaintiffs") bring this action for declaratory and injunctive relief to require the United States Food and Drug Administration ("FDA"), the United States Department of Health and Human Services ("DHHS"), and the individual defendants, sued in their official capacities (all defendants collectively, "Defendants") to bring the membership of the Tobacco Products Scientific Advisory Committee ("TPSAC" or "the Committee") and the membership of the Constituents Subcommittee of the TPSAC into compliance with the law, and to prevent the Defendants from taking any action based on or influenced by, and from making any other use of, any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC or the Constituents Subcommittee as each is currently constituted.

2.      Under 5 C.F.R. § 5501.101(a)-(b) (2010), members of the TPSAC are special government employees and, as such, are subject to the conflict-of-interest rules set forth in 18 U.S.C. §§ 202(a), 208 (2006); section 712 of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 379d-1 (2006 & Supp. III 2009); and 5 C.F.R. pts. 2635, 2640 (2010). Of the eight individuals whom the Defendants appointed as voting members of the TPSAC and who are currently serving on the Committee, three (including the Chair) have severe financial

and appearance conflicts of interest and associated biases that are incompatible with the TPSAC's role as an impartial advisor on issues relating to the regulation of tobacco products. The same is true of two of the members of the Constituents Subcommittee of the TPSAC who are not members of the TPSAC.  These conflicts and biases derive from the continuing service of these appointees as paid expert witnesses in litigation against tobacco-product manufacturers and also, as to the three TPSAC members, continuing employment as consultants for, and receipt of research funding or other financial compensation from, large pharmaceutical companies that manufacture nicotine-replacement-therapy products and other smoking-cessation products. These conflicts and biases affect the TPSAC's consideration of issues relating to menthol in cigarettes and issues relating to smokeless tobacco products, and will affect its consideration of other issues that will come before the Committee; they also affect issues that have been or will be before the Constituents Subcommittee.

3.     Because the TPSAC is governed by the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 § 5 (2006), the Committee must be "fairly balanced in terms of the points of view represented and the functions to be performed," and its membership must be such that any report, information, assessment, judgment, recommendation, or other advice it provides to the Defendants "will not be inappropriately influenced . . . by any special interest."  As currently constituted, the TPSAC fails to meet these requirements with respect to issues relating both to menthol in cigarettes and to smokeless tobacco products.  For example, of the eight current voting members of the Committee, three (including the Chair) constitute a clique who have the same or similar views and are all on one side of a substantial controversy within the public-health and tobacco-control communities as to whether enough is currently known to conclude that smokeless tobacco products can play a beneficial role in reducing the harm from

tobacco; and no member of the Committee has represented the opposing point of view, of which there are numerous representatives in those communities.

4.      Lorillard and Reynolds seek, *inter alia*, a declaration that the Defendants' appointment of these individuals to the TPSAC and the Constituents Subcommittee violates the applicable ethics rules and the FACA, and an injunction preventing the Defendants from receiving, considering, or relying on reports, information, assessments, judgments, recommendations, or other advice from the Committee until the TPSAC and, as applicable, the Subcommittee are constituted in accordance with the law.

## NATURE OF THE ACTION

5.      The Plaintiffs bring this civil action on the basis of the final agency actions embodied in the Defendants' March 1, 2010 announcement of the TPSAC roster, in their appointments of members of the Constituents Subcommittee, in their March 25, 2010 and July 8, 2010 rejections of objections by Philip Morris USA, Inc. ("PM-USA") and United States Smokeless Tobacco Company LLC ("USSTC") to the composition of the TPSAC and the Constituents Subcommittee, in their October 6, 2010 rejection of objections by Reynolds to the composition of the TPSAC and the Constituents Subcommittee, and in their extended delay in responding substantively to other letters by Reynolds, Lorillard, PM-USA, and USSTC that set forth additional grounds for their objections to the composition of the TPSAC.

6.      In appointing voting members to the TPSAC, in appointing members to the TPSAC's Constituents Subcommittee, and in allowing such voting members of the TPSAC and members of the Constituents Subcommittee to participate in the work of the TPSAC and the Subcommittee, respectively, in violation of applicable ethics rules and the FACA, the Defendants have acted, are continuing to act, and will in the future continue to act, in a manner

that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006).

7. Accordingly, the Plaintiffs seek from this Court prospective declaratory, mandatory, and injunctive relief, including: (a) a declaration that the present composition of the TPSAC is contrary to the applicable ethics statutes and regulations; (b) a declaration that the present composition of the TPSAC violates the FACA; (c) a declaration that it is unlawful for the Defendants to transmit to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully constituted; (d) an order enjoining the Defendants from receiving, considering, or relying on any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC (including any report, information, assessment, judgment, recommendation, or other advice relating to menthol in cigarettes or to dissolvable or other smokeless tobacco products) except for such a report, information, assessment, judgment, recommendation, or other advice that is provided by the TPSAC when it and, as applicable, its Constituents Subcommittee are composed and operating in accordance with the law; and (e) an order enjoining the Defendants from transmitting to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully composed.

## PARTIES

8.      Plaintiff Lorillard, Inc. is a Delaware corporation with its principal place of business in Greensboro in Guilford County, North Carolina.

9.      Plaintiff Lorillard Tobacco Company is a Delaware corporation with its principal place of business in Greensboro in Guilford County, North Carolina.  It is the third-largest tobacco-product manufacturer in the United States.  Lorillard Tobacco Company manufactures and sells a variety of cigarettes, including menthol and non-menthol cigarettes.  Its cigarettes are sold under the brand names Newport, Maverick, True, and Old Gold, among others.  Lorillard Tobacco Company's brands are advertised, distributed, and sold nationwide, including in this District.  Lorillard Tobacco Company is a wholly owned subsidiary of Plaintiff Lorillard, Inc.

10.     Plaintiff Reynolds is a North Carolina corporation with its principal place of business in Winston-Salem in Forsyth County, North Carolina.  Its manufacturing operations are also located in Forsyth County, North Carolina.  Reynolds is the second-largest manufacturer of tobacco products in the United States.  It manufactures and sells a variety of tobacco products, including menthol and non-menthol cigarettes, and snus, dissolvable and other smokeless tobacco products.  Its cigarettes are sold under the brand names Camel, Winston, Kool, and Pall Mall, among others.  Reynolds's brands are advertised, distributed, and sold nationwide, including in this District.

11.     As corporations engaged in the production, marketing, and distribution of tobacco products, the Plaintiffs are subject to regulation by the Defendants under the FDCA, and will be directly affected by decisions and actions by the Defendants that are based on or influenced by reports, information, assessments, judgments, recommendations, and/or other advice provided by the TPSAC to the Defendants.  As entities regulated by the Defendants, the Plaintiffs have a

6

direct interest (a) in the purpose, functions, and functioning of the TPSAC and its Constituents Subcommittee, and are injured by the Defendants' creation of and reliance on an advisory committee and subcommittee that fail to comply with applicable ethics rules and the FACA; (b) in the public accountability of the TPSAC and its Constituents Subcommittee; (c) in the requirement that the TPSAC be fairly balanced, free of improper influence, representative of pertinent viewpoints, and fully informed by public participation; and (d) in the APA's requirement that the regulation of tobacco products comply with the law, including the FACA and the ethics rules applicable to members of the TPSAC and to members of the Constituents Subcommittee.

12.     The Plaintiffs are within the zone of interests protected by the ethics provisions and regulations applicable to government employees, the conflict-of-interest provisions of the FDCA, and the FACA because those statutes and regulations are designed to ensure that advisory committees, such as the TPSAC, are independent, adequately representative, and accountable to the public, including regulated parties; and because the Defendants, in regulating the Plaintiffs, will rely on reports, information, assessments, judgments, recommendations, and other advice from the TPSAC and the Constituents Subcommittee.  The Plaintiffs are also within the zone of interests protected by the laws protecting trade secrets and confidential commercial information because those laws are designed to ensure that trade secrets and confidential commercial information submitted to federal agencies are not disclosed advertently or inadvertently to any members of the public.

13.     Defendant FDA is a division of Defendant DHHS.  The FDA is an agency of the United States, and has the responsibility, among other things, to regulate tobacco products sold within the United States.  The FDA's headquarters and principal place of business are at 10903

New Hampshire Avenue, Silver Spring, Maryland 20903.  Its governmental activities occur in this District and nationwide.

14.      Defendant DHHS is a Department of the United States.  Its headquarters and principal place of business are at 100 Independence Avenue, S.W., Washington, District of Columbia 20201.  Its governmental activities occur in this District and nationwide.

15.      Defendant Kathleen Sebelius is the Secretary of Health and Human Services and the head of the DHHS.  The Plaintiffs sue her solely in her official capacity.  Her governmental activities occur in this District and nationwide.

16.      Defendant Margaret A. Hamburg, M.D., is the Commissioner of Food and Drugs, and the head of the FDA.  The Plaintiffs sue her solely in her official capacity.  Her governmental activities occur in this District and nationwide.

17.      Defendant Lawrence R. Deyton, M.S.P.H., M.D., is the Director of the Center for Tobacco Products, the unit of the FDA that regulates tobacco products.  The Plaintiffs sue him solely in his official capacity.  His governmental activities occur in this District and nationwide.

18.      All of the FDA's actions referred to herein were taken pursuant to authorities delegated by the Congress to Defendant Secretary Sebelius, re-delegated by her to Defendant Dr. Hamburg as Commissioner of Food and Drugs, and re-delegated by Defendant Dr. Hamburg to Defendant Dr. Deyton as Director of the Center for Tobacco Products.  Accordingly, all of the actions by the FDA referred to herein were taken by or on behalf of each and all of the Defendants.

## JURISDICTION AND VENUE

19.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (2006). This action arises under the APA, 5 U.S.C. § 702 (2006); the Declaratory Judgment Act, 28

U.S.C. §§ 2201, 2202 (2006); 18 U.S.C. §§ 202(a), 208, and implementing regulations; FDCA § 712, 21 U.S.C. § 379d-1; and the FACA, 5 U.S.C. app. 2 § 5.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e) (2006) because, among other things, all of the Defendants reside or are found in this judicial district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

21.     An actual, justiciable controversy now exists between each of the Plaintiffs and each and all of the Defendants, and the requested relief is proper under 5 U.S.C. §§ 701-706 (2006); 28 U.S.C. §§ 2201, 2202; 18 U.S.C. §§ 202(a), 208, and implementing regulations; FDCA § 712, 21 U.S.C. § 379d-1; and 5 U.S.C. app. 2 § 5.

22.     As to this civil action, the federal government has waived sovereign immunity in 5 U.S.C. § 702.

## FACTS GIVING RISE TO THIS ACTION

### The Tobacco Products Scientific Advisory Committee

23.     On June 22, 2009, the President signed the Family Smoking Prevention and Tobacco Control Act (the "TCA"), Pub. L. No. 111-31, 123 Stat. 1776 (2009), which authorizes the FDA to regulate tobacco products.  Section 917 of the FDCA, 21 U.S.C. § 387q (Supp. III 2009), added by section 101 of the TCA, 123 Stat. at 1824-25, mandates the establishment of the TPSAC.

24.     Section 917(c) of the FDCA, 21 U.S.C. § 387q(c), specifies certain duties of the TPSAC:

(c) DUTIES.—The Tobacco Products Scientific Advisory Committee shall provide advice, information, and recommendations to the Secretary—

(1) as provided in this chapter;
(2) on the effects of the alteration of the nicotine yields from tobacco products;
(3) on whether there is a threshold level below which nicotine yields do not produce dependence on the tobacco product involved; and
(4) on its review of other safety, dependence, or health issues relating to tobacco products as requested by the Secretary.

25.     Section 906(e) of the FDCA, 21 U.S.C. § 387f(e) (Supp. III 2009), added by the TCA, 123 Stat. at 1797-99, authorizes the Secretary of Health and Human Services to establish and require good manufacturing practices for tobacco products.  Section 906(e)(1)(B), 21 U.S.C. § 387f(e)(1)(B), provides that, "before promulgating any regulation under subparagraph (A)," the Secretary shall "afford the [TPSAC] an opportunity to submit recommendations with respect to the regulation proposed to be promulgated."  Section 906(e)(2), 21 U.S.C. § 387f(e)(2), provides for exemptions and variances from good manufacturing practice requirements.  Section 906(e)(2)(B), 21 U.S.C. § 387f(e)(2)(B), provides that "[t]he Secretary may refer to the [TPSAC] any petition submitted under subparagraph (A)" for such an exemption or variance.  Under section 906(e)(2)(B), the TPSAC's report of its recommendations with respect to any such referral is due within sixty days after the date of the referral.

26.     Section 907(e)(1) of the FDCA, 21 U.S.C. § 387g(e)(1) (Supp. III 2009), added by the TCA, 123 Stat. at 1804, provides in part:  "Immediately upon the establishment of the [TPSAC] under section 917(a), the Secretary shall refer to the Committee for report and recommendation, under section 917(c)(4), the issue of the impact of the use of menthol in cigarettes on the public health, including such use among children, African-Americans, Hispanics, and other racial and ethnic minorities."  The report is due within one year of the establishment of the Committee, under FDCA § 907(e)(2), 21 U.S.C. § 387g(e)(2) (Supp. III 2009), added by the TCA, 123 Stat. at 1804.  The report will influence the Defendants' decisions

and actions with respect to menthol in cigarettes, including menthol in cigarettes manufactured and sold by Lorillard and in cigarettes manufactured and sold by Reynolds.  The TPSAC is already at work on that report.

27.    In addition, Section 907(f)(1) of the FDCA, 21 U.S.C. § 387g(f)(1) (Supp. III 2009), added by the TCA, 123 Stat. at 1804, provides in part:  "The Secretary shall refer to the Tobacco Products Scientific Advisory Committee for report and recommendation, under section 917(c)(4), the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children."  Dissolvable tobacco products are a subcategory of smokeless tobacco products.  Under FDCA § 907(f)(2), 21 U.S.C. § 387g(f)(2) (Supp. III 2009), added by the TCA, 123 Stat. 1804, the TPSAC's report is due within two years of the establishment of the Committee.  The report will influence the Defendants' decisions and actions with respect to dissolvable tobacco products, including dissolvable tobacco products manufactured and sold by Reynolds.

28.    In addition, under Section 911(f) of the FDCA, 21 U.S.C. § 387k(f) (Supp. III 2009), added by the TCA, 123 Stat. at 1814, the FDA must refer to the TPSAC for its review and evaluation any modified risk tobacco product application; and, no later than 60 days after such a referral, the TPSAC must "report its recommendations on the application" to the FDA.  The TPSAC's reports and recommendations on such applications will influence the Defendants' decisions and actions with respect to such applications submitted by the Plaintiffs and others.

29.    The FDA may refer additional matters to the TPSAC.

(a)    Under FDCA § 907(d)(5)(D), 21 U.S.C. § 387g(d)(5)(D) (Supp. III 2009), added by the TCA, 123 Stat. at 1803, the FDA "may refer a proposed regulation for the establishment, amendment, or revocation of a tobacco product standard to the [TPSAC] for a

report and recommendation with respect to any matter in the proposed regulation which requires the exercise of scientific judgment"; and, in response to such a referral, the Committee is to submit to the FDA, within 60 days, "a report and recommendation respecting such regulation, together with all underlying data and information and a statement of the reason or basis for the recommendation." Such report and recommendation will influence the Defendants' decisions and actions with respect to standards that apply to tobacco products manufactured and sold by the Plaintiffs and others.

(b)    Further, under FDCA § 910(b)(2), 21 U.S.C. § 387j(b)(2) (Supp. III 2009), added by the TCA, 123 Stat. at 1809, the FDA, on its own initiative or at the request of the applicant, may refer to the TPSAC an application for permission to distribute a "new tobacco product"; and, in response to such a referral, the TPSAC is to submit to the FDA "a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation." Such reports and recommendations will influence the FDA's decisions and actions with respect to applications submitted by the Plaintiffs and others to the Defendants for permission to distribute "new tobacco product[s]."

30.    Thus, in general, as set forth on the FDA's website, *available at* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/default.htm, the TPSAC "advises the Commissioner of Food and Drugs or designee in discharging responsibilities as they relate to the regulation of tobacco products, reviews and evaluates safety, dependence, and health issues relating to tobacco products, and provides advice, information and recommendations to the Commissioner of Food and Drugs. . . . The Committee may provide recommendations to the Secretary regarding any regulations to be promulgated under the act . . . ."

31.      On August 26, 2009, the FDA published in the *Federal Register* a Notice

announcing its establishment of the TPSAC: Advisory Committee; Tobacco Products Scientific

Advisory Committee; Establishment, 74 Fed. Reg. 43,042 (Aug. 26, 2009).  The Notice

acknowledged that the TPSAC is "governed by . . . the Federal Advisory Committee Act, which

sets forth standards for the formation and use of advisory committees." *Id.* at 43,042.

32.      FDCA § 917(b)(1)(A), 21 U.S.C. § 387q(b)(1)(A), provides that the TPSAC is to

consist of nine voting members and three nonvoting industry representatives.

33.      On March 1, 2010, the FDA announced the appointment of the initial nine voting

members of the TPSAC, as set forth in FDA News Release (Mar. 1, 2010), *available at*

http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm202394.htm.  In early

January 2011, Dr. Gregory N. Connolly ("Dr. Connolly"), whom the Defendants had appointed

as a voting member of the TPSAC, but who had financial and appearance conflicts of interest in

that role, informed the press that he had resigned from the TPSAC three weeks earlier; and his

resignation was confirmed by a spokesman for the FDA, as reported in David Kesmodel, *FDA*

*Tobacco Adviser Resigns*, WALL ST. J., Jan. 5, 2011, *available at*

http://online.wsj.com/article/SB10001424052748704405704576064000800551720.html.  Dr.

Connolly did not cite conflicts of interest as a reason for his resignation.  At the January 10, 2011

meeting of the TPSAC at p. 4 of the transcript, the FDA confirmed his resignation.  The roster of

the TPSAC once included Dr. Connolly.  It no longer does, as shown in Roster of the Tobacco

Products Scientific Advisory Committee, *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm180906.htm.  The appointment of the nine voting members of the

TPSAC was final agency action within the meaning of the APA, as was the appointment of the members of the Constituents Subcommittee.

34.     The TPSAC has been operating since the first quarter of 2010.  It held formal meetings on March 30 and 31, July 15 and 16, August 30, October 7, and November 18, 2010, and January 10 and 11, and February 10, 2011; and it is scheduled to meet on March 2, 2011. The Constituents Subcommittee of the TPSAC held formal meetings on June 8 and 9, and July 7 and 8, 2010.  The Menthol Report Subcommittee of the TPSAC held formal meetings on September 27, 2010, and February 11, 2011.  These meetings are shown in the lists of meetings of the TPSAC and its subcommittees, *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti ficAdvisoryCommittee/ucm180903.htm;

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti ficAdvisoryCommittee/ucm237359.htm.

**Objections by the Plaintiffs and Others to the Membership of the TPSAC
and the Membership of Its Constituents Subcommittee,
and the Defendants' Responses, and Failures to Respond, to Those Objections**

35.     The Defendants have had numerous full and fair opportunities to address the issues raised herein.  On March 22, 2010, PM-USA and USSTC sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 16-page, single-spaced letter that objected to the voting membership on the TPSAC of Dr. Neal L. Benowitz ("Dr. Benowitz"), Dr. Connolly, Dr. Jack E. Henningfield ("Dr. Henningfield"), and Dr. Jonathan M. Samet ("Dr. Samet") (Chair of the TPSAC), and presented detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit A.

36.     On behalf of the Defendants, Dr. Deyton responded to the March 22, 2010 letter from PM-USA and USSTC with a 2-page, single-spaced letter dated March 25, 2010.  Dr. Deyton's letter summarily rejected all of the objections raised by PM-USA and USSTC.  A true and correct copy of Dr. Deyton's March 25, 2010 letter is attached hereto as Exhibit B.

37.     On June 14, 2010, PM-USA and USSTC sent to Defendant Dr. Deyton, in his official capacity, a 4-page, single-spaced letter that objected to the membership on the TPSAC's Constituents Subcommittee of Dr. David M. Burns ("Dr. Burns") and Dr. William A. Farone ("Dr. Farone"), and presented detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit C.

38.     On behalf of the Defendants, Dr. Deyton responded to the June 14, 2010 letter from PM-USA and USSTC with a 2-page, single-spaced letter dated July 8, 2010.  Dr. Deyton's letter summarily rejected all of the objections raised by PM-USA and USSTC.  A true and correct copy of Dr. Deyton's July 8, 2010 letter is attached hereto as Exhibit D.

39.     On June 30, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 36-page, single-spaced letter that objected to the voting membership on the TPSAC of Drs. Benowitz, Connolly, Henningfield, and Samet, and also objected to the membership on the TPSAC's Constituents Subcommittee of Drs. Henningfield, Burns, and Farone, and presented detailed supporting reasons.  A true and correct copy of Reynolds's June 30, 2010 letter (without its appendices) is attached hereto as Exhibit E.

40.     On behalf of the Defendants, Dr. Deyton responded to Reynolds's June 30, 2010 letter with a 2-page, single-spaced letter dated October 6, 2010.  Dr. Deyton's letter summarily rejected all of Reynolds's objections.  A true and correct copy of Dr. Deyton's October 6, 2010 letter is attached hereto as Exhibit F.

41.      On August 26, 2010, PM-USA and USSTC sent to Defendant Dr. Deyton, in his official capacity, a 3-page, single-spaced letter that objected to the submission by Dr. Connolly to the Constituents Subcommittee of written views regarding harmful and potentially harmful constituents in tobacco products and tobacco smoke, and presented detailed supporting reasons. A true and correct copy of that letter is attached hereto as Exhibit G.  As of the date of this Complaint (February 25, 2011), as far as Plaintiffs are aware, none of the Defendants has responded to that letter.

42.      On September 17, 2010, Lorillard and Reynolds responded to the FDA's request for comments in connection with the September 27, 2010 meeting of the Menthol Report Subcommittee of the TPSAC.  The comments emphasized that TPSAC voting members must be screened for all conflicts of interest, including personal opposition to the tobacco industry.  The comments noted that questions had already been raised concerning potential conflicts involving four TPSAC members.  A true and correct copy of the comments submitted by Lorillard and Reynolds is attached hereto as Exhibit H.

43.      Also on September 17, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 3-page single-spaced letter that brought to their attention certain public statements by a private-business colleague of Dr. Henningfield, which appeared to reflect knowledge concerning what documents were produced by manufacturers of tobacco products to the FDA, some of which are confidential under federal law.  The letter asked Dr. Hamburg and Dr. Deyton to take certain actions, including making inquiries as to whether there were any improper disclosures to Dr. Henningfield's business colleague by any member of the TPSAC or any employee of the FDA.  A true and correct copy of Reynolds's September 17, 2010 letter (without its appendices) is attached hereto as Exhibit I.

16

44.     By a 1-page, 4-line letter dated September 30, 2010, the Executive Secretariat of the FDA's Center for Tobacco Products, on behalf of the Defendants, acknowledged receipt of Reynolds's September 17, 2010 letter.  The September 30, 2010 letter did not respond to the substance of Reynolds's September 17, 2010 letter, and did not state when a substantive response would be provided, but did state that "it is our intention to respond at the soonest possible time." A true and correct copy of the Defendants' September 30, 2010 letter is attached hereto as Exhibit J.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded substantively to Reynolds's letter of September 17, 2010.

45.     On October 11, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 22-page, single-spaced letter that brought to their attention the participation by TPSAC voting members Dr. Benowitz (as co-author) and Dr. Dorothy Hatsukami ("Dr. Hatsukami") and Dr. Samet (as publicly-identified peer-reviewers) in a newly published policy statement by the American Heart Association on smokeless tobacco products. The policy statement took positions on issues that will come before the TPSAC, including issues relating to dissolvable tobacco products, as to which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates a review by the TPSAC, as alleged in paragraph 27, *supra*.  A true and correct copy of Reynolds's October 11, 2010 letter (without its appendices) is attached hereto as Exhibit K.

46.     By a 1-page, 4-line letter dated November 17, 2010, the Executive Secretariat of the FDA's Center for Tobacco Products, on behalf of the Defendants, acknowledged receipt of Reynolds's October 11, 2010 letter.  The November 17, 2010 letter did not respond to the substance of Reynolds's October 11, 2010 letter, and did not state when a substantive response would be provided, but did state that "it is our intention to respond at the soonest possible time." A true and correct copy of the November 17, 2010 letter is attached hereto as Exhibit L.  As of

the date of this Complaint (February 25, 2011), none of the Defendants has responded substantively to Reynolds's letter of October 11, 2010.

47.     On December 17, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 67-page, single-spaced letter that presented additional detailed reasons for concluding that the present composition of the TPSAC violates applicable ethical rules and the FACA.  A true and correct copy of Reynolds's December 17, 2010 letter (without its appendices) is attached hereto as Exhibit M.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded to Reynolds's letter of December 17, 2010.

48.     On January 6, 2011, PM-USA sent to Ralph S. Tyler, Chief Counsel of the FDA, in his official capacity, a 3-page, single-spaced letter that brought to his attention certain testimony by Dr. Henningfield on September 20, 2010, in which he expressed views about matters (relating to menthol in cigarettes) that are pending before the TPSAC.  The letter requested that the FDA disqualify Dr. Henningfield as a member of the TPSAC, and presented detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit N.  As far as the Plaintiffs are aware, as of the date of this Complaint (February 25, 2011), neither Mr. Tyler nor any of the Defendants has responded to that letter.

49.     On January 31, 2011, Lorillard sent to Defendant Dr. Deyton, in his official capacity, a letter requesting that Dr. Benowitz and Dr. Henningfield be recused from the TPSAC's ongoing work related to the use of menthol in cigarettes.  A true and correct copy of that letter is attached hereto as Exhibit O.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded to Lorillard's letter of January 31, 2011.

50.     On February 19, 2011, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 3-page, single-spaced letter (dated February 18, 2011) that presented additional reasons to disqualify Dr. Henningfield as a member of the TPSAC.  A true and correct copy of that letter (without its appendices) is attached hereto as Exhibit P.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded to that letter.

### Prohibited Conflicts of Interest Among the Voting Members of the TPSAC and the Members of Its Constituents Subcommittee

51.     Of the eight individuals the Defendants selected to be TPSAC voting members and who are still serving in that capacity, three – Drs. Benowitz, Henningfield, and Samet – have severe financial conflicts of interest and biases in points of view that are incompatible with the TPSAC's role as an impartial (as well as knowledgeable) advisor to the Defendants on issues relating to the regulation of tobacco products and tobacco-product manufacturers.  As discussed further below, these conflicts and biases stem largely, but not exclusively, from these individuals' regular service as paid expert witnesses in litigation against tobacco-product manufacturers and their current or recent employment as consultants to the pharmaceutical industry regarding nicotine-replacement-therapy products and other smoking-cessation products.

52.     The Constituents Subcommittee of the TPSAC consists of twelve members, as shown in Roster of the Constituents Subcommittee of the [TPSAC], *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM225585.pdf.  Of those twelve members, three – Drs. Burns and Farone, and also Dr. Henningfield – similarly have severe financial conflicts of interest and biases in points of view because they, too, regularly serve as paid expert witnesses in litigation against tobacco-product manufacturers.

53.      As expert witnesses, Drs. Benowitz, Henningfield, Samet, Burns, and Farone testify against tobacco-product manufacturers, and, therefore, are subject to cross-examination by lawyers representing those manufacturers.  Thereby, Drs. Benowitz, Henningfield, Samet, Burns, and Farone put themselves in positions of adversity to those manufacturers.  This employment as expert witnesses will continue – indeed, has been continuing – during the service by Drs. Benowitz, Henningfield, Samet, Burns, and Farone on the TPSAC or the Constituents Subcommittee, in connection with which they are supposed to advise the FDA impartially as to regulation of those very same manufacturers.  They will also be testifying for plaintiffs' lawyers in lawsuits against tobacco-product manufacturers on some of the same issues and topics that are currently pending before, or that will come before, the TPSAC and, in some instances, the Constituents Subcommittee.

54.      On January 8, 2010, Dr. Benowitz wrote a letter to Philip M. Gerson, Esq., a lawyer for plaintiffs suing tobacco-product manufacturers, in which he stated:  "In addition I have been appointed to the FDA Tobacco Products Scientific Advisory Committee, a committee that will advise the FDA as to how the use of tobacco should be regulated.  Although no official decision has been made, it is my expectation that committee members would not be allowed to testify in tobacco related civil trials."  Contrary to Dr. Benowitz's reasonable expectation, however, the Defendants are allowing TPSAC members to testify as paid expert witnesses for plaintiffs suing tobacco-product manufacturers.

55.      At the TPSAC meeting on January 10, 2011, Michael Weisman, a lawyer for the plaintiffs in *Evans v. Lorillard Tobacco Co.*, No. 04-2840-B (Mass. Super. Ct. filed June 28, 2004), stated to the Committee:  "[T]he jury heard and apparently found persuasive, [sic] the testimony of Dr. William Farone, the former director of Applied Research for Philip Morris and

a consultant to the FDA, as well as the National Cancer Institute" (transcript at 69). Dr. Farone testified in that case on November 16-17, 2010, while he was a member of the Constituents Subcommittee. Mr. Weisman's reference to Dr. Farone as "a consultant to the FDA" is an example of how plaintiffs' lawyers seek to use a paid expert witness's service on an FDA committee to bolster the witness's credibility.

### Dr. Benowitz

56.     For more than two decades, Dr. Benowitz has been one of plaintiffs' counsels' most frequently retained witnesses in litigation against tobacco-product manufacturers. To date, he has testified against tobacco-product manufacturers in more than fifty lawsuits.

57.     In such cases, Dr. Benowitz has charged expert-witness fees ranging from $275 to $600 per hour. He has estimated that he commonly earns approximately $25,000 in such a case. Thus, it is estimated that he has been paid more than $1 million for his work in testifying against tobacco-product manufacturers.

58.     Dr. Benowitz is currently scheduled to testify for plaintiffs in more than 130 trials in cases against tobacco-product manufacturers.

59.     Since March 2, 2010, while serving on the TPSAC, Dr. Benowitz, as an expert witness for plaintiffs suing tobacco-product manufacturers, has been deposed in at least one case and has testified at trial at least four times in three cases (one case involved a second trial following a mistrial).

60.     In his capacity as an expert witness, Dr. Benowitz has testified against the Plaintiffs and other tobacco-product manufacturers on a wide range of issues concerning tobacco and health, including: menthol, light/low-tar cigarettes and descriptors, smoking compensation,

21

nicotine and addiction, cigarette design, and tobacco regulation.  His testimony commonly

addresses issues certain or likely to come before the TPSAC.

61.     For example, as discussed in paragraphs 26 and 34, *supra*, the TPSAC is

deliberating and will advise the FDA on the impact of menthol in cigarettes on public health.

Even before the TPSAC existed, however, Dr. Benowitz, as an expert witness, had already

staked out his positions on this topic.  He testified in a deposition in *Craft v. Philip Morris Cos.,*

No. 002-00406 (Mo. Cir. Ct. filed Feb. 14, 2000) (Oct. 22, 2009 at Tr. 48), that he has already

made up his mind that menthol cigarettes may be more addictive and harder to quit than non-

menthol cigarettes, and that "menthol has something to do with why African Americans take in

more [smoke] per cigarette."  Indeed, he has already conclusively determined to his own

satisfaction that menthol constitutes a "public health risk," as reported in Stephanie Saul,

*Cigarette Bill Treats Menthol With Leniency*, N.Y. TIMES, May 13, 2008, *available at*

http://www.nytimes.com/2008/05/13/business/13menthol.html?_r=1&scp=3&sq=benowitz%20a

nd%20menthol&st=cse.

62.     Dr. Benowitz, as a paid consultant for pharmaceutical companies, has assisted

them with the design, development, and marketing of smoking-cessation products.  Among the

companies for which he has consulted on such products are GlaxoSmithKline plc and its

affiliates (collectively, "GSK"); Pfizer, Inc. and its affiliates (collectively, "Pfizer"); Novartis

AG and its affiliates (collectively, "Novartis"); Sanofi-Aventis U.S. LLC and its affiliates

(collectively, "Sanofi-Aventis"); and Aradigm Corp. and its affiliates (collectively, "Aradigm").

During the last ten years, he has received at least approximately $10,000 per year for such

consulting.  He has also received grant support for research and writing from GSK and/or Pfizer

on at least five occasions.  In 2010, he co-authored a study, funded by Pfizer, on the use of its

drug, Chantix, for smoking cessation.

### Dr. Henningfield

63.     Since 1986, Dr. Henningfield has testified for plaintiffs in litigation against

tobacco-product manufacturers in at least thirty-two depositions and at least eleven trials.  Since

March 2, 2010, while serving on the TPSAC, Dr. Henningfield, as an expert witness for such

plaintiffs, has testified in at least three depositions and three trials, including one trial in which he

testified concerning menthol, as described in Exhibit N to this Complaint.  He is currently slated

to testify against tobacco-product manufacturers in at least 132 cases.

64.     In his role as a paid expert witness in cases against tobacco-product

manufacturers, Dr. Henningfield has collected fees for himself and his employer, Pinney

Associates, since at least 1997.  Those fees have ranged from $350 to $700 per hour, with at least

$150 of the per-hour fee going directly to Dr. Henningfield and the remainder going to Pinney

Associates.

65.     Dr. Henningfield's views, as stated in litigation and other contexts, demonstrate

that he has already made up his mind on critical questions to be considered by the TPSAC, such

as the impact of menthol and of other tobacco-product ingredients on nicotine, addiction, and the

public health.

66.     Dr. Henningfield is a Principal at, and derives most of his income from, Pinney

Associates, a firm that currently provides to GSK on an exclusive basis consulting services

regarding smoking-cessation products.  His formal title is: Vice President, Research & Health

Policy.  Through his association with Pinney Associates, Dr. Henningfield advises GSK

specifically on the development of nicotine-replacement therapies and treatments for tobacco

23

dependence.  Pinney Associates has received on average more than $2 million per year in revenue from pharmaceutical companies, more than half of which relates to smoking-cessation products.  In addition, during the last decade, Dr. Henningfield has received grant support for research and writing from GSK on at least eight occasions.

67.     Dr. Henningfield is also a partner in a company that holds patents for a nicotine-replacement-therapy product.  He has estimated that, if thess patents are successfully licensed, they could be worth more than $1 million to him as a partner in that company.  Thus, Dr. Henningfield has a financial interest in bringing about regulatory policies that will drive current smokers to use nicotine-replacement-therapy products.

**Dr. Samet**

68.     Dr. Samet has testified for plaintiffs in at least eight tobacco-product trials.  He has testified that, in one case in Minnesota, he earned from his expert-witness engagement approximately $60,000 for his then employer, Johns Hopkins University.  He is currently scheduled to testify in one trial.  He has not withdrawn from that case even though he will testify about matters that are likely to come before the TPSAC.

69.     During the last decade, Dr. Samet has received grant support for research and writing from GSK on at least six occasions, including in 2010.  In addition, he formerly led the Institute for Global Tobacco Control, which is funded by GSK and Pfizer.  Moreover, until 2009, Dr. Samet received regular honoraria from Pfizer for his service on the Pfizer Global Tobacco Advisory Board.

**Dr. Burns**

70.     Since 1985, Dr. Burns has testified for plaintiffs as an expert witness in over forty tobacco-product trials, and, in that capacity, has been deposed at least 125 times.

71.     Dr. Burns charges at least $600 an hour for deposition or trial testimony, and earns, on average, at least $4,800 for each day that he provides expert-witness services to plaintiffs suing tobacco-product manufacturers.  To date, he has earned over $1 million from his expert-witness engagements for plaintiffs in tobacco-product cases.  Indeed, so entrenched are Dr. Burns's ties to the tobacco-plaintiffs' bar that he has refused to turn over – even pursuant to court order – his income-tax returns reflecting his expert-witness income; and, as a result, he was removed as an expert in a lawsuit in West Virginia, as shown by Order Striking Dr. David M. Burns as an Expert Witness, *In Re: Tobacco Litigation (Personal Injury Cases)*, No. 00-C-5000, (W. Va. Cir. Ct. Ohio Cnty. June 11, 2003).

72.     Dr. Burns is currently designated as an expert witness in over 570 pending cases, in at least 130 of which he has not yet testified at a deposition or in trial.  He has not withdrawn from those cases, or from any of the cases in which he will be testifying as an expert witness against tobacco-product manufacturers.  Dr. Burns has testified at trial for plaintiffs suing tobacco-product manufacturers since his appointment to the Constituents Subcommittee.

73.     Moreover, Dr. Burns has consulted with plaintiffs' attorneys on how best to use science against tobacco-product manufacturers in litigation.  He has received multiple payments from plaintiffs' lawyers for lectures on the effective conduct of tobacco litigation.  As part of his general consulting for plaintiffs' attorneys, he also assists them in recruiting additional expert witnesses, and he participates in mock trials.

**Dr. Farone**

74.     Since 1997, Dr. Farone has testified as an expert for plaintiffs in over forty tobacco-product trials and, in that capacity, has been deposed over eighty-five times in cases against tobacco-product manufacturers.

25

75.     Dr. Farone charges at least $250 an hour for deposition or trial testimony.  To date, he has earned at least approximately $250,000 from his expert-witness engagements for plaintiffs in tobacco-product cases.  Dr. Farone is currently designated as an expert witness in at least 241 pending cases, in at least 142 of which he has not yet testified at a deposition or in trial.  He has not withdrawn from those cases, or from any of the cases in which he will be testifying as an expert witness against tobacco-product manufacturers.  Dr. Farone has testified at trial for plaintiffs suing tobacco-product manufacturers since his appointment to the Constituents Subcommittee.  Dr. Farone is a former PM-USA employee, who was terminated by the company and who, since that time, has worked actively as a witness against tobacco-product manufacturers.

## Violations of the Ethics Rules

76.     The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC and, separately, the presence of Drs. Burns and Farone (and Dr. Henningfield) as members of the Constituents Subcommittee create appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and the continuing roles of Drs. Benowitz, Henningfield, and Samet as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC, or as members of the Constituents Subcommittee.  As to those expressed views, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

26

77.     The TPSAC's consideration of menthol in cigarettes and its future consideration of dissolvable products, and the Constituents Subcommittee's consideration of constituents in cigarette smoke, are particular matters as the term "particular matter" is used in the statutes, regulations, guidance documents, and other materials relating to conflicts of interest and the ethical requirements applicable to special government employees.

### The Plaintiffs' Production of Documents, Including Confidential Documents, to the Defendants

78.     The Plaintiffs have produced to the Defendants large quantities of confidential documents in response to requests from the Defendants, including requests that relate specifically to issues pending before the TPSAC.

(a)     On March 31, 2010, Reynolds produced documents to the Defendants in response to a request from the Defendants seeking information on the marketing, research, and development of its Camel dissolvable tobacco products.  Many of the documents included in its submission contain trade secrets or otherwise confidential commercial information.

(b)     On August 25, 2010 and October 6, 2010, Reynolds produced to the Defendants, in response to requests by the Defendants on behalf of the TPSAC, more than two million pages of documents relating to menthol in cigarettes.  More than 1.1 million of those pages contain trade secrets or otherwise confidential commercial information.

(c)     On August 26, 2010, Lorillard produced to the Defendants 3,323 documents (totaling 56,866 pages).  Of those, 365 documents (4,489 pages) contain trade secrets or otherwise confidential commercial information.

79.     The Defendants are making available to the voting members of the TPSAC confidential information (or one or more summaries of such information) in the documents relating to menthol that the Plaintiffs have submitted to the Defendants.

80.     The Defendants have not indicated to the public or to the Plaintiffs whether and how such confidential information will be provided to the voting members of the TPSAC as they review the issues relating to dissolvable tobacco products.

81.     The Defendants have not indicated to the public or to the Plaintiffs whether and how other confidential information submitted by the Plaintiffs to the Defendants will be provided to the voting members of the TPSAC or to the members of the Constituents Subcommittee.

**Adverse Consequences of the Conflicts of Interest Among the Voting Members
of the TPSAC and Among the Members of Its Constituents Subcommittee**

82.     Because the Defendants have failed to require TPSAC members and Subcommittee members to withdraw from service as paid expert witnesses in current and future lawsuits relating to tobacco products, Drs. Benowitz, Henningfield, Samet, Burns, and Farone will continue to testify against the manufacturers of the very products as to the regulation of which they will advise the Defendants.

83.     In advising the Defendants, these individuals will have incentives to provide to them, and to try to persuade other members of the TPSAC or its Constituents Subcommittee to provide to them, scientific reports, information, assessments, judgments, recommendations, and other advice that support the positions they take in their ongoing work as expert witnesses adverse to tobacco-product manufacturers.  Any such report, information, assessment, judgment, recommendation, or other advice that deviates from those positions could be a basis for cross-examination.  Because these individuals are aligned so consistently against tobacco-product manufacturers, they have incentives to try to persuade the TPSAC to reach conclusions consistent with those they have expressed or will express as witnesses, so that they will not be cross-examined on conclusions at odds with their stated views.  Thus, these individuals have a need to protect the positions they have staked out or will stake out in their continuing work as

expert witnesses for plaintiffs suing tobacco-product manufacturers, and are likely to do so by inappropriately influencing the TPSAC or its Constituents Subcommittee to provide reports, information, assessments, judgments, recommendations, and other advice that are not based strictly upon an impartial analysis of the relevant scientific information.  In addition, in their work for the TPSAC or Constituents Subcommittee, the positions they have taken or plan to take as expert witnesses will prevent them from being (and from appearing to be) open-minded, and from considering (and from appearing to consider) impartially the submissions and presentations to the TPSAC or Constituents Subcommittee by tobacco-product manufacturers and others.  The continuing work of Drs. Benowitz, Henningfield, Samet, Burns, and Farone as paid expert witnesses against tobacco-product manufacturer prevents the public from having a basis for confidence that the views they express as members of the TPSAC or the Constituents Subcommittee are not influenced by that work and by the income these individuals continue to derive from it.

84.     Manufacturers of nicotine-replacement-therapy products and other smoking-cessation products, including the pharmaceutical companies, GSK, Pfizer, Novartis, Sanofi-Aventis, and Aradigm, are in direct competition with tobacco-product manufacturers for the purchasing choices of adult smokers.  This competitive dynamic is reflected in the discussion at the March 31, 2010 meeting of the Committee of whether banning menthol from cigarettes would result in smokers trying to quit smoking, rather than switching to a non-menthol brand (Tr. 92 (public comment), 199-200 (committee discussion)).  A ban or restriction on the sale of menthol cigarettes might increase the sales of nicotine-replacement-therapy products and other smoking-cessation products.  Similarly, FDA regulations banning or further restricting the

availability of dissolvable or other smokeless tobacco products might increase the sales of such products.

85.     The opportunities for Drs. Benowitz, Henningfield, and Samet to continue to obtain income from consulting with pharmaceutical companies with respect to nicotine-replacement-therapy products and/or other smoking-cessation products depend on the continuing sales and profitability of such products.  Therefore, these individuals have an interest in protecting and enhancing the sales and profitability of such products, and may consciously or unconsciously influence the other members of the TPSAC inappropriately to recommend bans on, or unduly strict regulation of, the smokeless tobacco products with which they compete.  Even if these individuals did not influence the TPSAC in such a manner, their mere presence on the committee poses (and appears to pose) severe financial conflicts of interest because their remunerative relationships with pharmaceutical companies will prevent them from being (and from being perceived as) open-minded and from considering impartially the submissions and presentations to the TPSAC or Constituents Subcommittee by tobacco-product manufacturers and others.

86.     These five individuals' continued service as expert witnesses and, in addition, the service of Drs. Benowitz, Henningfield, and Samet as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products also create the risk of substantial unfairness and other harms to the Plaintiffs.  As members of the TPSAC or the Constituents Subcommittee, these individuals will have access to confidential documents that FDCA § 904, 21 U.S.C. § 387d, added by the TCA, 123 Stat. at 1790-92, requires tobacco-product manufacturers to submit to the FDA.  By failing to prohibit TPSAC members from serving as expert witnesses against tobacco-product manufacturers, the Defendants fail to protect

against the risk that these individuals, inadvertently or advertently, will use information in such documents in formulating their testimony, in advising the trial lawyers who present them as expert witnesses, and/or in consulting for their pharmaceutical clients.  It is not credible that they can or will put such information completely out of their minds when engaging in such activities. That information is likely to color what they say as expert witnesses and/or consultants, how they say it, and what they deliberately refrain from saying.  Advertently or inadvertently, they may communicate the Plaintiffs' trade secrets and/or other commercial information to lawyers suing the Plaintiffs and/or to pharmaceutical companies that compete with the Plaintiffs, not only by words but also by facial expressions, gestures, and other nonverbal means.  Having on an advisory committee people who will continue to be testifying experts against parties that are subject to regulation that may be influenced by the committee's recommendations, or who will be consultants on matters as to which they will have access to regulated parties' trade secrets or other confidential commercial information, is contrary to the ethics laws and the FACA.

87.     These five individuals' pervasive financial conflicts of interest make clear that the Defendants have not taken appropriate steps to ensure that the Committee's reports, information, assessments, judgments, recommendations, and other advice will not be inappropriately influenced by any special interests.

88.     A further indicator of the Defendants' disregard of financial conflicts of interest is their engagement of Roswell Park Cancer Institute ("Roswell Park") as a contractor to review the menthol-related documents produced to the Defendants by Plaintiffs Lorillard and Reynolds and other tobacco-product manufacturers.  Roswell Park employs Dr. Michael Cummings as the Chair of its Department of Health Behavior.  Like Drs. Benowitz, Henningfield, Samet, Burns, and Farone, Dr. Cummings frequently testifies as an expert witness against tobacco-product

manufacturers in litigation.  The documents Roswell Park has reviewed pursuant to its contract

with the FDA contain trade secret and/or confidential commercial information submitted to the

Defendants by Plaintiffs Lorillard and Reynolds and other tobacco-product manufacturers.  One

of the employees of Roswell Park who reviewed documents produced by tobacco-product

manufacturers is Dr. Richard O'Connor, who works in the Department of Health Behavior.  The

Defendants have not publicly disclosed any restrictions on access to that confidential information

by Dr. Cummings or others at Roswell Park who help him in his work as an expert witness

against tobacco-product manufacturers.  On January 28, 2011, Reynolds sent to Defendant Dr.

Deyton, in his official capacity, a 3-page, single-spaced letter that objected, *inter alia*, to the

Defendants' provision to Roswell Park of confidential information submitted by Reynolds to the

Defendants; the letter included detailed supporting reasons.  A true and correct copy of that letter

is attached hereto as Exhibit Q.  On February 7, 2011, PM-USA sent to Dr. Deyton, in his

official capacity, a 2-page, single-spaced letter that made substantially the same objection.  A

true and correct copy of that letter is attached hereto as Exhibit R.  On February 8, 2011,

Lorillard sent to Dr. Deyton, in his official capacity, a 2-page, single-spaced letter that made

substantially the same objection, and adopted the reasons presented in Exhibits Q and R hereto.

A true and correct copy of that letter is attached hereto as Exhibit S.  As of the date of this

Complaint (February 25, 2011), as far as the Plaintiffs are aware, none of the Defendants has

responded to any of these three letters.

### Adverse Consequences of the Voting Members' Conflicts of Interest on the TPSAC's Consideration of Menthol in Cigarettes

89.     The TPSAC is currently considering a variety of issues with respect to menthol in

cigarettes, and is scheduled to issue to the Defendants a report and recommendations on these

issues by March 23, 2011.  Due to the conflicts of interest affecting Drs. Benowitz, Henningfield,

and Samet, the TPSAC is unable to deliver any report or recommendation that is free of the taint of conflicts of interest.  Any report or recommendation by the TPSAC as currently composed either will actually have been influenced by conflicting interests or will have the appearance of having been so influenced, or both.  There will be no way for the Defendants or the public to have confidence that the Committee's report and recommendations with respect to menthol are the product of an unbiased assessment of the relevant science, uninfluenced by special interests and by the prospect of financial gains.

90.     Drs. Benowitz, Henningfield, and Samet have incentives to lead the Committee to develop a report with information, assessments, judgments, recommendations, and other advice that are adverse to menthol in cigarettes.  Such a report would be of financial benefit to them in their roles as consultants to pharmaceutical companies that manufacture nicotine-replacement-therapy products and other smoking-cessation products.  Such a report would also be of financial benefit to them because it would enhance their value as paid expert witnesses in lawsuits against manufacturers of menthol cigarettes.  A report that was not adverse to menthol in cigarettes would provide a basis for effective cross-examination when they serve as paid expert witnesses in such lawsuits, and so would be contrary to their financial interests.  Drs. Benowitz, Henningfield, and Samet might expect that a ban or restrictions on menthol in cigarettes would induce large numbers of menthol smokers to try to quit smoking altogether and thereby might result in increased demand for smoking-cessation products, including those of their consulting clients.  They might also expect that such a ban or restrictions, or even a TPSAC report that recommends a ban or restrictions, would lead to additional legal claims against manufacturers of menthol cigarettes, and so to increased demand for their services as expert witnesses.  The mere

33

appearance of these possibilities undermines public confidence in any report and recommendations by the TPSAC that are adverse to menthol in cigarettes.

91.     With respect to the TPSAC's report and recommendations as to menthol in cigarettes, the effects of the conflicts of interest described herein are aggravated by the Defendants' total exclusion of the Committee's nonvoting members from the drafting process. FDCA § 917(b)(1)(B), 21 U.S.C. § 387q(b)(1)(B), provides that the nonvoting members are to be nonvoting; but it does not otherwise exclude them from any activity of the Committee. Indeed, that statute provides that the nonvoting members "shall serve as consultants to" the voting members.  The FDA's exclusion of the nonvoting members from the preparation of the report prevents them from serving as consultants to the voting members with respect to the preparation of the report, and therefore is contrary to the statute.  In their letters of January 28, February 7, and February 8, 2011 to Dr. Deyton, Exhibits Q-S hereto, Reynolds, PM-USA, and Lorillard objected to the exclusion of the nonvoting members of the TPSAC from the process of drafting the menthol report, and provided detailed supporting reasons.

92.     The effects of the conflicts of interest described herein are further aggravated by the secretive manner in which the preparation of the TPSAC's report on menthol is proceeding. The Committee's deliberations as to the assessments of available information about menthol in cigarettes, the recommendation(s) it will make, and the content of its report are occurring outside public view, and thus in a manner that is not transparent and that prevents the Plaintiffs and the public from ascertaining the roles being played by Drs. Benowitz, Henningfield, and Samet in those deliberations.  On December 3, 2010, Reynolds sent to Defendant Dr. Deyton, in his official capacity, a 5-page, single-spaced letter that requested that the FDA (1) instruct the TPSAC members (a) that they shall conduct in writing (hard copy or electronic writing), and not

orally, all discussions relating to the report on menthol in cigarettes between any two or more members of the Committee; (b) that they shall promptly provide to the Agency a copy of each such writing, and shall not destroy or change any such writing after its initial use; and (c) that they shall promptly provide to the Agency copies of all drafts of the report and all notes, communications, and other working materials that are involved in or relate to the preparation of the report; and (2) make all such materials available to the public sufficiently in advance of the meeting at which the TPSAC will review the report so that interested members of the public will have a fair opportunity to review those materials before the meeting.  The letter included detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit T.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded to that letter.

93.     The Defendants' stated reason for excluding the nonvoting members is that preparation of the report involves access to certain confidential documents that tobacco-product manufacturers have submitted to the Defendants.  In the public meetings of the Committee, no one has referred to a single piece of confidential information that makes any material difference to any issue that will be addressed in the report.  Moreover, the Defendants have not inquired of the submitters of the confidential documents relating to menthol in cigarettes whether, or to what extent, they would waive confidentiality in order to permit the nonvoting members to have access to them.  In contrast, the Defendants make such inquiries in connection with requests under the Freedom of Information Act that seek records that submitters have designated as containing trade secret and/or confidential commercial information.  In addition, concern about the confidentiality of documents does not justify excluding the nonvoting members from

participating in stages of the drafting process that do not involve access to confidential information, *e.g.*, reviewing drafts of chapters that do not disclose any confidential information.

### The TPSAC's Lack of Fair Balance
### as to Issues Relating to Smokeless Tobacco

94.     Within the public-health and tobacco-control communities, a product is considered harm-reducing "if it lowers total tobacco-related mortality and morbidity even though use of that product may involve continued exposure to tobacco-related toxicants," as stated in Kathleen Stratton, Padma Shetty, Robert Wallace & Stuart Bondurant (eds.), *Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction* 2 (Institute of Medicine 2001) (italics omitted).

95.     For several years, there has been a clear and very substantial controversy within the public-health and tobacco-control communities over a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States.  The controversy has focused particularly on low-nitrosamine snus, a form of moist snuff that was originally developed and consumed in Sweden, and is now sold in the United States as well.  Such domestic moist snuff and dissolvable tobacco products constitute two additional categories of smokeless tobacco products, among others, that have been discussed in the public-health and tobacco-control communities as possibly being appropriate for a current role in harm reduction.

96.     In this ongoing controversy, there are two clearly divided sides: (a) those who believe that current scientific and other knowledge adequately supports a current role for snus, dissolvable, and/or other smokeless tobacco products in reducing the harm from tobacco in the United States, and (b) those who believe that current scientific and other knowledge does not adequately support such a current role for these products, because either (i) current knowledge adequately supports a conclusion that they should never have such a role, or (ii) many years of

36

further research would be needed before scientific and other knowledge might be adequate to support such a role for all or some smokeless tobacco products.

97.     The controversy within the public-health and tobacco-control communities over a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States also includes a clear and very substantial dispute over the issue of the nature and impact of the use of dissolvable tobacco products on the public health.

98.     The controversy within the public-health and tobacco-control communities over a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States also includes a clear and very substantial dispute as to whether any smokeless tobacco product is a "modified risk tobacco product," within the meaning of FDCA § 911(b), 21 U.S.C. § 387k(b).

99.     With respect to tobacco harm reduction, manufacturers of smoking-cessation products, especially – but not only – those containing nicotine, are in regulatory competition with manufacturers of smokeless tobacco products over how the FDA should regulate smokeless tobacco products.  In two submissions to the FDA – Letter from Caroline Tillett, Ph.D., GlaxoSmithKline Consumer Healthcare, to Dr. Margaret Hamburg (undated, but posted on regulations.gov on Oct. 5, 2010) (Dkt. No. FDA-2010-N-0123) ("GSK Sept. Letter"), *available at* http://www.regulations.gov/search/Regs/home.html#searchResults?Ne=11+8+8053+8098+8074 +8066+8084+1&Ntt=FDA-2010-N-0123&Ntk=All&Ntx=mode+matchall&N=0; Letter from Caroline Tillett, Ph.D., GlaxoSmithKline Consumer Healthcare, to Dr. Margaret Hamburg (Oct. 19, 2010) (Dkt. No. FDA-2010-N-0449) ("GSK Oct. 19, 2010 Letter"), *available at*

http://www.regulations.gov/search/Regs/home.html#searchResults?Ne=11+8+8053+8098+8074
+8066+8084+1&Ntt=FDA-2010-N-0123&Ntk=All&Ntx=mode+matchall&N=0 (true and
correct copies of which are attached hereto as Exhibits U and V) – GlaxoSmithKline Consumer
Healthcare ("GSK Healthcare"), manufacturer of the nicotine-replacement-therapy products
Nicorette and Nicoderm, advocates that the FDA (a) ban dissolvable tobacco products, which
might compete in the marketplace with GSK Healthcare's nicotine products as harm-reduction
products, and (b) expand the scope for permissible marketing and recommended use of GSK
Healthcare's nicotine products.

100.   These GSK Healthcare letters are salvos in the competition between GSK and
other manufacturers of non-tobacco nicotine products and other smoking-cessation products, on
one side, and manufacturers of smokeless tobacco products, on the other.  The competition is not
being conducted fairly, however, because three members of the TPSAC have financial ties to
GSK and/or other manufacturers of nicotine-replacement-therapy products and other smoking-
cessation products, and no members have any similar ties to manufacturers of smokeless tobacco
products.

101.   Four of the eight current voting members of the TPSAC are on one side of the
two-sided controversy over whether smokeless tobacco products are currently known to be
suitable for a current role in tobacco harm reduction in the United States.   Drs. Benowitz,
Hatsukami, Henningfield, and Samet have all publicly espoused, or are otherwise publicly
associated with, the view that none of these products is currently known to be suitable for such a
role.

(a)   For example, Dr. Benowitz is a co-author, and Dr. Hatsukami and Dr.
Samet are publicly identified peer reviewers, of a "policy statement" issued by the American

Heart Association, which takes a public position on an ultimate issue relating to smokeless tobacco products that the TPSAC will consider when it addresses dissolvable tobacco products, as required by FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), quoted in paragraph 27, *supra*. The policy statement asserts:  "[T]here is inadequate evidence to support the use of ST [smokeless tobacco] products as a smoking cessation strategy.  Based on the findings reviewed in this statement, clinicians should continue to discourage use of all tobacco products and emphasize prevention of smoking initiation and smoking cessation as primary goals for tobacco control," Mariann R. Piano, Neal L. Benowitz, Garret A. FitzGerald, Susan Corbridge, Janie Heath, Ellen Hahn, Terry F. Pechacek, & George Howard, on behalf of the American Heart Association Council on Cardiovascular Nursing, *Impact of Smokeless Tobacco Products on Cardiovascular Disease: Implications for Policy, Prevention, and Treatment[:] A Policy Statement From the American Heart Association*, Circulation 2010; 122:15 1520-1544 (pub. online Sept. 13, 2010), *available at* http://circ.ahajournals.org/cgi/reprint/122/15/1520.

       (b)      Other statements by Drs. Benowitz, Hatsukami, Henningfield, and Samet that show them to be on the same side of the controversy over a current role for smokeless tobacco products in reducing the harm from tobacco are quoted or discussed at pp. 18-21 of Exhibit M hereto.

       102.     These four voting members are also the principal biological scientists on the Committee.  FDA's Roster of the TPSAC, *available at* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/ucm180906.htm, ascribes particular types of expertise to each TPSAC member.  It ascribes expertise with respect to tobacco, nicotine, or addiction to each of these four

voting members, but not to any of the other four voting members.  The only voting member to whom it ascribes expertise as to smokeless tobacco is Dr. Hatsukami.

103.    In addition, Dr. Mark Clanton, a member of the TPSAC, is the Chief Medical Officer of the American Cancer Society ("ACS"), High Plains Division.  In 2003, he was National President Elect of the ACS Board of Directors; and he has held many other responsible positions with the national ACS.  The discussion of smokeless tobacco in general and snus in particular on the ACS website, *see* American Cancer Society, *Are spit tobacco and snuff safe alternatives to cigarette smoking?  What is snus?  Is it safe?* (Nov. 8, 2010), *available at* http://www.cancer.org/Cancer/CancerCauses/TobaccoCancer/QuestionsaboutSmokingTobaccoa ndHealth/questions-about-smoking-tobacco-and-health-smokeless-alt, acknowledges that smokeless tobacco products are "less lethal" than cigarettes, but the ACS discussion provides no encouragement whatever to substitute any form of smokeless tobacco for cigarettes.  On information and belief, Dr. Clanton adheres to the ACS's negative view as to any role for smokeless tobacco products in tobacco harm reduction.

104.    Three voting members of the TPSAC – Drs. Benowitz, Hatsukami, and Henningfield – by reason of their many joint publications and other joint activities – constitute a clique.  From time to time, other voting members of the TPSAC have engaged in joint professional activities with one or more of these three voting members, thereby expanding the clique.

(a)    Drs. Benowitz, Hatsukami, and Henningfield have collaborated on numerous publications over long periods of time.  As set forth in Exhibit M hereto:

(1)    Drs. Benowitz and Hatsukami are co-authors of at least eight publications spanning thirteen years.

(2)     Drs. Benowitz and Henningfield are co-authors of at least twenty-one publications spanning twenty-two years.

(3)     Drs. Hatsukami and Henningfield are co-authors of at least five publications spanning thirteen years.

(4)     Drs. Benowitz, Hatsukami, and Henningfield are co-authors of at least one publication in 2009, and another in 2010.

(5)     In sum, two or more of these three voting members of the TPSAC have collaborated on at least thirty-six publications.

(b)     These authors have also collaborated with Dr. Samet and Dr. Burns.  Dr. Benowitz has co-authored with Dr. Samet at least four publications spanning five years.  Dr. Henningfield has worked with Dr. Samet on one publication, in 2004.  Drs. Hatsukami and Samet were publicly identified peer reviewers of a publication Dr. Benowitz co-authored for the American Heart Association in 2010.  In addition, Drs. Benowitz, Henningfield, Samet, and Burns have collaborated on numerous tobacco-related Surgeon General's Reports and numerous tobacco-related monographs issued by the National Cancer Institute ("NCI"), as described in paragraphs 122-23, *infra*.

(c)     Dr.  Henningfield collaborated on a publication with TPSAC voting member Melanie Wakefield in 2010.

(d)     Over long periods of time, Drs. Benowitz, Hatsukami, Henningfield, and Samet have also shared many other professional activities.  As truthfully set forth in Exhibit M hereto:

41

(1)     From 1982 to 1996, Dr. Henningfield held various positions at the Addiction Research Center of the National Institute on Drug Abuse ("NIDA").  During 1993-1996, Dr. Hatsukami was on the Center's Scientific Board of Counselors.

(2)     In 1991, Drs. Benowitz and Henningfield collaborated on a video tape: "Nicotine Addiction: Toward a New Understanding."

(3)     In 1994, Dr. Hatsukami was a participant in the President's Cancer Panel, NCI Ad Hoc Panel on FTC Cigarette Test Methods; that same year, Dr. Benowitz was an invited speaker for the Ad Hoc Panel.  In February 1997 in Jackson, MS, Drs. Hatsukami and Henningfield gave lectures to the President's Panel: "Promoting Healthy Lifestyles to Reduce the Risk of Cancer."

(4)     Drs. Benowitz, Hatsukami, and Henningfield were consultants or advisors to the FDA on nicotine during the mid-1990s.

(5)     In 1996, Dr. Benowitz was a member of Canada's Expert Committee on Cigarette Modifications, and Dr. Henningfield was a presenter and discussant at a meeting of the Committee.

(6)     Drs. Benowitz, Hatsukami, and Henningfield have all been active in the Society for Research on Nicotine and Tobacco ("SRNT").  Dr. Benowitz was President of the Society in 1996-1997, Dr. Henningfield was President in 1998-1999, and Dr. Hatsukami was President in 1999-2000.  In addition, Dr. Benowitz was Chair of the Society's Awards Committee from 2004 to 2009, and gave its Master Lecture in 1995; in 2000-2001, he was Chair of the Safety Section of the SRNT-World Health Organization ("WHO") Treatobacco.net Project (web-based smoking-cessation database); in 1995, he was an organizer of, and a speaker at, SRNT's Workshop on Nicotine Safety and Toxicity; and he was a speaker at its annual meetings

42

in 1999, 2001, 2002, and 2008.  Dr. Hatsukami served on SRNT's Awards Committee in 1999-2002 and 2006, was a Global Network Committee Member during 2000-2002, served as Past President and on the Executive Board in 2000-2001, and was an Executive Committee Member and Member Delegate in 1994-1997; she also has given numerous presentations at its annual meetings since 2000.   Dr. Henningfield has been SRNT's Membership Chair since 1994; he received awards from SRNT in 2001 and 2005; he was Deputy Chair of SRNT's Editorial Board, and was Deputy Editor of the SRNT-WHO Treatobacco.net Project; and he gave lectures at SRNT meetings in 1995, 1998, 1999, 2001, and 2003-2008.

(7)     Drs. Benowitz, Hatsukami, and Henningfield have also been active in the American Legacy Foundation.  They all participated in the "Strategic Dialogue on Tobacco Harm Reduction," of which Dr. Hatsukami was Co-Chair.  The Dialogue was funded by the American Legacy Foundation, the Robert Wood Johnson Foundation, and the University of Minnesota Tobacco Use Research Center (with which Dr. Hatsukami is affiliated).  The participants met four times from December 2005 to August 2007, and they produced a consensus report, which Drs. Benowitz, Hatsukami, and Henningfield all joined.  Dr. Hatsukami was a grant reviewer for the Foundation's Evaluation Coordinating Center in 1999; she served on the Foundation's Emerging Science Advisory Group in 2000-2002; from 2004 to at least February 4, 2010 (the date of her curriculum vitae on the FDA website), she was Co-Chair of the Tobacco Harm Reduction Network, sponsored by the Foundation and the NCI; and in 2007 and 2009, she was Co-Chair of Science and Future Directions for Nicotine Regulation, funded by the Foundation, NCI, and NIDA.  Dr Henningfield has been a member of the Foundation's Policy Advisory Panel since 2000.

(8)     In the mid-2000s, Drs. Hatsukami and Henningfield served overlapping terms on the Interagency Committee on Smoking and Health.

(9)     Drs. Benowitz and Henningfield have both served on the editorial board of the Journal of Smoking-related Disorders.

(10)     Drs. Hatsukami and Henningfield have been active in the College on Problems of Drug Dependence.  Dr. Hatsukami was President in 2001-2002, Past President and Executive Committee Member in 2002-2003, and Treasurer and Executive Committee Member in 2004-2007.  Dr. Henningfield was a Charter Fellow of the College.  At a College meeting in 2009, Drs. Hatsukami and Henningfield co-chaired a program on regulating nicotine in tobacco products: state of the science and future policy.  During Dr. Hatsukami's tenure on the Executive Committee, Dr. Henningfield was a frequent panelist, lecturer, and/or member of a program committee for College meetings.

(11)     Dr. Benowitz was an External Advisor to NCI's and NIDA's Transdisciplinary Tobacco Use Research Center Program during 2005-2009.  Dr. Hatsukami presented on the Centers in 2004, and co-authored an article about them in 2009.

(12)     Dr. Henningfield lists on his curriculum vitae on the FDA website under the heading, "Extramural sponsorship Current/Recent Research Collaborations," a collaboration with Dr. Hatsukami: "University of Minnesota, Dorothy Hatsukami, P.I.: Transdisciplinary Tobacco Use Research Center, Nicotine dependence and risk across generations.  Funded by National Cancer Institute, National Institute on Drug Abuse, Robert Wood Johnson Foundation.  Scientific Advisory Board Member, 2000 to 2004."

(13)     From 2004 to at least June 17, 2009 (the date of his curriculum vitae on the FDA website), Dr. Henningfield was an expert for the WHO Study Group on

Tobacco Product Regulation.  Dr. Hatsukami was a consultant to the Study Group in 2006 and 2007.

(14)     In his curriculum vitae under the heading, "Selected Invited and Keynote Lectures," Dr. Henningfield lists additional collaborations with Dr. Hatsukami in 2001, 2007, and two in 2009.

(15)     In their roles as paid expert witnesses for plaintiffs suing tobacco-product manufacturers, Drs. Benowitz and Henningfield, and also Dr. Samet, frequently have worked for the same plaintiffs and their lawyers.  Two or more of them have testified for the same plaintiffs and lawyers in at least sixteen cases, from 1986 to the present.   Two or more of them have been disclosed as expert witnesses by the same lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least an additional 177 cases.  Thus, the total number of cases in which two or more of them have worked for the same plaintiffs and their lawyers is at least 193.

(A)     Drs. Benowitz and Henningfield have testified on the same side in at least eight cases.  Drs. Benowitz and Samet have testified on the same side in at least four cases.  Drs. Henningfield and Samet have testified on the same side in at least one case.  Drs. Benowitz, Henningfield, and Samet have testified on the same side in at least three cases.

(B)     Drs. Benowitz and Henningfield have been formally disclosed as expert witnesses by the same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least 174 additional cases.  Drs. Benowitz and Samet have been formally disclosed as expert witnesses by the same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least one additional case.  Drs. Benowitz, Henningfield, and Samet have been formally disclosed as expert witnesses by the

45

same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least two additional cases.

(16)     In addition, Drs. Henningfield and Samet were colleagues at Johns Hopkins University from 1994 to 2008; and, from 2003 to 2008, both were affiliated with the University's Institute for Global Tobacco Control (of which Dr. Samet was the Director).

105.     As alleged in paragraphs 62, 66-67, and 69, *supra*, three voting members of the TPSAC – Drs. Benowitz,  Henningfield, and Samet – have or recently had and may have again financial relationships with manufacturers of nicotine-replacement-therapy products or other smoking-cessation products, and Dr. Henningfield has an interest in two patents on a nicotine gum.  In addition, Dr. Hatsukami has received at least one research grant from Nabi Pharmaceuticals, and has consulted (without honoraria) for Pfizer and Abbott Laboratories. This set of circumstances also causes the TPSAC to lack fair balance on issues affecting the competition between pharmaceutical manufacturers of nicotine-replacement-therapy and other smoking-cessation products and manufacturers of smokeless tobacco products because, in accordance with FDCA § 917(b)(1)(C), 21 U.S.C. § 387q(b)(1)(C), the Committee has no voting members who have a financial relationship with a tobacco-product manufacturer, but the committee does include four voting members who have financial relationships with the pharmaceutical manufacturers,

106.     Not a single voting member of the TPSAC represents the views of the other side of the controversy over a current role for smokeless tobacco products in tobacco harm reduction. Therefore, as to the specific question on which, under FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), the TPSAC is to provide a report and recommendation – "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use

among children" – the TPSAC contains four voting members on one side of an existing and

substantial controversy within the public-health and tobacco-control communities, and not one

voting member on the other side of that controversy.

107.    The TPSAC also lacks fair balance as to issues relating to menthol in cigarettes

because no voting member of the Committee balances the anti-menthol views of Drs. Benowitz

and Henningfield, discussed in Exhibits N and O hereto.

108.    The nonvoting members of the TPSAC cannot provide fair balance with respect to

issues relating to menthol in cigarettes or dissolvable tobacco products and/or other smokeless

tobacco products, or any other issue.  First, the nonvoting members have no vote on any report,

information, assessment, judgment, recommendation, or other advice to be provided by the

TPSAC to the Defendants.  Second, the Defendants exclude the nonvoting members from

important activities of the Committee, such as the preparation of the Committee's report on

menthol in cigarettes, and probably will exclude them from important activities relating to

dissolvable tobacco products and other subjects.  Third, the Defendants view the nonvoting

members as being merely industry representatives and as lacking the kinds of expertise the

Defendants attribute to the voting members; and, consequently, the Defendants will give much

less weight to the views of the nonvoting members than to those of the voting members.  On

FDA's webpage containing the roster of the TPSAC,

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm180906.htm, the Defendants identify the "expertise" of the voting

members as substantive (*e.g.*, Dr. Benowitz: nicotine, substance abuse, clinical pharmacology,

toxicology; Dr. Hatsukami: clinical psychology, smokeless tobacco, tobacco cessation and harm

reduction; Dr. Henningfield: addiction medicine, pharmacology, health policy; and Dr. Samet:

internal medicine, pulmonary, epidemiology, tobacco control, public health), but they identify the "expertise" of each nonvoting member as: "industry representative."

### The TPSAC Is Inappropriately Influenced by Special Interests

109.    The plaintiffs and their lawyers who sue tobacco-product manufacturers for personal injuries are a special interest group with respect to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC to the Defendants.  The interests of that special interest group are adverse to the interests of the Plaintiffs and other tobacco-product manufacturers.

110.    Manufacturers of nicotine-replacement-therapy products and other smoking-cessation products are a special interest group with respect to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC to the Defendants.  The interests of that special interest group are adverse to the interests of the Plaintiffs and other tobacco-product manufacturers.

111.    The Defendants have failed to apply appropriate provisions against inappropriate influence of special interests resulting from the financial conflicts of interest and appearance conflicts of interest of Drs. Benowitz, Henningfield, and Samet and the lack of fair balance on the TPSAC.  Due to these conflicts of interest and lack of fair balance, it is likely that the TPSAC will unfairly disregard or give inadequate weight to scientific information that is adverse to the interests of these groups, will disregard or give inadequate weight to the legitimate interests of the Plaintiffs and submissions by the Plaintiffs and other tobacco-product manufacturers, and will provide to the Defendants reports, information, assessments, judgments, recommendations, and other advice that are biased against and adverse to the Plaintiffs' tobacco products and to the Plaintiffs.

### Injuries to the Plaintiffs from the Conflicts of Interest on the TPSAC and the Constituents Subcommittee and the Lack of Fair Balance on the TPSAC

### Injuries Resulting from Actions by the FDA Influenced by the TPSAC

112.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because the reports, information, assessments, judgments, recommendations, and other advice it provides to the Defendants (a) will have resulted from a committee three of whose voting members have financial and appearance conflicts of interests that reflect antecedent and continuing hostility to the Plaintiffs' tobacco products and to the Plaintiffs, and that disqualify those voting members (1) from serving on the TPSAC or, in the alternative, (2) from taking part in the activities of the TPSAC relating to menthol in cigarettes or dissolvable or other smokeless tobacco products, and in the activities of the TPSAC relating to other matters that affect those special interests, (b) through these three members will have been unduly influenced by the special interests identified herein, and (c) will have resulted from a committee that lacks fair balance.

113.    More often than not, the FDA follows the advice and recommendations of its advisory committees.

114.    The Plaintiffs have a direct interest in the reports, information, assessments, judgments, recommendations, and other advice the TPSAC provides to the Defendants with respect to menthol in cigarettes, dissolvable tobacco products, smokeless tobacco products generally, modified risk tobacco products, standards for tobacco products, good manufacturing practices for tobacco products, applications to the FDA relating to new tobacco products, and other matters relating to the regulation of tobacco products because the Plaintiffs and the tobacco products they manufacture and sell will be directly and materially affected by the Defendants'

decisions with respect to the regulation of those products; and those decisions will be directly and materially influenced by the reports, information, assessments, judgments, recommendations, and other advice that the TPSAC provides to the Defendants.

115.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the exclusion of the nonvoting members of the TPSAC from the preparation of the Committee's report on menthol in cigarettes because that exclusion aggravates the influence on the content of report that is being exercised by voting members who have conflicts of interest and who, even before serving on the Committee, expressed strongly negative views about menthol in cigarettes.  The preparation of the report would benefit from the vast relevant experience of the nonvoting members.  Even though they would have no vote and the voting members need not accept any of their comments or editorial suggestions, the quality of the Committee's report would be improved by the voting members' consideration of such comments and editorial suggestions.

116.    Reynolds is and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because the reports, information, assessments, judgments, recommendations, and other advice it provides to the Defendants will fail to reflect the views of those in the public-health and tobacco-control communities who believe that current scientific and other knowledge adequately supports a current role for snus, dissolvable, and/or other smokeless tobacco products in reducing the harm from tobacco in the United States – and, instead, will reflect the views of only one side in this two-sided controversy.

117.    The burden of any new prohibitions or restrictions on menthol in cigarettes – adopted by the Defendants after receiving and giving weight to the reports, information,

assessments, judgments, recommendations, and other advice provided by the TPSAC – will fall directly on the Plaintiffs and other manufacturers of cigarettes containing menthol.

118.    The burden of any new prohibitions or restrictions on the sale of dissolvable (and/or other) smokeless tobacco products – adopted by the Defendants after receiving and giving weight to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC – will fall directly on Plaintiff Reynolds and other manufacturers of such products.

**Injury Resulting from the Conflicted TPSAC Members' and Constituents Subcommittee Members' Access to the Plaintiffs' Confidential Information**

119.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because, as voting members of the TPSAC, Drs. Benowitz, Henningfield, and Samet will have access to confidential information that the Plaintiffs submit (or have submitted) to the Defendants, and will be able to make unsupervised use of that information in their work as consultants to pharmaceutical manufacturers, some of whose products compete with the Plaintiffs' products, and in their work as expert witnesses against the Plaintiffs in litigation.

120.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the membership of Dr. Burns and Dr. Farone on the Constituents Subcommittee because, as members of the Subcommittee, they will have access to confidential information that the Plaintiffs submit (or have submitted) to the Defendants and will be able to make unsupervised use of that information in their work as expert witnesses against the Plaintiffs in litigation.

**Injury Resulting from Use of TPSAC Reports in Litigation**

121.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because reports issued by the TPSAC will be used by Drs. Benowitz, Henningfield, Samet, Burns, and Farone to support their testimony in lawsuits against the Plaintiffs and other tobacco-product manufacturers.

122.    Other reports issued by federal committees in which Drs. Benowitz, Henningfield, Samet, and Burns have frequently participated, such as reports of the Surgeon General and monographs issued by committees appointed by the NCI, are commonly used by plaintiffs as exhibits in trials against tobacco-product manufacturers, and are commonly referred to by plaintiffs' expert witnesses, including Dr. Benowitz and Dr. Henningfield, in such trials.   Thus, the individuals in this clique repeatedly receive appointments to committees to write these reports, which appointments enhance their value as expert witnesses against tobacco-product manufacturers, and then these individuals use the reports in their testimony.

(a)    Drs. Benowitz, Henningfield, Samet, and Burns were among the editors, authors, reviewers, or other contributors to the tobacco-related Surgeon General's Reports in the following years:

(1)    1981:  Dr. Burns, as shown in U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking The Changing Cigarette[:] A Report of the Surgeon General (1981), *available at* http://profiles.nlm.nih.gov/NN/B/B/S/N/_/nnbbsn.pdf.

(2)    1982:  Dr. Burns, as shown in U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: Cancer:  A Report of the Surgeon General (1982), *available at* http://profiles.nlm.nih.gov/NN/B/C/D/W/.

52

(3)     1983:  Dr. Burns, as shown in U.S. Dep't of Health & Human
Servs., The Health Consequences of Smoking: Cardiovascular Disease:  A Report of the Surgeon
General (1983), *available at* http://profiles.nlm.nih.gov/NN/B/B/T/D/.

(4)     1984:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &
Human Servs., The Health Consequences of Smoking: Chronic Obstructive Lung Disease: A
Report of the Surgeon General (1984), *available at* http://profiles.nlm.nih.gov/NN/B/C/C/S/.

(5)     1985:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &
Human Servs., The Health Consequences of Smoking: Cancer and Chronic Lung Disease in the
Workplace:  A Report of the Surgeon General (1985), *available at*
http://profiles.nlm.nih.gov/NN/B/C/B/N/.

(6)     1986:  Drs. Benowitz, Samet, and Burns, as shown in U.S. Dep't of
Health & Human Servs., The Health Consequences of Involuntary Smoking[:]  a Report of the
Surgeon General (1986), *available at* http://profiles.nlm.nih.gov/NN/B/C/P/M/.

(7)     1986:  Drs.  Benowitz, Henningfield, and Burns, as shown in U.S.
Dep't of Health & Human Servs., The Health Consequences of Using Smokeless Tobacco[:]  A
Report of the Advisory Committee to the Surgeon General (1986), *available at*
http://profiles.nlm.nih.gov/NN/B/B/F/C/.

(8)     1988:  Drs. Benowitz, Henningfield, and Burns, as shown in U.S.
Dep't of Health & Human Servs.,  The Health Consequences of Smoking[:]  Nicotine
Addiction[:]  A Report of the Surgeon General (1988), *available at*
http://profiles.nlm.nih.gov/NN/B/B/Z/D/.

(9)     1989:  Drs. Henningfield and Burns, as shown in U.S. Dep't of
Health & Human Servs., Reducing the Health Consequences of Smoking[:]  25 Years Of

Progress[:] a report of the Surgeon General (1989), *available at*
http://profiles.nlm.nih.gov/NN/B/B/X/S/.

(10)     1990:  Drs. Henningfield, Samet, and Burns, as shown in U.S.
Dep't of Health & Human Servs., The Health Benefits of Smoking Cessation[:]  a report of the
Surgeon General (1990), available at http://profiles.nlm.nih.gov/NN/B/B/C/T/.

(11)     1992:  Dr. Burns, as shown in U.S. Dep't of Health & Human
Servs., Smoking and Health in the Americas[:]  A 1992 Report of the Surgeon General, in
collaboration with the Pan American Health Organization (1992), *available at*
http://profiles.nlm.nih.gov/NN/B/B/B/J/.

(12)     1998:  Drs. Benowitz, Henningfield, Samet, and Burns, as shown
in U.S. Dep't of Health & Human Servs., Tobacco Use Among U.S. Racial/Ethnic Minority
Groups[:] African Americans American Indians and Alaska Natives Asian Americans and
Pacific Islanders Hispanics[:]  A Report of the Surgeon General (1998), *available at*
http://www.cdc.gov/tobacco/data_statistics/sgr/1998/complete_report/index.htm.

(13)     2000:  Henningfield, Samet, and Burns, as shown in U.S. Dep't of
Health & Human Servs., Reducing Tobacco Use[:]  A Report of the Surgeon General (2000),
*available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2000/index.htm.

(14)     2001:  Drs. Benowitz, Henningfield, Samet, and Burns, as shown
in U.S. Dep't of Health & Human Servs., Women and Smoking[:]  A Report of the Surgeon
General (2001), *available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2001/index.htm.

(15)     2004:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &
Human Servs., The Health Consequences of Smoking[:]  A Report of the Surgeon General
(2004), *available at* http://www.surgeongeneral.gov/library/smokingconsequences/index.html.

54

(16)     2006:  Drs. Benowitz, Samet, and Burns, as shown in U.S. Dep't of

Health & Human Servs., The Health Consequences of Involuntary Exposure to Tobacco Smoke:

A Report of the Surgeon General (2006), *available at*

http://www.surgeongeneral.gov/library/secondhandsmoke/index.html.

(17)     For the most recent Surgeon General's report, in 2010, the

contributing editors included Drs. Benowitz, Hatsukami, Henningfield, and Samet; the authors of

chapters included all of them and also Dr. Burns; and the reviewers, whom one would have

expected to be independent of the editors and authors, included Drs. Benowitz, Hatsukami,

Henningfield, and Burns – as shown in U.S. Dep't of Health & Human Servs., How Tobacco

Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease[:]

A Report of the Surgeon General vi-x (2010), *available at*

http://www.surgeongeneral.gov/library/tobaccosmoke/report/full_report.pdf.

(b)     Drs. Benowitz, Henningfield, Samet, and Burns were among the editors,

authors, reviewers, or other contributors to the following tobacco-related monographs issued by

the NCI (and once by the Environmental Protection Agency):

(1)     Monograph 1 (1991):  Drs. Samet and Burns, as shown in NCI,

Strategies to Control Tobacco Use in the United States: A Blueprint for Public Health Action in

the 1990's (Dec. 1991), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/1/index.html.

(2)     Monograph 2 (1992):  Drs. Benowitz, Henningfield, and Burns, as

shown in NCI, Smokeless Tobacco or Health: An International Perspective (Sept. 1992), *available

at* http://cancercontrol.cancer.gov/tcrb/monographs/2/index.html.

(3)     Monograph 4 (1992):  Drs. Benowitz, Samet and Burns, as shown in EPA, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders (Dec. 1992), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/.

(4)     Monograph 5 (1994): Dr. Burns, as shown in NCI, Tobacco and the Clinician: Interventions for Medical and Dental Practice (Jan. 1994), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/5/index.html.

(5)     Monograph 6 (1995): Dr. Burns, as shown in NCI, Community-Based Interventions for Smokers: The COMMIT Field Experience (Aug. 1995), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/6/index.html.

(6)     Monograph 7 (1995):  Drs. Benowitz, Henningfield, and Samet, as shown in NCI, The FTC Cigarette test Method for Determining Tar, Nicotine, and Carbon Monoxide Yields of U.S. Cigarettes (no date), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/7/index.html.

(7)     Monograph 8 (1997):  Drs. Samet and Burns, as shown in NCI, Changes in Cigarette-Related Disease Risks and Their Implications for Prevention and Control (Feb. 1997), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/.

(8)     Monograph 9 (1998):  Drs. Benowitz, Henningfield, and Burns, as shown in NCI, Cigars: Health Effects and Trends (Feb. 1998), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/9/index.html.

(9)     Monograph 10 (1999):  Dr. Benowitz, as shown in NCI, health Effects of Exposure to Environmental Tobacco Smoke (Aug. 1999), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/10/index.html.

(10)     Monograph 11 (2000):  Dr. Burns, as shown in NCI, State and

Local Legislative Action to Reduce Tobacco Use (June 2000), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/11/index.html.

(11) Monograph 12 (2000): Drs. Benowitz and Burns, as shown in
NCI, Population Based Smoking Cessation (Nov. 2000), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/12/index.html.

(12) Monograph 13 (2001): Drs. Benowitz, Henningfield, Samet, and
Burns, as shown in NCI, Risks Associated with Smoking Cigarettes with Low Machine-
Measured Yields of Tar and Nicotine (Oct. 2001), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/13/index.html.

(13) Monograph 14 (2001): Dr. Burns, as shown in NCI, Changing
Adolescent Smoking Prevalence (Nov. 2001), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/14/index.html.

(14) Monograph 15 (2003): Drs. Henningfield and Burns, as shown in
NCI, Those Who Continue to Smoke (Sept. 2003), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/15/index.html.

(16) Monograph 17 (2006), Drs. Samet and Burns, as shown in NCI,
Evaluating ASSIST: A Blueprint for Understanding State-level Tobacco Control (Oct. 2006),
*available at* http://cancercontrol.cancer.gov/tcrb/monographs/17/index.html.

(17) Monograph 18 (2007): Dr. Henningfield, as shown in NCI,
Greater Than the Sum: Systems Thinking in Tobacco Control (May 2007), *available at*
http://cancercontrol.cancer.gov/tcrb/monographs/18/index.html.

(18) Monograph 20 (2009): Dr. Benowitz, as shown in NCI,
Phenotypes and Endophenotypes: Foundations for Genetic Studies of Nicotine Use and

Dependence (Sept. 2009), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/20/index.html.

123.     By appointing these frequently testifying expert witnesses to the TPSAC and its

Constituents Subcommittee, the Defendants are perpetuating the practice of these witnesses in

influencing federal committees to issue reports that bolster the testimony they give on behalf of

parties suing tobacco-product manufacturers, including Lorillard Tobacco Company and

Reynolds.

### Additional Injury to Lorillard from the Composition of the TPSAC

124.     Lorillard already has been harmed by the fact that the TPSAC is composed of

individuals with pre-existing, well-defined anti-tobacco stances.  For example, on November 18,

2010, the TPSAC held a formal meeting.  At that meeting, Dr. Connolly – whom observers had

generally considered one of the most outspoken anti-tobacco advocates on the TPSAC –

presented his personal view that menthol is a so-called "starter" product for young individuals.

Over the next five days, through November 23, 2010, Lorillard's share price plunged $3.10 from

$86.89 to $83.79.  Further, on December 8, 2010, the FDA held a discussion with tobacco

manufacturers and growers, at which industry stakeholders voiced their concerns that the TPSAC

is composed of anti-tobacco activists.  Even though the FDA explained that it would make its

final decision based upon its own view of the relevant science, Lorillard's stock fell $1.73 the

very next day.  During the November 2010 - January 2011 time period, reports filed by financial

analysts who cover the tobacco industry consistently noted the TPSAC members' anti-tobacco

bias.  The growing recognition in this time period that the TPSAC included members with an

anti-tobacco bias caused a continuing decline in Lorillard's share price, which dropped to $74.20

on Jan. 21, 2011, $15.02 below its price of $89.22 on Nov. 8, 2010, less than two and a half

months earlier.   This drop in the stock price represented a loss of more than $2 billion in
shareholder value.  The importance to Lorillard shareholders and prospective shareholders of the
anti-tobacco bias on the TPSAC is underscored by the sudden increase in Lorillard's share price
on January 10, 2011, the day it was confirmed that Dr. Connolly had resigned from the
Committee.  But that increase proved fleeting, because Dr. Connolly's resignation did not
eliminate concerns about the anti-tobacco bias of the TPSAC.  To the contrary, the TPSAC's
continuing anti-tobacco bias – expressed during a public meeting that concluded the next day,
January 11, 2011 and covered extensively in analyst reports – caused the stock to plummet more
than $3.50 in the ensuing week and a half.

### Traceability of the Plaintiffs' Injuries to the Defendants' Actions

125.    The injuries alleged herein are directly traceable to Defendants' actions in
appointing the current voting members of the TPSAC.  Those injuries arise from the bias in favor
of special interest groups and the lack of fair balance on the Committee as currently composed,
which will cause the Committee to ignore or not fairly consider scientific information relating to
menthol in cigarettes, a possible current role for smokeless tobacco products in reducing the
harm from tobacco in the United States, and other matters that will come before the Committee.
The appointment of these members, who have conflicts of interest as described herein, also has
created the risk that they will use the Plaintiffs' confidential information improperly and,
advertently or inadvertently, will reveal such confidential information to other parties that, like
them, are adverse to the Plaintiffs.

126.    The injuries alleged herein with respect to constituents of tobacco products are
also directly traceable to the Defendants' actions in appointing the current members of the
Constituents Subcommittee.  Those injuries arise from the risk that bias in favor of special

59

interest groups will cause the Subcommittee to ignore or not fairly consider scientific information relating to constituents that is contrary to the views that Drs. Burns and Farone (and Henningfield) express as paid expert witnesses for plaintiffs in litigation against tobacco-product manufacturers. The appointment of Drs. Burns and Farone to the Subcommittee also has created the risk that they will use the Plaintiffs' confidential information improperly and, advertently or inadvertently, will reveal such information to other parties that, like them, are adverse to the Plaintiffs.

### Other Matters

127. The relief requested herein would cure future harm from the violations of law alleged herein. Because it is highly likely that the Defendants will act in accordance with the law as declared by this Court and will comply with whatever injunctive relief this Court orders, the Plaintiffs' injuries alleged herein can be redressed by the relief requested herein.

128. In view of the Defendants' summary responses to PM-USA's and USSTC's letters of March 22, 2010 and June 14, 2010 and to Reynolds's letter of June 30, 2010, and in view of the lack of substantive response by any of the Defendants to PM-USA's and USSTC's letters of August 26, 2010, January 6, 2011, January 27, 2011, and February 7, 2011, to Reynolds's letters of September 17, 2010, October 11, 2010, December 3, 2010, December 17, 2010, January 28, 2010, February 8, 2010, and February 19 (dated February 18), 2010, and to Lorillard's letter of January 31, 2011, further resort to the FDA's administrative procedures by the Plaintiffs to obtain the relief requested herein would be futile. The Plaintiffs and others have presented to the Defendants, in the first instance, the very same issues as those raised herein; and the Defendants have made clear that they reject the Plaintiffs' concerns and objections with respect to (a) the conflicts of interest of Drs. Benowitz, Henningfield, Samet, Burns, and Farone,

(b) the inappropriate influence of special interests on the TPSAC, and (c) the lack of fair balance on the TPSAC.

## FIRST CAUSE OF ACTION

### Financial Conflicts of Interest

### (5 U.S.C. § 706(2)(A); 18 U.S.C. §§ 202(a), 208(a); FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640)

129.    Paragraphs 1-128, *supra*, are incorporated and re-alleged here.

130.    The Defendants' appointments of Drs. Benowitz, Henningfield, and Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

131.    The Defendants' appointments of Drs. Burns and Farone to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

132.    The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 (2010) because these individuals have financial interests that are disqualifying under these provisions of law.

133.    The presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because these individuals have financial interests that are disqualifying under these provisions of law.

134.  Any report, information, assessment, judgment, recommendation, or other advice developed and/or provided by the TPSAC during the time that members with conflicts of interest served on the Committee must be disregarded and not relied on for any purpose, including the issuance of any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco products, or any other matter.

## SECOND CAUSE OF ACTION

### Appearance Conflicts of Interest

### (5 U.S.C. § 706(2)(A); 18 U.S.C. §§ 202(a), 208(a); FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640)

135.  Paragraphs 1-134 *supra*, are incorporated and re-alleged here.

136.  The Defendants' appointments of Drs. Benowitz, Henningfield, and Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

137.  The Defendants' appointments of Drs. Burns and Farone to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

138.  The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and their continuing roles as expert witnesses against tobacco-product manufacturers and as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding

their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

139.    The presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their continuing roles as expert witnesses in lawsuits against tobacco-product manufacturers, constitute circumstances that demonstrate their lack of impartiality, or at least raises questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as members of the Constituents Subcommittee; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

140.    Any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC during the time that members with conflicts of interest served on the Committee must be disregarded and not relied on for any purpose, including the issuance of any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco products, or any other matter.

### THIRD CAUSE OF ACTION

### Violation of the FACA

### (5 U.S.C. § 706(2)(A), 5 U.S.C. app. 2 § 5)

141.    Paragraphs 1-140, *supra*, are incorporated and re-alleged here.

142.     The Defendants' appointments of the current voting members of the TPSAC, taken together, are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

143.     The current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to menthol in cigarettes, dissolvable tobacco products and other smokeless tobacco products, and other matters.

(a)     The current voting membership of the TPSAC cannot properly perform its broad statutory function because it has no voting members whose views balance the negative views of menthol in cigarettes previously expressed by Drs. Benowitz and Henningfield.

(b)     The current voting membership of the TPSAC cannot properly perform its broad statutory function because it does not represent the view of those members of the public-health and tobacco-control communities who have no financial or other ties to tobacco-product manufacturers (and so are not industry representatives of tobacco-product manufacturers) but who believe that current scientific knowledge about smokeless tobacco products shows that, now and in the future, at least some smokeless tobacco products can play a beneficial role in reducing the harm from tobacco in the United States.

(c)     The current voting membership of the TPSAC cannot properly perform its broad statutory function because it is dominated by a clique of people with similar viewpoints on smokeless tobacco and other matters, including matters on which they have jointly published articles, and thus does not reflect the diversity of views on tobacco-related issues among the members of the public-health and tobacco-control communities.

144.     The current voting membership of the TPSAC is not "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5(b)(2), with respect to the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States, and with respect to issues and topics related to that question, because it does not represent at all one of the viewpoints in the current two-sided controversy over a possible role for smokeless tobacco products in tobacco harm reduction.

145.     Specifically, with respect to dissolvable tobacco products, the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States is at the heart of "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children," which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates be presented to the TPSAC for a report and recommendation.

146.     Specifically, the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States is also at the heart of the TPSAC's review of any claim that a smokeless tobacco product is a modified risk tobacco product.  Such review is mandated by FDCA § 911(f), 21 U.S.C. § 387k(f).

147.     The current voting membership of the TPSAC is not such that the reports, information, assessments, judgments, recommendations, and other advice it provides to the

Defendants "will not be inappropriately influenced . . . by any special interest," 5 U.S.C. app. 2 § 5(b)(3).  By reason of the current and ongoing financial connections between Drs. Benowitz, Henningfield, Samet, Burns, and Farone, and lawyers for plaintiffs suing tobacco-product manufacturers, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to many aspects of the regulation of tobacco products will be influenced by the special interest of those plaintiffs' lawyers.  By reason of the current and ongoing or recent and possibly to-be-renewed financial connections between Drs. Benowitz, Henningfield, and Samet and manufacturers of nicotine-replacement-therapy products and other smoking-cessation products, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to menthol in cigarettes and issues relating to the competition between manufacturers of such products and manufacturers of smokeless tobacco products will be influenced by the incentives these conflicted members have to advance the special interest of the manufacturers of nicotine-replacement-therapy products and other smoking-cessation products.  Such incentives are inappropriate because advisory committees are intended to be impartial and neutral as to issues that come before them.

148.    Therefore, the current voting membership of the TPSAC violates 5 U.S.C. app. 2 § 5(b)(2)-(3), (c).

149.    Any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC on a subject as to which the Committee is not fairly balanced as to points of view must be disregarded and not relied on for any purpose, including the issuance of any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco products, or any other matter.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court, pursuant to 28 U.S.C §§ 1361, 2201-02, and Rule 65, Fed. R. Civ. P.:

1.     Declare:

(a)     That the Defendants' appointments of Drs. Benowitz, Henningfield, and Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

(b)     That the Defendants' appointments of Drs. Burns, Farone, and Henningfield to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

(c)     That the presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 (2010) because these individuals have financial interests that are disqualifying under these provisions of law.

(d)     That the financial conflicts of interest of Drs. Benowitz, Henningfield, and Samet incapacitate the TPSAC from preparing a report on menthol in cigarettes that is unbiased and untainted by financial conflicts of interest.

(e)     That the presence of Drs. Burns, Farone and Henningfield on the Constituents Subcommittee of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because these individuals have financial interests that are disqualifying under these provisions of law.

67

(f)     That the financial conflicts of interest of Drs. Burns, Farone, and Henningfield incapacitate the Constituents Subcommittee from providing a report, information, assessment, judgment, recommendation, or other advice on constituents that is unbiased and untainted by financial conflicts of interest.

(g)     That the presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA §712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and their continuing  roles as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

(h)     That the appearance conflicts of interest of Drs. Benowitz, Henningfield, and Samet incapacitate the TPSAC from preparing a report on menthol in cigarettes that is unbiased and untainted by appearance conflicts of interest.

(i)     That the presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA §712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their roles as expert witnesses in lawsuits against tobacco-product manufacturers constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as

68

members of the Constituents Subcommittee; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict.

(j)     That the appearance conflicts of interest of Drs. Burns, Farone, and Henningfield incapacitate the Constituents Subcommittee from preparing a report, information, assessment, judgment, recommendation, or other advice on constituents that is unbiased and untainted by appearance conflicts of interest.

(k)     That the Defendants' appointments of the current voting members of the TPSAC, taken together, are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

(l)     That the current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to menthol in cigarettes because the TPSAC has no voting members whose views balance the negative views of menthol previously expressed by Drs. Benowitz and Henningfield

(m)     That the current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to dissolvable tobacco products and other smokeless tobacco products because it does not represent the view of those members of the public-health and tobacco-control communities who have no financial or other ties to tobacco-product manufacturers (and so are not industry representatives of tobacco-product manufacturers), but who believe that current scientific knowledge about smokeless tobacco products shows that, now and in the future, at least some smokeless tobacco products can play a beneficial role in reducing the harm from tobacco in the United States.

(n)     That the current voting membership of the TPSAC cannot properly perform its broad statutory function because it is dominated by a clique of people with similar viewpoints on smokeless tobacco and other matters, including matters on which they have jointly published articles, and thus does not reflect the diversity of views on tobacco-related issues among the members of the public-health and tobacco-control communities.

(o)     That the current voting membership of the TPSAC is not "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5, with respect to the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States, and with respect to issues and topics related to that question, because it does not represent at all one of the viewpoints in this two-sided controversy.

(p)     That, specifically with respect to dissolvable tobacco products, the question whether current scientific knowledge about dissolvable tobacco products shows that, now and in the future, they, or some of them, can play a beneficial role in tobacco harm reduction in the United States is at the heart of "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children," which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates be presented to the TPSAC for a report and recommendations.

(q)     That the current voting membership of the TPSAC is not such that its recommendations and other advice "will not be inappropriately influenced . . . by any special interest," 5 U.S.C. app. 2 § 5.  By reason of the current and ongoing financial connections between, on one side, Drs. Benowitz, Henningfield, Samet, Burns, and Farone, and, on the other

side, lawyers for plaintiffs suing tobacco-product manufacturers, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to many aspects of the regulation of tobacco products will be influenced by the special interest of those plaintiffs' lawyers.  By reason of the current and ongoing or recent and possibly to-be-renewed financial connections between Drs. Benowitz, Henningfield, and Samet and manufacturers of smoking-cessation products, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to the competition between manufacturers of smoking-cessation products and manufacturers of smokeless tobacco products will be influenced by the special interest of the manufacturers of smoking-cessation products; and that such influences are inappropriate because advisory committees are intended to be impartial and neutral as to issues that come before them.

(r)     That the nonvoting members of the TPSAC cannot provide fair balance to Drs. Benowitz, Hatsukami, Henningfield, and Samet because (a) the nonvoting members have no vote and the Defendants exclude them from drafting the committee's reports and recommendations; (b) the nonvoting members bear the stigma of being industry representatives to whose views the FDA will give less weight.

(s)     That, therefore, the current voting membership of the TPSAC violates 5 U.S.C. app. 2 § 5.

(t)     That the Defendants' exclusion of the nonvoting members of the TPSAC from participation in the preparation of the Committee's report on menthol in cigarettes is arbitrary, capricious, an abuse of discretion, and not in accordance with law because the exclusion violates FDCA § 917(b)(1)(B), 21 U.S.C. § 387q(b)(1)(B).

(u)     That the practice of having government reports written by committees that include special government employees who continue to testify as expert witnesses in litigation

71

and are likely to use such reports in support of their future testimony is contrary to the ethics rules applicable to special government employees and to the FACA.

2.     Order:

(a)     That the Defendants are enjoined from receiving, considering, or relying on any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC, except a report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC when it and, as applicable, its Constituents Subcommittee are composed and operating in accordance with the law.

(b)     That the Defendants are enjoined from transmitting, or otherwise making available, to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided heretofore by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully composed; and that the Plaintiffs need not produce to any of the Defendants any trade secret or confidential commercial documents or other trade secret or confidential commercial information that otherwise would be provided to the TPSAC or to its Constituents Subcommittee unless and until the TPSAC and/or the Constituents Subcommittee, as relevant, is lawfully composed.

(c)     That the Defendants are enjoined from excluding nonvoting members of the TPSAC from activities of the Committee in which the nonvoting members would not have access to trade secret or confidential commercial information (other than trade secret or confidential commercial information submitted by a party that has consented to such access).

(d)     That, until the TPSAC is properly composed in accordance with the applicable ethics requirements and the FACA, the Defendants shall attach to the cover of any

final report or other final document prepared by the TPSAC a disclaimer stating that the report or

other document, as applicable, was prepared by a committee constituted in violation of

applicable ethics rules and the Federal Advisory Committee Act.

     3.     Provide such further and other relief as the Court deems just and proper.

Respectfully submitted,

_____
Laura Metcoff Klaus, DC Bar # 294272
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2362
FAX: (202) 261-0137
Klausl@gtlaw.com

_____
Richard M. Cooper, DC Bar # 92817
Amer S. Ahmed, DC Bar # 500630
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5466
Phone: (202) 434-5288
FAX: (202) 434-5029
rcooper@ wc.com
aahmed@wc.com

Alan Mansfield
*Application for admission to the District*
*Court for the District of Columbia pending*
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, New York 10166
Phone: (212) 801-9200
FAX: (212) 801-6400
MansfieldA@gtlaw.com

Attorneys for Plaintiffs
Lorillard, Inc. and
Lorillard Tobacco Company

Attorneys for Plaintiff
R.J. Reynolds Tobacco Company