# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| LORILLARD, INC.<br>714 Green Valley Road<br>Greensboro, NC  27408, | ) ) ) ) | |
| LORILLARD TOBACCO COMPANY<br>714 Green Valley Road<br>Greensboro, NC  27408, | ) ) ) ) | |
| and | ) ) | |
| R.J. REYNOLDS TOBACCO COMPANY<br>401 N. Main Street<br>Winston-Salem, NC  27101, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case: 1:11-cv-00440<br>Assigned To: Leon, Richard, J.<br>Assign. Date: 2/25/2011<br>Description: Admin. Agency Review |
| v. | ) ) | |
| UNITED STATES FOOD AND DRUG<br>ADMINISTRATION<br>10903 New Hampshire Avenue<br>Silver Spring, MD  20993, | ) ) ) ) | **SECOND AMENDED<br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Avenue S.W.<br>Washington, DC  20201, | ) ) ) ) ) | |
| KATHLEEN SEBELIUS,<br>Secretary of Health and Human Services<br>U.S. Department of Health and Human Services<br>200 Independence Avenue S.W.<br>Washington, DC  20201, | ) ) ) ) ) ) | |
| MARGARET A. HAMBURG, M.D.,<br>Commissioner of Food and Drugs<br>10903 New Hampshire Ave.<br>Silver Spring, MD  20993, | ) ) ) ) ) | |
| and | ) ) ) | |

LAWRENCE R. DEYTON, M.S.P.H., M.D.,    )
Director, Center for Tobacco Products      )
United States Food and Drug Administration   )
9200 Corporate Blvd., Rm. 100          )
Rockville, MD  20850,                )
                             )
                  Defendants     )
_____)

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Lorillard, Inc. and Lorillard Tobacco Company (collectively, "Lorillard") and R.J.

Reynolds Tobacco Company ("Reynolds") (the three plaintiffs collectively, "Plaintiffs") bring

this action for declaratory and injunctive relief to require the United States Food and Drug

Administration ("FDA"), the United States Department of Health and Human Services

("DHHS"), and the individual defendants, sued in their official capacities (all defendants

collectively, "Defendants") to bring the membership of the Tobacco Products Scientific

Advisory Committee ("TPSAC" or "the Committee") and the membership of the Constituents

Subcommittee of the TPSAC into compliance with the law, and to prevent the Defendants from

taking any action based on or influenced by, and from making any other use of, any report,

information, assessment, judgment, recommendation, or other advice provided by the TPSAC or

the Constituents Subcommittee as each is currently constituted.

2.     Under 5 C.F.R. § 5501.101(a)-(b) (2010), members of the TPSAC are special

government employees and, as such, are subject to the conflict-of-interest rules set forth in 18

U.S.C. §§ 202(a), 208 (2006); section 712 of the Federal Food, Drug, and Cosmetic Act

("FDCA"), 21 U.S.C. § 379d-1 (2006 & Supp. III 2009); and 5 C.F.R. pts. 2635, 2640 (2010).

Of the eight individuals whom the Defendants appointed as voting members of the TPSAC and

who are currently serving on the Committee, three (including the Chair) have severe financial and appearance conflicts of interest and associated biases that are incompatible with the TPSAC's role as an impartial advisor on issues relating to the regulation of tobacco products. The same is true of two of the members of the Constituents Subcommittee of the TPSAC who are not members of the TPSAC.  These conflicts and biases derive from the continuing service of these appointees as paid expert witnesses in litigation against tobacco-product manufacturers and also, as to the three TPSAC members, continuing employment as consultants for, and receipt of research funding or other financial compensation from, large pharmaceutical companies that manufacture nicotine-replacement-therapy products and other smoking-cessation products. These conflicts and biases affect the TPSAC's consideration of issues relating to menthol in cigarettes and issues relating to smokeless tobacco products, and will affect its consideration of other issues that will come before the Committee; they also affect issues that have been or will be before the Constituents Subcommittee.

3.      Because the TPSAC is governed by the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 § 5 (2006), the Committee must be "fairly balanced in terms of the points of view represented and the functions to be performed," and its membership must be such that any report, information, assessment, judgment, recommendation, or other advice it provides to the Defendants "will not be inappropriately influenced . . . by any special interest."  As currently constituted, the TPSAC fails to meet these requirements with respect to issues relating both to menthol in cigarettes and to smokeless tobacco products.  For example, of the eight current voting members of the Committee, three (including the Chair) constitute a clique who have the same or similar views and are all on one side of a substantial controversy within the public-health and tobacco-control communities as to whether enough is currently known to

conclude that smokeless tobacco products can play a beneficial role in reducing the harm from tobacco; and no member of the Committee has represented the opposing point of view, of which there are numerous representatives in those communities.

4.     Lorillard and Reynolds seek, *inter alia*, a declaration that the Defendants' appointment of these individuals to the TPSAC and the Constituents Subcommittee violates the applicable ethics rules and the FACA, and an injunction preventing the Defendants from receiving, considering, or relying on reports, information, assessments, judgments, recommendations, or other advice from the Committee until the TPSAC and, as applicable, the Subcommittee are constituted in accordance with the law.

## NATURE OF THE ACTION

5.     The Plaintiffs bring this civil action on the basis of the final agency actions embodied in the Defendants' March 1, 2010 announcement of the TPSAC roster, in their appointments of members of the Constituents Subcommittee, in their March 25, 2010 and July 8, 2010 rejections of objections by Philip Morris USA, Inc. ("PM-USA") and United States Smokeless Tobacco Company LLC ("USSTC") to the composition of the TPSAC and the Constituents Subcommittee, in their October 6, 2010 rejection of objections by Reynolds to the composition of the TPSAC and the Constituents Subcommittee, and in their extended delay in responding substantively to other letters by Reynolds, Lorillard, PM-USA, and USSTC that set forth additional grounds for their objections to the composition of the TPSAC.

6.     In appointing voting members to the TPSAC, in appointing members to the TPSAC's Constituents Subcommittee, and in allowing such voting members of the TPSAC and members of the Constituents Subcommittee to participate in the work of the TPSAC and the Subcommittee, respectively, in violation of applicable ethics rules and the FACA, the

4

Defendants have acted, are continuing to act, and will in the future continue to act, in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006).

7.    Accordingly, the Plaintiffs seek from this Court prospective declaratory, mandatory, and injunctive relief, including:  (a) a declaration that the present composition of the TPSAC is contrary to the applicable ethics statutes and regulations; (b) a declaration that the present composition of the TPSAC violates the FACA; (c) a declaration that it is unlawful for the Defendants to transmit to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully constituted; (d) an order enjoining the Defendants from receiving, considering, or relying on any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC (including any report, information, assessment, judgment, recommendation, or other advice relating to menthol in cigarettes or to dissolvable or other smokeless tobacco products) except for such a report, information, assessment, judgment, recommendation, or other advice that is provided by the TPSAC when it and, as applicable, its Constituents Subcommittee are composed and operating in accordance with the law; and (e) an order enjoining the Defendants from transmitting to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully composed.

## PARTIES

8.      Plaintiff Lorillard, Inc. is a Delaware corporation with its principal place of business in Greensboro in Guilford County, North Carolina.

9.      Plaintiff Lorillard Tobacco Company is a Delaware corporation with its principal place of business in Greensboro in Guilford County, North Carolina.  It is the third-largest tobacco-product manufacturer in the United States.  Lorillard Tobacco Company manufactures and sells a variety of cigarettes, including menthol and non-menthol cigarettes.  Its cigarettes are sold under the brand names Newport, Maverick, True, and Old Gold, among others.  Lorillard Tobacco Company's brands are advertised, distributed, and sold nationwide, including in this District.  Lorillard Tobacco Company is a wholly owned subsidiary of Plaintiff Lorillard, Inc.

10.     Plaintiff Reynolds is a North Carolina corporation with its principal place of business in Winston-Salem in Forsyth County, North Carolina.  Its manufacturing operations are also located in Forsyth County, North Carolina.  Reynolds is the second-largest manufacturer of tobacco products in the United States.  It manufactures and sells a variety of tobacco products, including menthol and non-menthol cigarettes, and snus, dissolvable and other smokeless tobacco products.  Its cigarettes are sold under the brand names Camel, Winston, Kool, and Pall Mall, among others.  Reynolds's brands are advertised, distributed, and sold nationwide, including in this District.

11.     As corporations engaged in the production, marketing, and distribution of tobacco products, the Plaintiffs are subject to regulation by the Defendants under the FDCA, and will be directly affected by decisions and actions by the Defendants that are based on or influenced by reports, information, assessments, judgments, recommendations, and/or other advice provided by the TPSAC to the Defendants.  As entities regulated by the Defendants, the Plaintiffs have a

direct interest (a) in the purpose, functions, and functioning of the TPSAC and its Constituents

Subcommittee, and are injured by the Defendants' creation of and reliance on an advisory

committee and subcommittee that fail to comply with applicable ethics rules and the FACA; (b)

in the public accountability of the TPSAC and its Constituents Subcommittee; (c) in the

requirement that the TPSAC be fairly balanced, free of improper influence, representative of

pertinent viewpoints, and fully informed by public participation; and (d) in the APA's

requirement that the regulation of tobacco products comply with the law, including the FACA

and the ethics rules applicable to members of the TPSAC and to members of the Constituents

Subcommittee.

12.     The Plaintiffs are within the zone of interests protected by the ethics provisions

and regulations applicable to government employees, the conflict-of-interest provisions of the

FDCA, and the FACA because those statutes and regulations are designed to ensure that

advisory committees, such as the TPSAC, are independent, adequately representative, and

accountable to the public, including regulated parties; and because the Defendants, in regulating

the Plaintiffs, will rely on reports, information, assessments, judgments, recommendations, and

other advice from the TPSAC and the Constituents Subcommittee.  The Plaintiffs are also within

the zone of interests protected by the laws protecting trade secrets and confidential commercial

information because those laws are designed to ensure that trade secrets and confidential

commercial information submitted to federal agencies are not disclosed advertently or

inadvertently to any members of the public.

13.     Defendant FDA is a division of Defendant DHHS.  The FDA is an agency of the

United States, and has the responsibility, among other things, to regulate tobacco products sold

within the United States.  The FDA's headquarters and principal place of business are at 10903

New Hampshire Avenue, Silver Spring, Maryland 20903. Its governmental activities occur in this District and nationwide.

14.     Defendant DHHS is a Department of the United States. Its headquarters and principal place of business are at 100 Independence Avenue, S.W., Washington, District of Columbia 20201. Its governmental activities occur in this District and nationwide.

15.     Defendant Kathleen Sebelius is the Secretary of Health and Human Services and the head of the DHHS. The Plaintiffs sue her solely in her official capacity. Her governmental activities occur in this District and nationwide.

16.     Defendant Margaret A. Hamburg, M.D., is the Commissioner of Food and Drugs, and the head of the FDA. The Plaintiffs sue her solely in her official capacity. Her governmental activities occur in this District and nationwide.

17.     Defendant Lawrence R. Deyton, M.S.P.H., M.D., is the Director of the Center for Tobacco Products, the unit of the FDA that regulates tobacco products. The Plaintiffs sue him solely in his official capacity. His governmental activities occur in this District and nationwide.

18.     All of the FDA's actions referred to herein were taken pursuant to authorities delegated by the Congress to Defendant Secretary Sebelius, re-delegated by her to Defendant Dr. Hamburg as Commissioner of Food and Drugs, and re-delegated by Defendant Dr. Hamburg to Defendant Dr. Deyton as Director of the Center for Tobacco Products. Accordingly, all of the actions by the FDA referred to herein were taken by or on behalf of each and all of the Defendants.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (2006). This action arises under the APA, 5 U.S.C. § 702 (2006); the Declaratory Judgment Act, 28

U.S.C. §§ 2201, 2202 (2006); 18 U.S.C. §§ 202(a), 208, and implementing regulations; FDCA § 712, 21 U.S.C. § 379d-1; and the FACA, 5 U.S.C. app. 2 § 5.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e) (2006) because, among other things, all of the Defendants reside or are found in this judicial district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

21.     An actual, justiciable controversy now exists between each of the Plaintiffs and each and all of the Defendants, and the requested relief is proper under 5 U.S.C. §§ 701-706 (2006); 28 U.S.C. §§ 2201, 2202; 18 U.S.C. §§ 202(a), 208, and implementing regulations; FDCA § 712, 21 U.S.C. § 379d-1; and 5 U.S.C. app. 2 § 5.

22.     As to this civil action, the federal government has waived sovereign immunity in 5 U.S.C. § 702.

## FACTS GIVING RISE TO THIS ACTION

### The Tobacco Products Scientific Advisory Committee

23.     On June 22, 2009, the President signed the Family Smoking Prevention and Tobacco Control Act (the "TCA"), Pub. L. No. 111-31, 123 Stat. 1776 (2009), which authorizes the FDA to regulate tobacco products.  Section 917 of the FDCA, 21 U.S.C. § 387q (Supp. III 2009), added by section 101 of the TCA, 123 Stat. at 1824-25, mandates the establishment of the TPSAC.

24.     Section 917(c) of the FDCA, 21 U.S.C. § 387q(c), specifies certain duties of the TPSAC:

(c) DUTIES.—The Tobacco Products Scientific Advisory Committee shall provide advice, information, and recommendations to the Secretary—

(1) as provided in this chapter;
(2) on the effects of the alteration of the nicotine yields from tobacco products;
(3) on whether there is a threshold level below which nicotine yields do not produce dependence on the tobacco product involved; and
(4) on its review of other safety, dependence, or health issues relating to tobacco products as requested by the Secretary.

25.     Section 906(e) of the FDCA, 21 U.S.C. § 387f(e) (Supp. III 2009), added by the TCA, 123 Stat. at 1797-99, authorizes the Secretary of Health and Human Services to establish and require good manufacturing practices for tobacco products.  Section 906(e)(1)(B), 21 U.S.C. § 387f(e)(1)(B), provides that, "before promulgating any regulation under subparagraph (A)," the Secretary shall "afford the [TPSAC] an opportunity to submit recommendations with respect to the regulation proposed to be promulgated."  Section 906(e)(2), 21 U.S.C. § 387f(e)(2), provides for exemptions and variances from good manufacturing practice requirements.  Section 906(e)(2)(B), 21 U.S.C. § 387f(e)(2)(B), provides that "[t]he Secretary may refer to the [TPSAC] any petition submitted under subparagraph (A)" for such an exemption or variance.  Under section 906(e)(2)(B), the TPSAC's report of its recommendations with respect to any such referral is due within sixty days after the date of the referral.

26.     Section 907(e)(1) of the FDCA, 21 U.S.C. § 387g(e)(1) (Supp. III 2009), added by the TCA, 123 Stat. at 1804, provides in part:  "Immediately upon the establishment of the [TPSAC] under section 917(a), the Secretary shall refer to the Committee for report and recommendation, under section 917(c)(4), the issue of the impact of the use of menthol in cigarettes on the public health, including such use among children, African-Americans, Hispanics, and other racial and ethnic minorities."  The report is due within one year of the establishment of the Committee, under FDCA § 907(e)(2), 21 U.S.C. § 387g(e)(2) (Supp. III 2009), added by the TCA, 123 Stat. at 1804.  The report will influence the Defendants' decisions

10

and actions with respect to menthol in cigarettes, including menthol in cigarettes manufactured and sold by Lorillard and in cigarettes manufactured and sold by Reynolds.  The TPSAC is already at work on that report.

27.     In addition, Section 907(f)(1) of the FDCA, 21 U.S.C. § 387g(f)(1) (Supp. III 2009), added by the TCA, 123 Stat. at 1804, provides in part:  "The Secretary shall refer to the Tobacco Products Scientific Advisory Committee for report and recommendation, under section 917(c)(4), the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children."  Dissolvable tobacco products are a subcategory of smokeless tobacco products.  Under FDCA § 907(f)(2), 21 U.S.C. § 387g(f)(2) (Supp. III 2009), added by the TCA, 123 Stat. 1804, the TPSAC's report is due within two years of the establishment of the Committee.  The report will influence the Defendants' decisions and actions with respect to dissolvable tobacco products, including dissolvable tobacco products manufactured and sold by Reynolds.

28.     In addition, under Section 911(f) of the FDCA, 21 U.S.C. § 387k(f) (Supp. III 2009), added by the TCA, 123 Stat. at 1814, the FDA must refer to the TPSAC for its review and evaluation any modified risk tobacco product application; and, no later than 60 days after such a referral, the TPSAC must "report its recommendations on the application" to the FDA.  The TPSAC's reports and recommendations on such applications will influence the Defendants' decisions and actions with respect to such applications submitted by the Plaintiffs and others.

29.     The FDA may refer additional matters to the TPSAC.

(a)     Under FDCA § 907(d)(5)(D), 21 U.S.C. § 387g(d)(5)(D) (Supp. III 2009), added by the TCA, 123 Stat. at 1803, the FDA "may refer a proposed regulation for the establishment, amendment, or revocation of a tobacco product standard to the [TPSAC] for a

report and recommendation with respect to any matter in the proposed regulation which requires the exercise of scientific judgment"; and, in response to such a referral, the Committee is to submit to the FDA, within 60 days, "a report and recommendation respecting such regulation, together with all underlying data and information and a statement of the reason or basis for the recommendation." Such report and recommendation will influence the Defendants' decisions and actions with respect to standards that apply to tobacco products manufactured and sold by the Plaintiffs and others.

(b)     Further, under FDCA § 910(b)(2), 21 U.S.C. § 387j(b)(2) (Supp. III 2009), added by the TCA, 123 Stat. at 1809, the FDA, on its own initiative or at the request of the applicant, may refer to the TPSAC an application for permission to distribute a "new tobacco product"; and, in response to such a referral, the TPSAC is to submit to the FDA "a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation." Such reports and recommendations will influence the FDA's decisions and actions with respect to applications submitted by the Plaintiffs and others to the Defendants for permission to distribute "new tobacco product[s]."

30.     Thus, in general, as set forth on the FDA's website, *available at* http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScient ificAdvisoryCommittee/default.htm, the TPSAC "advises the Commissioner of Food and Drugs or designee in discharging responsibilities as they relate to the regulation of tobacco products, reviews and evaluates safety, dependence, and health issues relating to tobacco products, and provides advice, information and recommendations to the Commissioner of Food and Drugs. . . . The Committee may provide recommendations to the Secretary regarding any regulations to be promulgated under the act . . . ."

31.     On August 26, 2009, the FDA published in the *Federal Register* a Notice

announcing its establishment of the TPSAC: Advisory Committee; Tobacco Products Scientific

Advisory Committee; Establishment, 74 Fed. Reg. 43,042 (Aug. 26, 2009).  The Notice

acknowledged that the TPSAC is "governed by . . . the Federal Advisory Committee Act, which

sets forth standards for the formation and use of advisory committees." *Id.* at 43,042.

32.     FDCA § 917(b)(1)(A), 21 U.S.C. § 387q(b)(1)(A), provides that the TPSAC is to

consist of nine voting members and three nonvoting industry representatives.

33.     On March 1, 2010, the FDA announced the appointment of the initial nine voting

members of the TPSAC, as set forth in FDA News Release (Mar. 1, 2010), *available at*

http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm202394.htm.  In early

January 2011, Dr. Gregory N. Connolly ("Dr. Connolly"), whom the Defendants had appointed

as a voting member of the TPSAC, but who had financial and appearance conflicts of interest in

that role, informed the press that he had resigned from the TPSAC three weeks earlier; and his

resignation was confirmed by a spokesman for the FDA, as reported in David Kesmodel, *FDA*

*Tobacco Adviser Resigns*, WALL ST. J., Jan. 5, 2011, *available at*

http://online.wsj.com/article/SB10001424052748704405704576064000800551720.html.  Dr.

Connolly did not cite conflicts of interest as a reason for his resignation.  At the January 10, 2011

meeting of the TPSAC at p. 4 of the transcript, the FDA confirmed his resignation.  The roster of

the TPSAC once included Dr. Connolly.  It no longer does, as shown in Roster of the Tobacco

Products Scientific Advisory Committee, *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm180906.htm.  The appointment of the nine voting members of the

TPSAC was final agency action within the meaning of the APA, as was the appointment of the members of the Constituents Subcommittee.

34.     The TPSAC has been operating since the first quarter of 2010.  It held formal meetings on March 30 and 31, July 15 and 16, August 30, October 7, and November 18, 2010, and January 10 and 11, and February 10, 2011; and it is scheduled to meet on March 2, 2011. The Constituents Subcommittee of the TPSAC held formal meetings on June 8 and 9, and July 7 and 8, 2010.  The Menthol Report Subcommittee of the TPSAC held formal meetings on September 27, 2010, and February 11, 2011.  These meetings are shown in the lists of meetings of the TPSAC and its subcommittees, *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/ucm180903.htm;

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/ucm237359.htm.

### Objections by the Plaintiffs and Others to the Membership of the TPSAC and the Membership of Its Constituents Subcommittee, and the Defendants' Responses, and Failures to Respond, to Those Objections

35.     The Defendants have had numerous full and fair opportunities to address the issues raised herein.  On March 22, 2010, PM-USA and USSTC sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 16-page, single-spaced letter that objected to the voting membership on the TPSAC of Dr. Neal L. Benowitz ("Dr. Benowitz"), Dr. Connolly, Dr. Jack E. Henningfield ("Dr. Henningfield"), and Dr. Jonathan M. Samet ("Dr. Samet") (Chair of the TPSAC), and presented detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit A.

14

36.     On behalf of the Defendants, Dr. Deyton responded to the March 22, 2010 letter
from PM-USA and USSTC with a 2-page, single-spaced letter dated March 25, 2010.  Dr.
Deyton's letter summarily rejected all of the objections raised by PM-USA and USSTC.  A true
and correct copy of Dr. Deyton's March 25, 2010 letter is attached hereto as Exhibit B.

37.     On June 14, 2010, PM-USA and USSTC sent to Defendant Dr. Deyton, in his
official capacity, a 4-page, single-spaced letter that objected to the membership on the TPSAC's
Constituents Subcommittee of Dr. David M. Burns ("Dr. Burns") and Dr. William A. Farone
("Dr. Farone"), and presented detailed supporting reasons.  A true and correct copy of that letter
is attached hereto as Exhibit C.

38.     On behalf of the Defendants, Dr. Deyton responded to the June 14, 2010 letter
from PM-USA and USSTC with a 2-page, single-spaced letter dated July 8, 2010.  Dr. Deyton's
letter summarily rejected all of the objections raised by PM-USA and USSTC.  A true and
correct copy of Dr. Deyton's July 8, 2010 letter is attached hereto as Exhibit D.

39.     On June 30, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in
their official capacities, a 36-page, single-spaced letter that objected to the voting membership on
the TPSAC of Drs. Benowitz, Connolly, Henningfield, and Samet, and also objected to the
membership on the TPSAC's Constituents Subcommittee of Drs. Henningfield, Burns, and
Farone, and presented detailed supporting reasons.  A true and correct copy of Reynolds's June
30, 2010 letter (without its appendices) is attached hereto as Exhibit E.

40.     On behalf of the Defendants, Dr. Deyton responded to Reynolds's June 30, 2010
letter with a 2-page, single-spaced letter dated October 6, 2010.  Dr. Deyton's letter summarily
rejected all of Reynolds's objections.  A true and correct copy of Dr. Deyton's October 6, 2010
letter is attached hereto as Exhibit F.

41.     On August 26, 2010, PM-USA and USSTC sent to Defendant Dr. Deyton, in his official capacity, a 3-page, single-spaced letter that objected to the submission by Dr. Connolly to the Constituents Subcommittee of written views regarding harmful and potentially harmful constituents in tobacco products and tobacco smoke, and presented detailed supporting reasons. A true and correct copy of that letter is attached hereto as Exhibit G.  As of the date of this Complaint (February 25, 2011), as far as Plaintiffs are aware, none of the Defendants has responded to that letter.

42.     On September 17, 2010, Lorillard and Reynolds responded to the FDA's request for comments in connection with the September 27, 2010 meeting of the Menthol Report Subcommittee of the TPSAC.  The comments emphasized that TPSAC voting members must be screened for all conflicts of interest, including personal opposition to the tobacco industry.  The comments noted that questions had already been raised concerning potential conflicts involving four TPSAC members.  A true and correct copy of the comments submitted by Lorillard and Reynolds is attached hereto as Exhibit H.

43.     Also on September 17, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 3-page single-spaced letter that brought to their attention certain public statements by a private-business colleague of Dr. Henningfield, which appeared to reflect knowledge concerning what documents were produced by manufacturers of tobacco products to the FDA, some of which are confidential under federal law.  The letter asked Dr. Hamburg and Dr. Deyton to take certain actions, including making inquiries as to whether there were any improper disclosures to Dr. Henningfield's business colleague by any member of the TPSAC or any employee of the FDA.  A true and correct copy of Reynolds's September 17, 2010 letter (without its appendices) is attached hereto as Exhibit I.

16

44.     By a 1-page, 4-line letter dated September 30, 2010, the Executive Secretariat of the FDA's Center for Tobacco Products, on behalf of the Defendants, acknowledged receipt of Reynolds's September 17, 2010 letter.  The September 30, 2010 letter did not respond to the substance of Reynolds's September 17, 2010 letter, and did not state when a substantive response would be provided, but did state that "it is our intention to respond at the soonest possible time." A true and correct copy of the Defendants' September 30, 2010 letter is attached hereto as Exhibit J.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded substantively to Reynolds's letter of September 17, 2010.

45.     On October 11, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr. Deyton, in their official capacities, a 22-page, single-spaced letter that brought to their attention the participation by TPSAC voting members Dr. Benowitz (as co-author) and Dr. Dorothy Hatsukami ("Dr. Hatsukami") and Dr. Samet (as publicly-identified peer-reviewers) in a newly published policy statement by the American Heart Association on smokeless tobacco products. The policy statement took positions on issues that will come before the TPSAC, including issues relating to dissolvable tobacco products, as to which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates a review by the TPSAC, as alleged in paragraph 27, *supra*.  A true and correct copy of Reynolds's October 11, 2010 letter (without its appendices) is attached hereto as Exhibit K.

46.     By a 1-page, 4-line letter dated November 17, 2010, the Executive Secretariat of the FDA's Center for Tobacco Products, on behalf of the Defendants, acknowledged receipt of Reynolds's October 11, 2010 letter.  The November 17, 2010 letter did not respond to the substance of Reynolds's October 11, 2010 letter, and did not state when a substantive response would be provided, but did state that "it is our intention to respond at the soonest possible time." A true and correct copy of the November 17, 2010 letter is attached hereto as Exhibit L.  As of

the date of this Complaint (February 25, 2011), none of the Defendants has responded
substantively to Reynolds's letter of October 11, 2010.

47.     On December 17, 2010, Reynolds sent to Defendants Dr. Hamburg and Dr.
Deyton, in their official capacities, a 67-page, single-spaced letter that presented additional
detailed reasons for concluding that the present composition of the TPSAC violates applicable
ethical rules and the FACA.  A true and correct copy of Reynolds's December 17, 2010 letter
(without its appendices) is attached hereto as Exhibit M.  As of the date of this Complaint
(February 25, 2011), none of the Defendants has responded to Reynolds's letter of December 17,
2010.

48.     On January 6, 2011, PM-USA sent to Ralph S. Tyler, Chief Counsel of the FDA,
in his official capacity, a 3-page, single-spaced letter that brought to his attention certain
testimony by Dr. Henningfield on September 20, 2010, in which he expressed views about
matters (relating to menthol in cigarettes) that are pending before the TPSAC.  The letter
requested that the FDA disqualify Dr. Henningfield as a member of the TPSAC, and presented
detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit
N.  As far as the Plaintiffs are aware, as of the date of this Complaint (February 25, 2011),
neither Mr. Tyler nor any of the Defendants has responded to that letter.

49.     On January 31, 2011, Lorillard sent to Defendant Dr. Deyton, in his official
capacity, a letter requesting that Dr. Benowitz and Dr. Henningfield be recused from the
TPSAC's ongoing work related to the use of menthol in cigarettes.  A true and correct copy of
that letter is attached hereto as Exhibit O.  As of the date of this Complaint (February 25, 2011),
none of the Defendants has responded to Lorillard's letter of January 31, 2011.

18

50.     On February 19, 2011, Reynolds sent to Defendants Dr. Hamburg and Dr.

Deyton, in their official capacities, a 3-page, single-spaced letter (dated February 18, 2011) that

presented additional reasons to disqualify Dr. Henningfield as a member of the TPSAC.  A true

and correct copy of that letter (without its appendices) is attached hereto as Exhibit P.  As of the

date of this Complaint (February 25, 2011), none of the Defendants has responded to that letter.

### Prohibited Conflicts of Interest Among the Voting Members of the TPSAC and the Members of Its Constituents Subcommittee

51.     Of the eight individuals the Defendants selected to be TPSAC voting members

and who are still serving in that capacity, three – Drs. Benowitz, Henningfield, and Samet – have

severe financial conflicts of interest and biases in points of view that are incompatible with the

TPSAC's role as an impartial (as well as knowledgeable) advisor to the Defendants on issues

relating to the regulation of tobacco products and tobacco-product manufacturers.  As discussed

further below, these conflicts and biases stem largely, but not exclusively, from these

individuals' regular service as paid expert witnesses in litigation against tobacco-product

manufacturers and their current or recent employment as consultants to the pharmaceutical

industry regarding nicotine-replacement-therapy products and other smoking-cessation products.

52.     The Constituents Subcommittee of the TPSAC consists of twelve members, as

shown in Roster of the Constituents Subcommittee of the [TPSAC], *available at*

http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoPro

ductsScientificAdvisoryCommittee/UCM225585.pdf.  Of those twelve members, three – Drs.

Burns and Farone, and also Dr. Henningfield – similarly have severe financial conflicts of

interest and biases in points of view because they, too, regularly serve as paid expert witnesses in

litigation against tobacco-product manufacturers.

53.     As expert witnesses, Drs. Benowitz, Henningfield, Samet, Burns, and Farone testify against tobacco-product manufacturers, and, therefore, are subject to cross-examination by lawyers representing those manufacturers.  Thereby, Drs. Benowitz, Henningfield, Samet, Burns, and Farone put themselves in positions of adversity to those manufacturers.  This employment as expert witnesses will continue – indeed, has been continuing – during the service by Drs. Benowitz, Henningfield, Samet, Burns, and Farone on the TPSAC or the Constituents Subcommittee, in connection with which they are supposed to advise the FDA impartially as to regulation of those very same manufacturers.  They will also be testifying for plaintiffs' lawyers in lawsuits against tobacco-product manufacturers on some of the same issues and topics that are currently pending before, or that will come before, the TPSAC and, in some instances, the Constituents Subcommittee.

54.     On January 8, 2010, Dr. Benowitz wrote a letter to Philip M. Gerson, Esq., a lawyer for plaintiffs suing tobacco-product manufacturers, in which he stated:  "In addition I have been appointed to the FDA Tobacco Products Scientific Advisory Committee, a committee that will advise the FDA as to how the use of tobacco should be regulated.  Although no official decision has been made, it is my expectation that committee members would not be allowed to testify in tobacco related civil trials."  Contrary to Dr. Benowitz's reasonable expectation, however, the Defendants are allowing TPSAC members to testify as paid expert witnesses for plaintiffs suing tobacco-product manufacturers.

55.     At the TPSAC meeting on January 10, 2011, Michael Weisman, a lawyer for the plaintiffs in *Evans v. Lorillard Tobacco Co.*, No. 04-2840-B (Mass. Super. Ct. filed June 28, 2004), stated to the Committee:  "[T]he jury heard and apparently found persuasive, [sic] the testimony of Dr. William Farone, the former director of Applied Research for Philip Morris and

a consultant to the FDA, as well as the National Cancer Institute" (transcript at 69). Dr. Farone

testified in that case on November 16-17, 2010, while he was a member of the Constituents

Subcommittee. Mr. Weisman's reference to Dr. Farone as "a consultant to the FDA" is an

example of how plaintiffs' lawyers seek to use a paid expert witness's service on an FDA

committee to bolster the witness's credibility.

### Dr. Benowitz

56.     For more than two decades, Dr. Benowitz has been one of plaintiffs' counsels'

most frequently retained witnesses in litigation against tobacco-product manufacturers. To date,

he has testified against tobacco-product manufacturers in more than fifty lawsuits.

57.     In such cases, Dr. Benowitz has charged expert-witness fees ranging from $275 to

$600 per hour. He has estimated that he commonly earns approximately $25,000 in such a case.

Thus, it is estimated that he has been paid more than $1 million for his work in testifying against

tobacco-product manufacturers.

58.     Dr. Benowitz is currently scheduled to testify for plaintiffs in more than 130 trials

in cases against tobacco-product manufacturers.

59.     Since March 2, 2010, while serving on the TPSAC, Dr. Benowitz, as an expert

witness for plaintiffs suing tobacco-product manufacturers, has been deposed in at least one case

and has testified at trial at least four times in three cases (one case involved a second trial

following a mistrial).

60.     In his capacity as an expert witness, Dr. Benowitz has testified against the

Plaintiffs and other tobacco-product manufacturers on a wide range of issues concerning tobacco

and health, including: menthol, light/low-tar cigarettes and descriptors, smoking compensation,

nicotine and addiction, cigarette design, and tobacco regulation.  His testimony commonly addresses issues certain or likely to come before the TPSAC.

61.     For example, as discussed in paragraphs 26 and 34, *supra*, the TPSAC is deliberating and will advise the FDA on the impact of menthol in cigarettes on public health. Even before the TPSAC existed, however, Dr. Benowitz, as an expert witness, had already staked out his positions on this topic.  He testified in a deposition in *Craft v. Philip Morris Cos.*, No. 002-00406 (Mo. Cir. Ct. filed Feb. 14, 2000) (Oct. 22, 2009 at Tr. 48), that he has already made up his mind that menthol cigarettes may be more addictive and harder to quit than non-menthol cigarettes, and that "menthol has something to do with why African Americans take in more [smoke] per cigarette."  Indeed, he has already conclusively determined to his own satisfaction that menthol constitutes a "public health risk," as reported in Stephanie Saul, *Cigarette Bill Treats Menthol With Leniency*, N.Y. TIMES, May 13, 2008, *available at* http://www.nytimes.com/2008/05/13/business/13menthol.html?_r=1&scp=3&sq=benowitz%20a nd%20menthol&st=cse.

62.     Dr. Benowitz, as a paid consultant for pharmaceutical companies, has assisted them with the design, development, and marketing of smoking-cessation products.  Among the companies for which he has consulted on such products are GlaxoSmithKline plc and its affiliates (collectively, "GSK"); Pfizer, Inc. and its affiliates (collectively, "Pfizer"); Novartis AG and its affiliates (collectively, "Novartis"); Sanofi-Aventis U.S. LLC and its affiliates (collectively, "Sanofi-Aventis"); and Aradigm Corp. and its affiliates (collectively, "Aradigm"). During the last ten years, he has received at least approximately $10,000 per year for such consulting.  He has also received grant support for research and writing from GSK and/or Pfizer

on at least five occasions.  In 2010, he co-authored a study, funded by Pfizer, on the use of its

drug, Chantix, for smoking cessation.

### Dr. Henningfield

63.     Since 1986, Dr. Henningfield has testified for plaintiffs in litigation against

tobacco-product manufacturers in at least thirty-two depositions and at least eleven trials.  Since

March 2, 2010, while serving on the TPSAC, Dr. Henningfield, as an expert witness for such

plaintiffs, has testified in at least three depositions and three trials, including one trial in which he

testified concerning menthol, as described in Exhibit N to this Complaint.  He is currently slated

to testify against tobacco-product manufacturers in at least 132 cases.

64.     In his role as a paid expert witness in cases against tobacco-product

manufacturers, Dr. Henningfield has collected fees for himself and his employer, Pinney

Associates, since at least 1997.  Those fees have ranged from $350 to $700 per hour, with at least

$150 of the per-hour fee going directly to Dr. Henningfield and the remainder going to Pinney

Associates.

65.     Dr. Henningfield's views, as stated in litigation and other contexts, demonstrate

that he has already made up his mind on critical questions to be considered by the TPSAC, such

as the impact of menthol and of other tobacco-product ingredients on nicotine, addiction, and the

public health.

66.     Dr. Henningfield is a Principal at, and derives most of his income from, Pinney

Associates, a firm that currently provides to GSK on an exclusive basis consulting services

regarding smoking-cessation products.  His formal title is: Vice President, Research & Health

Policy.  Through his association with Pinney Associates, Dr. Henningfield advises GSK

specifically on the development of nicotine-replacement therapies and treatments for tobacco

dependence.  Pinney Associates has received on average more than $2 million per year in revenue from pharmaceutical companies, more than half of which relates to smoking-cessation products.  In addition, during the last decade, Dr. Henningfield has received grant support for research and writing from GSK on at least eight occasions.

67.     Dr. Henningfield is also a partner in a company that holds patents for a nicotine-replacement-therapy product.  He has estimated that, if thess patents are successfully licensed, they could be worth more than $1 million to him as a partner in that company.  Thus, Dr. Henningfield has a financial interest in bringing about regulatory policies that will drive current smokers to use nicotine-replacement-therapy products.

### Dr. Samet

68.     Dr. Samet has testified for plaintiffs in at least eight tobacco-product trials.  He has testified that, in one case in Minnesota, he earned from his expert-witness engagement approximately $60,000 for his then employer, Johns Hopkins University.  He is currently scheduled to testify in one trial.  He has not withdrawn from that case even though he will testify about matters that are likely to come before the TPSAC.

69.     During the last decade, Dr. Samet has received grant support for research and writing from GSK on at least six occasions, including in 2010.  In addition, he formerly led the Institute for Global Tobacco Control, which is funded by GSK and Pfizer.  Moreover, until 2009, Dr. Samet received regular honoraria from Pfizer for his service on the Pfizer Global Tobacco Advisory Board.

### Dr. Burns

70.     Since 1985, Dr. Burns has testified for plaintiffs as an expert witness in over forty tobacco-product trials, and, in that capacity, has been deposed at least 125 times.

71.     Dr. Burns charges at least $600 an hour for deposition or trial testimony, and earns, on average, at least $4,800 for each day that he provides expert-witness services to plaintiffs suing tobacco-product manufacturers.  To date, he has earned over $1 million from his expert-witness engagements for plaintiffs in tobacco-product cases.  Indeed, so entrenched are Dr. Burns's ties to the tobacco-plaintiffs' bar that he has refused to turn over – even pursuant to court order – his income-tax returns reflecting his expert-witness income; and, as a result, he was removed as an expert in a lawsuit in West Virginia, as shown by Order Striking Dr. David M. Burns as an Expert Witness, *In Re: Tobacco Litigation (Personal Injury Cases)*, No. 00-C-5000, (W. Va. Cir. Ct. Ohio Cnty. June 11, 2003).

72.     Dr. Burns is currently designated as an expert witness in over 570 pending cases, in at least 130 of which he has not yet testified at a deposition or in trial.  He has not withdrawn from those cases, or from any of the cases in which he will be testifying as an expert witness against tobacco-product manufacturers.  Dr. Burns has testified at trial for plaintiffs suing tobacco-product manufacturers since his appointment to the Constituents Subcommittee.

73.     Moreover, Dr. Burns has consulted with plaintiffs' attorneys on how best to use science against tobacco-product manufacturers in litigation.  He has received multiple payments from plaintiffs' lawyers for lectures on the effective conduct of tobacco litigation.  As part of his general consulting for plaintiffs' attorneys, he also assists them in recruiting additional expert witnesses, and he participates in mock trials.

### Dr. Farone

74.     Since 1997, Dr. Farone has testified as an expert for plaintiffs in over forty tobacco-product trials and, in that capacity, has been deposed over eighty-five times in cases against tobacco-product manufacturers.

75.     Dr. Farone charges at least $250 an hour for deposition or trial testimony.  To date, he has earned at least approximately $250,000 from his expert-witness engagements for plaintiffs in tobacco-product cases.  Dr. Farone is currently designated as an expert witness in at least 241 pending cases, in at least 142 of which he has not yet testified at a deposition or in trial. He has not withdrawn from those cases, or from any of the cases in which he will be testifying as an expert witness against tobacco-product manufacturers.  Dr. Farone has testified at trial for plaintiffs suing tobacco-product manufacturers since his appointment to the Constituents Subcommittee.  Dr. Farone is a former PM-USA employee, who was terminated by the company and who, since that time, has worked actively as a witness against tobacco-product manufacturers.

### Violations of the Ethics Rules

76.     The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC and, separately, the presence of Drs. Burns and Farone (and Dr. Henningfield) as members of the Constituents Subcommittee create appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and the continuing roles of Drs. Benowitz, Henningfield, and Samet as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC, or as members of the Constituents Subcommittee.  As to those expressed views, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

77.     The TPSAC's consideration of menthol in cigarettes and its future consideration of dissolvable products, and the Constituents Subcommittee's consideration of constituents in cigarette smoke, are particular matters as the term "particular matter" is used in the statutes, regulations, guidance documents, and other materials relating to conflicts of interest and the ethical requirements applicable to special government employees.

### The Plaintiffs' Production of Documents, Including Confidential Documents, to the Defendants

78.     The Plaintiffs have produced to the Defendants large quantities of confidential documents in response to requests from the Defendants, including requests that relate specifically to issues pending before the TPSAC.

(a)     On March 31, 2010, Reynolds produced documents to the Defendants in response to a request from the Defendants seeking information on the marketing, research, and development of its Camel dissolvable tobacco products.  Many of the documents included in its submission contain trade secrets or otherwise confidential commercial information.

(b)     On August 25, 2010 and October 6, 2010, Reynolds produced to the Defendants, in response to requests by the Defendants on behalf of the TPSAC, more than two million pages of documents relating to menthol in cigarettes.  More than 1.1 million of those pages contain trade secrets or otherwise confidential commercial information.

(c)     On August 26, 2010, Lorillard produced to the Defendants 3,323 documents (totaling 56,866 pages).  Of those, 365 documents (4,489 pages) contain trade secrets or otherwise confidential commercial information.

79.     The Defendants are making available to the voting members of the TPSAC confidential information (or one or more summaries of such information) in the documents relating to menthol that the Plaintiffs have submitted to the Defendants.

80.     The Defendants have not indicated to the public or to the Plaintiffs whether and how such confidential information will be provided to the voting members of the TPSAC as they review the issues relating to dissolvable tobacco products.

81.     The Defendants have not indicated to the public or to the Plaintiffs whether and how other confidential information submitted by the Plaintiffs to the Defendants will be provided to the voting members of the TPSAC or to the members of the Constituents Subcommittee.

**Adverse Consequences of the Conflicts of Interest Among the Voting Members of the TPSAC and Among the Members of Its Constituents Subcommittee**

82.     Because the Defendants have failed to require TPSAC members and Subcommittee members to withdraw from service as paid expert witnesses in current and future lawsuits relating to tobacco products, Drs. Benowitz, Henningfield, Samet, Burns, and Farone will continue to testify against the manufacturers of the very products as to the regulation of which they will advise the Defendants.

83.     In advising the Defendants, these individuals will have incentives to provide to them, and to try to persuade other members of the TPSAC or its Constituents Subcommittee to provide to them, scientific reports, information, assessments, judgments, recommendations, and other advice that support the positions they take in their ongoing work as expert witnesses adverse to tobacco-product manufacturers.  Any such report, information, assessment, judgment, recommendation, or other advice that deviates from those positions could be a basis for cross-examination.  Because these individuals are aligned so consistently against tobacco-product manufacturers, they have incentives to try to persuade the TPSAC to reach conclusions consistent with those they have expressed or will express as witnesses, so that they will not be cross-examined on conclusions at odds with their stated views.  Thus, these individuals have a need to protect the positions they have staked out or will stake out in their continuing work as

expert witnesses for plaintiffs suing tobacco-product manufacturers, and are likely to do so by inappropriately influencing the TPSAC or its Constituents Subcommittee to provide reports, information, assessments, judgments, recommendations, and other advice that are not based strictly upon an impartial analysis of the relevant scientific information.  In addition, in their work for the TPSAC or Constituents Subcommittee, the positions they have taken or plan to take as expert witnesses will prevent them from being (and from appearing to be) open-minded, and from considering (and from appearing to consider) impartially the submissions and presentations to the TPSAC or Constituents Subcommittee by tobacco-product manufacturers and others.  The continuing work of Drs. Benowitz, Henningfield, Samet, Burns, and Farone as paid expert witnesses against tobacco-product manufacturer prevents the public from having a basis for confidence that the views they express as members of the TPSAC or the Constituents Subcommittee are not influenced by that work and by the income these individuals continue to derive from it.

84.     Manufacturers of nicotine-replacement-therapy products and other smoking-cessation products, including the pharmaceutical companies, GSK, Pfizer, Novartis, Sanofi-Aventis, and Aradigm, are in direct competition with tobacco-product manufacturers for the purchasing choices of adult smokers.  This competitive dynamic is reflected in the discussion at the March 31, 2010 meeting of the Committee of whether banning menthol from cigarettes would result in smokers trying to quit smoking, rather than switching to a non-menthol brand (Tr. 92 (public comment), 199-200 (committee discussion)).  A ban or restriction on the sale of menthol cigarettes might increase the sales of nicotine-replacement-therapy products and other smoking-cessation products.  Similarly, FDA regulations banning or further restricting the

availability of dissolvable or other smokeless tobacco products might increase the sales of such products.

85.     The opportunities for Drs. Benowitz, Henningfield, and Samet to continue to obtain income from consulting with pharmaceutical companies with respect to nicotine-replacement-therapy products and/or other smoking-cessation products depend on the continuing sales and profitability of such products.  Therefore, these individuals have an interest in protecting and enhancing the sales and profitability of such products, and may consciously or unconsciously influence the other members of the TPSAC inappropriately to recommend bans on, or unduly strict regulation of, the smokeless tobacco products with which they compete. Even if these individuals did not influence the TPSAC in such a manner, their mere presence on the committee poses (and appears to pose) severe financial conflicts of interest because their remunerative relationships with pharmaceutical companies will prevent them from being (and from being perceived as) open-minded and from considering impartially the submissions and presentations to the TPSAC or Constituents Subcommittee by tobacco-product manufacturers and others.

86.     These five individuals' continued service as expert witnesses and, in addition, the service of Drs. Benowitz, Henningfield, and Samet as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products also create the risk of substantial unfairness and other harms to the Plaintiffs.  As members of the TPSAC or the Constituents Subcommittee, these individuals will have access to confidential documents that FDCA § 904, 21 U.S.C. § 387d, added by the TCA, 123 Stat. at 1790-92, requires tobacco-product manufacturers to submit to the FDA.  By failing to prohibit TPSAC members from serving as expert witnesses against tobacco-product manufacturers, the Defendants fail to protect

against the risk that these individuals, inadvertently or advertently, will use information in such documents in formulating their testimony, in advising the trial lawyers who present them as expert witnesses, and/or in consulting for their pharmaceutical clients.  It is not credible that they can or will put such information completely out of their minds when engaging in such activities. That information is likely to color what they say as expert witnesses and/or consultants, how they say it, and what they deliberately refrain from saying.  Advertently or inadvertently, they may communicate the Plaintiffs' trade secrets and/or other commercial information to lawyers suing the Plaintiffs and/or to pharmaceutical companies that compete with the Plaintiffs, not only by words but also by facial expressions, gestures, and other nonverbal means.  Having on an advisory committee people who will continue to be testifying experts against parties that are subject to regulation that may be influenced by the committee's recommendations, or who will be consultants on matters as to which they will have access to regulated parties' trade secrets or other confidential commercial information, is contrary to the ethics laws and the FACA.

87.     These five individuals' pervasive financial conflicts of interest make clear that the Defendants have not taken appropriate steps to ensure that the Committee's reports, information, assessments, judgments, recommendations, and other advice will not be inappropriately influenced by any special interests.

88.     A further indicator of the Defendants' disregard of financial conflicts of interest is their engagement of Roswell Park Cancer Institute ("Roswell Park") as a contractor to review the menthol-related documents produced to the Defendants by Plaintiffs Lorillard and Reynolds and other tobacco-product manufacturers.  Roswell Park employs Dr. Michael Cummings as the Chair of its Department of Health Behavior.  Like Drs. Benowitz, Henningfield, Samet, Burns, and Farone, Dr. Cummings frequently testifies as an expert witness against tobacco-product

manufacturers in litigation.  The documents Roswell Park has reviewed pursuant to its contract

with the FDA contain trade secret and/or confidential commercial information submitted to the

Defendants by Plaintiffs Lorillard and Reynolds and other tobacco-product manufacturers.  One

of the employees of Roswell Park who reviewed documents produced by tobacco-product

manufacturers is Dr. Richard O'Connor, who works in the Department of Health Behavior.  The

Defendants have not publicly disclosed any restrictions on access to that confidential information

by Dr. Cummings or others at Roswell Park who help him in his work as an expert witness

against tobacco-product manufacturers.  On January 28, 2011, Reynolds sent to Defendant Dr.

Deyton, in his official capacity, a 3-page, single-spaced letter that objected, *inter alia*, to the

Defendants' provision to Roswell Park of confidential information submitted by Reynolds to the

Defendants; the letter included detailed supporting reasons.  A true and correct copy of that letter

is attached hereto as Exhibit Q.  On February 7, 2011, PM-USA sent to Dr. Deyton, in his

official capacity, a 2-page, single-spaced letter that made substantially the same objection.  A

true and correct copy of that letter is attached hereto as Exhibit R.  On February 8, 2011,

Lorillard sent to Dr. Deyton, in his official capacity, a 2-page, single-spaced letter that made

substantially the same objection, and adopted the reasons presented in Exhibits Q and R hereto.

A true and correct copy of that letter is attached hereto as Exhibit S.  As of the date of this

Complaint (February 25, 2011), as far as the Plaintiffs are aware, none of the Defendants has

responded to any of these three letters.

### Adverse Consequences of the Voting Members' Conflicts of Interest on the TPSAC's Consideration of Menthol in Cigarettes

89.     The TPSAC is currently considering a variety of issues with respect to menthol in

cigarettes, and is scheduled to issue to the Defendants a report and recommendations on these

issues by March 23, 2011.  Due to the conflicts of interest affecting Drs. Benowitz, Henningfield,

and Samet, the TPSAC is unable to deliver any report or recommendation that is free of the taint

of conflicts of interest.  Any report or recommendation by the TPSAC as currently composed

either will actually have been influenced by conflicting interests or will have the appearance of

having been so influenced, or both.  There will be no way for the Defendants or the public to

have confidence that the Committee's report and recommendations with respect to menthol are

the product of an unbiased assessment of the relevant science, uninfluenced by special interests

and by the prospect of financial gains.

90.     Drs. Benowitz, Henningfield, and Samet have incentives to lead the Committee to

develop a report with information, assessments, judgments, recommendations, and other advice

that are adverse to menthol in cigarettes.  Such a report would be of financial benefit to them in

their roles as consultants to pharmaceutical companies that manufacture nicotine-replacement-

therapy products and other smoking-cessation products.  Such a report would also be of financial

benefit to them because it would enhance their value as paid expert witnesses in lawsuits against

manufacturers of menthol cigarettes.  A report that was not adverse to menthol in cigarettes

would provide a basis for effective cross-examination when they serve as paid expert witnesses

in such lawsuits, and so would be contrary to their financial interests.  Drs. Benowitz,

Henningfield, and Samet might expect that a ban or restrictions on menthol in cigarettes would

induce large numbers of menthol smokers to try to quit smoking altogether and thereby might

result in increased demand for smoking-cessation products, including those of their consulting

clients.  They might also expect that such a ban or restrictions, or even a TPSAC report that

recommends a ban or restrictions, would lead to additional legal claims against manufacturers of

menthol cigarettes, and so to increased demand for their services as expert witnesses.  The mere

appearance of these possibilities undermines public confidence in any report and recommendations by the TPSAC that are adverse to menthol in cigarettes.

91. With respect to the TPSAC's report and recommendations as to menthol in cigarettes, the effects of the conflicts of interest described herein are aggravated by the Defendants' total exclusion of the Committee's nonvoting members from the drafting process. FDCA § 917(b)(1)(B), 21 U.S.C. § 387q(b)(1)(B), provides that the nonvoting members are to be nonvoting; but it does not otherwise exclude them from any activity of the Committee. Indeed, that statute provides that the nonvoting members "shall serve as consultants to" the voting members. The FDA's exclusion of the nonvoting members from the preparation of the report prevents them from serving as consultants to the voting members with respect to the preparation of the report, and therefore is contrary to the statute. In their letters of January 28, February 7, and February 8, 2011 to Dr. Deyton, Exhibits Q-S hereto, Reynolds, PM-USA, and Lorillard objected to the exclusion of the nonvoting members of the TPSAC from the process of drafting the menthol report, and provided detailed supporting reasons.

92. The effects of the conflicts of interest described herein are further aggravated by the secretive manner in which the preparation of the TPSAC's report on menthol is proceeding. The Committee's deliberations as to the assessments of available information about menthol in cigarettes, the recommendation(s) it will make, and the content of its report are occurring outside public view, and thus in a manner that is not transparent and that prevents the Plaintiffs and the public from ascertaining the roles being played by Drs. Benowitz, Henningfield, and Samet in those deliberations. On December 3, 2010, Reynolds sent to Defendant Dr. Deyton, in his official capacity, a 5-page, single-spaced letter that requested that the FDA (1) instruct the TPSAC members (a) that they shall conduct in writing (hard copy or electronic writing), and not

orally, all discussions relating to the report on menthol in cigarettes between any two or more members of the Committee; (b) that they shall promptly provide to the Agency a copy of each such writing, and shall not destroy or change any such writing after its initial use; and (c) that they shall promptly provide to the Agency copies of all drafts of the report and all notes, communications, and other working materials that are involved in or relate to the preparation of the report; and (2) make all such materials available to the public sufficiently in advance of the meeting at which the TPSAC will review the report so that interested members of the public will have a fair opportunity to review those materials before the meeting.  The letter included detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit T.  As of the date of this Complaint (February 25, 2011), none of the Defendants has responded to that letter.

93.    The Defendants' stated reason for excluding the nonvoting members is that preparation of the report involves access to certain confidential documents that tobacco-product manufacturers have submitted to the Defendants.  In the public meetings of the Committee, no one has referred to a single piece of confidential information that makes any material difference to any issue that will be addressed in the report.  Moreover, the Defendants have not inquired of the submitters of the confidential documents relating to menthol in cigarettes whether, or to what extent, they would waive confidentiality in order to permit the nonvoting members to have access to them.  In contrast, the Defendants make such inquiries in connection with requests under the Freedom of Information Act that seek records that submitters have designated as containing trade secret and/or confidential commercial information.  In addition, concern about the confidentiality of documents does not justify excluding the nonvoting members from

participating in stages of the drafting process that do not involve access to confidential

information, *e.g.*, reviewing drafts of chapters that do not disclose any confidential information.

### The TPSAC's Lack of Fair Balance as to Issues Relating to Smokeless Tobacco

94.     Within the public-health and tobacco-control communities, a product is

considered harm-reducing "if it lowers total tobacco-related mortality and morbidity even though

use of that product may involve continued exposure to tobacco-related toxicants," as stated in

Kathleen Stratton, Padma Shetty, Robert Wallace & Stuart Bondurant (eds.), *Clearing the*

*Smoke: Assessing the Science Base for Tobacco Harm Reduction* 2 (Institute of Medicine 2001)

(italics omitted).

95.     For several years, there has been a clear and very substantial controversy within

the public-health and tobacco-control communities over a possible current role for smokeless

tobacco products in reducing the harm from tobacco in the United States.  The controversy has

focused particularly on low-nitrosamine snus, a form of moist snuff that was originally

developed and consumed in Sweden, and is now sold in the United States as well.  Such

domestic moist snuff and dissolvable tobacco products constitute two additional categories of

smokeless tobacco products, among others, that have been discussed in the public-health and

tobacco-control communities as possibly being appropriate for a current role in harm reduction.

96.     In this ongoing controversy, there are two clearly divided sides: (a) those who

believe that current scientific and other knowledge adequately supports a current role for snus,

dissolvable, and/or other smokeless tobacco products in reducing the harm from tobacco in the

United States, and (b) those who believe that current scientific and other knowledge does not

adequately support such a current role for these products, because either (i) current knowledge

adequately supports a conclusion that they should never have such a role, or (ii) many years of

further research would be needed before scientific and other knowledge might be adequate to support such a role for all or some smokeless tobacco products.

97.     The controversy within the public-health and tobacco-control communities over a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States also includes a clear and very substantial dispute over the issue of the nature and impact of the use of dissolvable tobacco products on the public health.

98.     The controversy within the public-health and tobacco-control communities over a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States also includes a clear and very substantial dispute as to whether any smokeless tobacco product is a "modified risk tobacco product," within the meaning of FDCA § 911(b), 21 U.S.C. § 387k(b).

99.     With respect to tobacco harm reduction, manufacturers of smoking-cessation products, especially – but not only – those containing nicotine, are in regulatory competition with manufacturers of smokeless tobacco products over how the FDA should regulate smokeless tobacco products.  In two submissions to the FDA – Letter from Caroline Tillett, Ph.D., GlaxoSmithKline Consumer Healthcare, to Dr. Margaret Hamburg (undated, but posted on regulations.gov on Oct. 5, 2010) (Dkt. No. FDA-2010-N-0123) ("GSK Sept. Letter"), *available at*

http://www.regulations.gov/search/Regs/home.html#searchResults?Ne=11+8+8053+8098+8074+8066+8084+1&Ntt=FDA-2010-N-0123&Ntk=All&Ntx=mode+matchall&N=0;

Letter from Caroline Tillett, Ph.D., GlaxoSmithKline Consumer Healthcare, to Dr. Margaret Hamburg (Oct. 19, 2010) (Dkt. No. FDA-2010-N-0449) ("GSK Oct. 19, 2010 Letter"), *available at*

http://www.regulations.gov/search/Regs/home.html#searchResults?Ne=11+8+8053+8098+8074

+8066+8084+1&Ntt=FDA-2010-N-0123&Ntk=All&Ntx=mode+matchall&N=0 (true and

correct copies of which are attached hereto as Exhibits U and V) – GlaxoSmithKline Consumer

Healthcare ("GSK Healthcare"), manufacturer of the nicotine-replacement-therapy products

Nicorette and Nicoderm, advocates that the FDA (a) ban dissolvable tobacco products, which

might compete in the marketplace with GSK Healthcare's nicotine products as harm-reduction

products, and (b) expand the scope for permissible marketing and recommended use of GSK

Healthcare's nicotine products.

100.    These GSK Healthcare letters are salvos in the competition between GSK and

other manufacturers of non-tobacco nicotine products and other smoking-cessation products, on

one side, and manufacturers of smokeless tobacco products, on the other.  The competition is not

being conducted fairly, however, because three members of the TPSAC have financial ties to

GSK and/or other manufacturers of nicotine-replacement-therapy products and other smoking-

cessation products, and no members have any similar ties to manufacturers of smokeless tobacco

products.

101.    Four of the eight current voting members of the TPSAC are on one side of the

two-sided controversy over whether smokeless tobacco products are currently known to be

suitable for a current role in tobacco harm reduction in the United States.   Drs. Benowitz,

Hatsukami, Henningfield, and Samet have all publicly espoused, or are otherwise publicly

associated with, the view that none of these products is currently known to be suitable for such a

role.

(a)    For example, Dr. Benowitz is a co-author, and Dr. Hatsukami and Dr.

Samet are publicly identified peer reviewers, of a "policy statement" issued by the American

Heart Association, which takes a public position on an ultimate issue relating to smokeless

tobacco products that the TPSAC will consider when it addresses dissolvable tobacco products,

as required by FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), quoted in paragraph 27, *supra*.  The

policy statement asserts:  "[T]here is inadequate evidence to support the use of ST [smokeless

tobacco] products as a smoking cessation strategy.  Based on the findings reviewed in this

statement, clinicians should continue to discourage use of all tobacco products and emphasize

prevention of smoking initiation and smoking cessation as primary goals for tobacco control,"

Mariann R. Piano, Neal L. Benowitz, Garret A. FitzGerald, Susan Corbridge, Janie Heath, Ellen

Hahn, Terry F. Pechacek, & George Howard, on behalf of the American Heart Association

Council on Cardiovascular Nursing, *Impact of Smokeless Tobacco Products on Cardiovascular*

*Disease: Implications for Policy, Prevention, and Treatment[:] A Policy Statement From the*

*American Heart Association*, Circulation 2010; 122:15 1520-1544 (pub. online Sept. 13, 2010),

*available at* http://circ.ahajournals.org/cgi/reprint/122/15/1520.

      (b)     Other statements by Drs. Benowitz, Hatsukami, Henningfield, and Samet

that show them to be on the same side of the controversy over a current role for smokeless

tobacco products in reducing the harm from tobacco are quoted or discussed at pp. 18-21 of

Exhibit M hereto.

      102.    These four voting members are also the principal biological scientists on the

Committee.  FDA's Roster of the TPSAC, *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm180906.htm, ascribes particular types of expertise to each TPSAC

member.  It ascribes expertise with respect to tobacco, nicotine, or addiction to each of these four

voting members, but not to any of the other four voting members.  The only voting member to whom it ascribes expertise as to smokeless tobacco is Dr. Hatsukami.

103.    In addition, Dr. Mark Clanton, a member of the TPSAC, is the Chief Medical Officer of the American Cancer Society ("ACS"), High Plains Division.  In 2003, he was National President Elect of the ACS Board of Directors; and he has held many other responsible positions with the national ACS.  The discussion of smokeless tobacco in general and snus in particular on the ACS website, *see* American Cancer Society, *Are spit tobacco and snuff safe alternatives to cigarette smoking?  What is snus?  Is it safe?* (Nov. 8, 2010), *available at* http://www.cancer.org/Cancer/CancerCauses/TobaccoCancer/QuestionsaboutSmokingTobaccoa ndHealth/questions-about-smoking-tobacco-and-health-smokeless-alt, acknowledges that smokeless tobacco products are "less lethal" than cigarettes, but the ACS discussion provides no encouragement whatever to substitute any form of smokeless tobacco for cigarettes.  On information and belief, Dr. Clanton adheres to the ACS's negative view as to any role for smokeless tobacco products in tobacco harm reduction.

104.    Three voting members of the TPSAC – Drs. Benowitz, Hatsukami, and Henningfield – by reason of their many joint publications and other joint activities – constitute a clique.  From time to time, other voting members of the TPSAC have engaged in joint professional activities with one or more of these three voting members, thereby expanding the clique.

(a)    Drs. Benowitz, Hatsukami, and Henningfield have collaborated on numerous publications over long periods of time.  As set forth in Exhibit M hereto:

(1)    Drs. Benowitz and Hatsukami are co-authors of at least eight publications spanning thirteen years.

(2)     Drs. Benowitz and Henningfield are co-authors of at least twenty-one publications spanning twenty-two years.

(3)     Drs. Hatsukami and Henningfield are co-authors of at least five publications spanning thirteen years.

(4)     Drs. Benowitz, Hatsukami, and Henningfield are co-authors of at least one publication in 2009, and another in 2010.

(5)     In sum, two or more of these three voting members of the TPSAC have collaborated on at least thirty-six publications.

(b)     These authors have also collaborated with Dr. Samet and Dr. Burns.  Dr. Benowitz has co-authored with Dr. Samet at least four publications spanning five years.  Dr. Henningfield has worked with Dr. Samet on one publication, in 2004.  Drs. Hatsukami and Samet were publicly identified peer reviewers of a publication Dr. Benowitz co-authored for the American Heart Association in 2010.  In addition, Drs. Benowitz, Henningfield, Samet, and Burns have collaborated on numerous tobacco-related Surgeon General's Reports and numerous tobacco-related monographs issued by the National Cancer Institute ("NCI"), as described in paragraphs 122-23, *infra*.

(c)     Dr.  Henningfield collaborated on a publication with TPSAC voting member Melanie Wakefield in 2010.

(d)     Over long periods of time, Drs. Benowitz, Hatsukami, Henningfield, and Samet have also shared many other professional activities.  As truthfully set forth in Exhibit M hereto:

(1)     From 1982 to 1996, Dr. Henningfield held various positions at the Addiction Research Center of the National Institute on Drug Abuse ("NIDA").  During 1993-1996, Dr. Hatsukami was on the Center's Scientific Board of Counselors.

(2)     In 1991, Drs. Benowitz and Henningfield collaborated on a video tape: "Nicotine Addiction: Toward a New Understanding."

(3)     In 1994, Dr. Hatsukami was a participant in the President's Cancer Panel, NCI Ad Hoc Panel on FTC Cigarette Test Methods; that same year, Dr. Benowitz was an invited speaker for the Ad Hoc Panel.  In February 1997 in Jackson, MS, Drs. Hatsukami and Henningfield gave lectures to the President's Panel: "Promoting Healthy Lifestyles to Reduce the Risk of Cancer."

(4)     Drs. Benowitz, Hatsukami, and Henningfield were consultants or advisors to the FDA on nicotine during the mid-1990s.

(5)     In 1996, Dr. Benowitz was a member of Canada's Expert Committee on Cigarette Modifications, and Dr. Henningfield was a presenter and discussant at a meeting of the Committee.

(6)     Drs. Benowitz, Hatsukami, and Henningfield have all been active in the Society for Research on Nicotine and Tobacco ("SRNT").  Dr. Benowitz was President of the Society in 1996-1997, Dr. Henningfield was President in 1998-1999, and Dr. Hatsukami was President in 1999-2000.  In addition, Dr. Benowitz was Chair of the Society's Awards Committee from 2004 to 2009, and gave its Master Lecture in 1995; in 2000-2001, he was Chair of the Safety Section of the SRNT-World Health Organization ("WHO") Treatobacco.net Project (web-based smoking-cessation database); in 1995, he was an organizer of, and a speaker at, SRNT's Workshop on Nicotine Safety and Toxicity; and he was a speaker at its annual meetings

in 1999, 2001, 2002, and 2008.  Dr. Hatsukami served on SRNT's Awards Committee in 1999-

2002 and 2006, was a Global Network Committee Member during 2000-2002, served as Past

President and on the Executive Board in 2000-2001, and was an Executive Committee Member

and Member Delegate in 1994-1997; she also has given numerous presentations at its annual

meetings since 2000.   Dr. Henningfield has been SRNT's Membership Chair since 1994; he

received awards from SRNT in 2001 and 2005; he was Deputy Chair of SRNT's Editorial Board,

and was Deputy Editor of the SRNT-WHO Treatobacco.net Project; and he gave lectures at

SRNT meetings in 1995, 1998, 1999, 2001, and 2003-2008.

    (7) Drs. Benowitz, Hatsukami, and Henningfield have also been active

in the American Legacy Foundation.  They all participated in the "Strategic Dialogue on

Tobacco Harm Reduction," of which Dr. Hatsukami was Co-Chair.  The Dialogue was funded

by the American Legacy Foundation, the Robert Wood Johnson Foundation, and the University

of Minnesota Tobacco Use Research Center (with which Dr. Hatsukami is affiliated).  The

participants met four times from December 2005 to August 2007, and they produced a consensus

report, which Drs. Benowitz, Hatsukami, and Henningfield all joined.  Dr. Hatsukami was a

grant reviewer for the Foundation's Evaluation Coordinating Center in 1999; she served on the

Foundation's Emerging Science Advisory Group in 2000-2002; from 2004 to at least February 4,

2010 (the date of her curriculum vitae on the FDA website), she was Co-Chair of the Tobacco

Harm Reduction Network, sponsored by the Foundation and the NCI; and in 2007 and 2009, she

was Co-Chair of Science and Future Directions for Nicotine Regulation, funded by the

Foundation, NCI, and NIDA.  Dr Henningfield has been a member of the Foundation's Policy

Advisory Panel since 2000.

(8)     In the mid-2000s, Drs. Hatsukami and Henningfield served overlapping terms on the Interagency Committee on Smoking and Health.

(9)     Drs. Benowitz and Henningfield have both served on the editorial board of the Journal of Smoking-related Disorders.

(10)     Drs. Hatsukami and Henningfield have been active in the College on Problems of Drug Dependence.  Dr. Hatsukami was President in 2001-2002, Past President and Executive Committee Member in 2002-2003, and Treasurer and Executive Committee Member in 2004-2007.  Dr. Henningfield was a Charter Fellow of the College.  At a College meeting in 2009, Drs. Hatsukami and Henningfield co-chaired a program on regulating nicotine in tobacco products: state of the science and future policy.  During Dr. Hatsukami's tenure on the Executive Committee, Dr. Henningfield was a frequent panelist, lecturer, and/or member of a program committee for College meetings.

(11)     Dr. Benowitz was an External Advisor to NCI's and NIDA's Transdisciplinary Tobacco Use Research Center Program during 2005-2009.  Dr. Hatsukami presented on the Centers in 2004, and co-authored an article about them in 2009.

(12)     Dr. Henningfield lists on his curriculum vitae on the FDA website under the heading, "Extramural sponsorship Current/Recent Research Collaborations," a collaboration with Dr. Hatsukami: "University of Minnesota, Dorothy Hatsukami, P.I.: Transdisciplinary Tobacco Use Research Center, Nicotine dependence and risk across generations.  Funded by National Cancer Institute, National Institute on Drug Abuse, Robert Wood Johnson Foundation.  Scientific Advisory Board Member, 2000 to 2004."

(13)     From 2004 to at least June 17, 2009 (the date of his curriculum vitae on the FDA website), Dr. Henningfield was an expert for the WHO Study Group on

Tobacco Product Regulation.  Dr. Hatsukami was a consultant to the Study Group in 2006 and 2007.

(14)    In his curriculum vitae under the heading, "Selected Invited and Keynote Lectures," Dr. Henningfield lists additional collaborations with Dr. Hatsukami in 2001, 2007, and two in 2009.

(15)    In their roles as paid expert witnesses for plaintiffs suing tobacco-product manufacturers, Drs. Benowitz and Henningfield, and also Dr. Samet, frequently have worked for the same plaintiffs and their lawyers.  Two or more of them have testified for the same plaintiffs and lawyers in at least sixteen cases, from 1986 to the present.   Two or more of them have been disclosed as expert witnesses by the same lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least an additional 177 cases.  Thus, the total number of cases in which two or more of them have worked for the same plaintiffs and their lawyers is at least 193.

(A)    Drs. Benowitz and Henningfield have testified on the same side in at least eight cases.  Drs. Benowitz and Samet have testified on the same side in at least four cases.  Drs. Henningfield and Samet have testified on the same side in at least one case.  Drs. Benowitz, Henningfield, and Samet have testified on the same side in at least three cases.

(B)    Drs. Benowitz and Henningfield have been formally disclosed as expert witnesses by the same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least 174 additional cases.  Drs. Benowitz and Samet have been formally disclosed as expert witnesses by the same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least one additional case.  Drs. Benowitz, Henningfield, and Samet have been formally disclosed as expert witnesses by the

same plaintiffs' lawyers for the same plaintiffs, but did not testify, or have not yet testified, in at least two additional cases.

(16)     In addition, Drs. Henningfield and Samet were colleagues at Johns Hopkins University from 1994 to 2008; and, from 2003 to 2008, both were affiliated with the University's Institute for Global Tobacco Control (of which Dr. Samet was the Director).

105.     As alleged in paragraphs 62, 66-67, and 69, *supra*, three voting members of the TPSAC – Drs. Benowitz,  Henningfield, and Samet – have or recently had and may have again financial relationships with manufacturers of nicotine-replacement-therapy products or other smoking-cessation products, and Dr. Henningfield has an interest in two patents on a nicotine gum.  In addition, Dr. Hatsukami has received at least one research grant from Nabi Pharmaceuticals, and has consulted (without honoraria) for Pfizer and Abbott Laboratories. This set of circumstances also causes the TPSAC to lack fair balance on issues affecting the competition between pharmaceutical manufacturers of nicotine-replacement-therapy and other smoking-cessation products and manufacturers of smokeless tobacco products because, in accordance with FDCA § 917(b)(1)(C), 21 U.S.C. § 387q(b)(1)(C), the Committee has no voting members who have a financial relationship with a tobacco-product manufacturer, but the committee does include four voting members who have financial relationships with the pharmaceutical manufacturers,

106.     Not a single voting member of the TPSAC represents the views of the other side of the controversy over a current role for smokeless tobacco products in tobacco harm reduction. Therefore, as to the specific question on which, under FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), the TPSAC is to provide a report and recommendation – "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use

among children" – the TPSAC contains four voting members on one side of an existing and

substantial controversy within the public-health and tobacco-control communities, and not one

voting member on the other side of that controversy.

107.    The TPSAC also lacks fair balance as to issues relating to menthol in cigarettes

because no voting member of the Committee balances the anti-menthol views of Drs. Benowitz

and Henningfield, discussed in Exhibits N and O hereto.

108.    The nonvoting members of the TPSAC cannot provide fair balance with respect to

issues relating to menthol in cigarettes or dissolvable tobacco products and/or other smokeless

tobacco products, or any other issue.  First, the nonvoting members have no vote on any report,

information, assessment, judgment, recommendation, or other advice to be provided by the

TPSAC to the Defendants.  Second, the Defendants exclude the nonvoting members from

important activities of the Committee, such as the preparation of the Committee's report on

menthol in cigarettes, and probably will exclude them from important activities relating to

dissolvable tobacco products and other subjects.  Third, the Defendants view the nonvoting

members as being merely industry representatives and as lacking the kinds of expertise the

Defendants attribute to the voting members; and, consequently, the Defendants will give much

less weight to the views of the nonvoting members than to those of the voting members.  On

FDA's webpage containing the roster of the TPSAC,

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm180906.htm, the Defendants identify the "expertise" of the voting

members as substantive (*e.g.*, Dr. Benowitz: nicotine, substance abuse, clinical pharmacology,

toxicology; Dr. Hatsukami: clinical psychology, smokeless tobacco, tobacco cessation and harm

reduction; Dr. Henningfield: addiction medicine, pharmacology, health policy; and Dr. Samet:

internal medicine, pulmonary, epidemiology, tobacco control, public health), but they identify the "expertise" of each nonvoting member as: "industry representative."

## The TPSAC Is Inappropriately Influenced by Special Interests

109.    The plaintiffs and their lawyers who sue tobacco-product manufacturers for personal injuries are a special interest group with respect to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC to the Defendants.  The interests of that special interest group are adverse to the interests of the Plaintiffs and other tobacco-product manufacturers.

110.    Manufacturers of nicotine-replacement-therapy products and other smoking-cessation products are a special interest group with respect to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC to the Defendants.  The interests of that special interest group are adverse to the interests of the Plaintiffs and other tobacco-product manufacturers.

111.    The Defendants have failed to apply appropriate provisions against inappropriate influence of special interests resulting from the financial conflicts of interest and appearance conflicts of interest of Drs. Benowitz, Henningfield, and Samet and the lack of fair balance on the TPSAC.  Due to these conflicts of interest and lack of fair balance, it is likely that the TPSAC will unfairly disregard or give inadequate weight to scientific information that is adverse to the interests of these groups, will disregard or give inadequate weight to the legitimate interests of the Plaintiffs and submissions by the Plaintiffs and other tobacco-product manufacturers, and will provide to the Defendants reports, information, assessments, judgments, recommendations, and other advice that are biased against and adverse to the Plaintiffs' tobacco products and to the Plaintiffs.

**Injuries to the Plaintiffs from the Conflicts of Interest on the TPSAC and the Constituents Subcommittee and the Lack of Fair Balance on the TPSAC**

**Injuries Resulting from Actions by the FDA Influenced by the TPSAC**

112.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because the reports, information, assessments, judgments, recommendations, and other advice it provides to the Defendants (a) will have resulted from a committee three of whose voting members have financial and appearance conflicts of interests that reflect antecedent and continuing hostility to the Plaintiffs' tobacco products and to the Plaintiffs, and that disqualify those voting members (1) from serving on the TPSAC or, in the alternative, (2) from taking part in the activities of the TPSAC relating to menthol in cigarettes or dissolvable or other smokeless tobacco products, and in the activities of the TPSAC relating to other matters that affect those special interests, (b) through these three members will have been unduly influenced by the special interests identified herein, and (c) will have resulted from a committee that lacks fair balance.

113.    More often than not, the FDA follows the advice and recommendations of its advisory committees.

114.    The Plaintiffs have a direct interest in the reports, information, assessments, judgments, recommendations, and other advice the TPSAC provides to the Defendants with respect to menthol in cigarettes, dissolvable tobacco products, smokeless tobacco products generally, modified risk tobacco products, standards for tobacco products, good manufacturing practices for tobacco products, applications to the FDA relating to new tobacco products, and other matters relating to the regulation of tobacco products because the Plaintiffs and the tobacco products they manufacture and sell will be directly and materially affected by the Defendants'

decisions with respect to the regulation of those products; and those decisions will be directly and materially influenced by the reports, information, assessments, judgments, recommendations, and other advice that the TPSAC provides to the Defendants.

115.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the exclusion of the nonvoting members of the TPSAC from the preparation of the Committee's report on menthol in cigarettes because that exclusion aggravates the influence on the content of report that is being exercised by voting members who have conflicts of interest and who, even before serving on the Committee, expressed strongly negative views about menthol in cigarettes. The preparation of the report would benefit from the vast relevant experience of the nonvoting members. Even though they would have no vote and the voting members need not accept any of their comments or editorial suggestions, the quality of the Committee's report would be improved by the voting members' consideration of such comments and editorial suggestions.

116.    Reynolds is and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because the reports, information, assessments, judgments, recommendations, and other advice it provides to the Defendants will fail to reflect the views of those in the public-health and tobacco-control communities who believe that current scientific and other knowledge adequately supports a current role for snus, dissolvable, and/or other smokeless tobacco products in reducing the harm from tobacco in the United States – and, instead, will reflect the views of only one side in this two-sided controversy.

117.    The burden of any new prohibitions or restrictions on menthol in cigarettes – adopted by the Defendants after receiving and giving weight to the reports, information,

assessments, judgments, recommendations, and other advice provided by the TPSAC – will fall directly on the Plaintiffs and other manufacturers of cigarettes containing menthol.

118.    The burden of any new prohibitions or restrictions on the sale of dissolvable (and/or other) smokeless tobacco products – adopted by the Defendants after receiving and giving weight to the reports, information, assessments, judgments, recommendations, and other advice provided by the TPSAC – will fall directly on Plaintiff Reynolds and other manufacturers of such products.

### Injury Resulting from the Conflicted TPSAC Members' and Constituents Subcommittee Members' Access to the Plaintiffs' Confidential Information

119.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because, as voting members of the TPSAC, Drs. Benowitz, Henningfield, and Samet will have access to confidential information that the Plaintiffs submit (or have submitted) to the Defendants, and will be able to make unsupervised use of that information in their work as consultants to pharmaceutical manufacturers, some of whose products compete with the Plaintiffs' products, and in their work as expert witnesses against the Plaintiffs in litigation.

120.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the membership of Dr. Burns and Dr. Farone on the Constituents Subcommittee because, as members of the Subcommittee, they will have access to confidential information that the Plaintiffs submit (or have submitted) to the Defendants and will be able to make unsupervised use of that information in their work as expert witnesses against the Plaintiffs in litigation.

**Injury Resulting from Use of TPSAC Reports in Litigation**

121.    The Plaintiffs are and, unless this Court grants relief, will continue to be injured by the current composition of the voting membership of the TPSAC because reports issued by the TPSAC will be used by Drs. Benowitz, Henningfield, Samet, Burns, and Farone to support their testimony in lawsuits against the Plaintiffs and other tobacco-product manufacturers.

122.    Other reports issued by federal committees in which Drs. Benowitz, Henningfield, Samet, and Burns have frequently participated, such as reports of the Surgeon General and monographs issued by committees appointed by the NCI, are commonly used by plaintiffs as exhibits in trials against tobacco-product manufacturers, and are commonly referred to by plaintiffs' expert witnesses, including Dr. Benowitz and Dr. Henningfield, in such trials.   Thus, the individuals in this clique repeatedly receive appointments to committees to write these reports, which appointments enhance their value as expert witnesses against tobacco-product manufacturers, and then these individuals use the reports in their testimony.

(a)    Drs. Benowitz, Henningfield, Samet, and Burns were among the editors, authors, reviewers, or other contributors to the tobacco-related Surgeon General's Reports in the following years:

(1)    1981:  Dr. Burns, as shown in U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking The Changing Cigarette[:] A Report of the Surgeon General (1981), *available at* http://profiles.nlm.nih.gov/NN/B/B/S/N/_/nnbbsn.pdf.

(2)    1982:  Dr. Burns, as shown in U.S. Dep't of Health & Human Servs., The Health Consequences of Smoking: Cancer:  A Report of the Surgeon General (1982), *available at* http://profiles.nlm.nih.gov/NN/B/C/D/W/.

(3)     1983:  Dr. Burns, as shown in U.S. Dep't of Health & Human
Servs., The Health Consequences of Smoking: Cardiovascular Disease:  A Report of the Surgeon
General (1983), *available at* http://profiles.nlm.nih.gov/NN/B/B/T/D/.

(4)     1984:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &
Human Servs., The Health Consequences of Smoking: Chronic Obstructive Lung Disease: A
Report of the Surgeon General (1984), *available at* http://profiles.nlm.nih.gov/NN/B/C/C/S/.

(5)     1985:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &
Human Servs., The Health Consequences of Smoking: Cancer and Chronic Lung Disease in the
Workplace:  A Report of the Surgeon General (1985), *available at*
http://profiles.nlm.nih.gov/NN/B/C/B/N/.

(6)     1986:  Drs. Benowitz, Samet, and Burns, as shown in U.S. Dep't of
Health & Human Servs., The Health Consequences of Involuntary Smoking[:]  a Report of the
Surgeon General (1986), *available at* http://profiles.nlm.nih.gov/NN/B/C/P/M/.

(7)     1986:  Drs.  Benowitz, Henningfield, and Burns, as shown in U.S.
Dep't of Health & Human Servs., The Health Consequences of Using Smokeless Tobacco[:]  A
Report of the Advisory Committee to the Surgeon General (1986), *available at*
http://profiles.nlm.nih.gov/NN/B/B/F/C/.

(8)     1988:  Drs. Benowitz, Henningfield, and Burns, as shown in U.S.
Dep't of Health & Human Servs.,  The Health Consequences of Smoking[:]  Nicotine
Addiction[:]  A Report of the Surgeon General (1988), *available at*
http://profiles.nlm.nih.gov/NN/B/B/Z/D/.

(9)     1989:  Drs. Henningfield and Burns, as shown in U.S. Dep't of
Health & Human Servs., Reducing the Health Consequences of Smoking[:]  25 Years Of

Progress[:] a report of the Surgeon General (1989), *available at*

http://profiles.nlm.nih.gov/NN/B/B/X/S/.

          (10)    1990:  Drs. Henningfield, Samet, and Burns, as shown in U.S.

Dep't of Health & Human Servs., The Health Benefits of Smoking Cessation[:]  a report of the

Surgeon General (1990), available at http://profiles.nlm.nih.gov/NN/B/B/C/T/.

          (11)    1992:  Dr. Burns, as shown in U.S. Dep't of Health & Human

Servs., Smoking and Health in the Americas[:]  A 1992 Report of the Surgeon General, in

collaboration with the Pan American Health Organization (1992), *available at*

http://profiles.nlm.nih.gov/NN/B/B/B/J/.

          (12)    1998:  Drs. Benowitz, Henningfield, Samet, and Burns, as shown

in U.S. Dep't of Health & Human Servs., Tobacco Use Among U.S. Racial/Ethnic Minority

Groups[:] African Americans American Indians and Alaska Natives Asian Americans and

Pacific Islanders Hispanics[:]  A Report of the Surgeon General (1998), *available at*

http://www.cdc.gov/tobacco/data_statistics/sgr/1998/complete_report/index.htm.

          (13)    2000:  Henningfield, Samet, and Burns, as shown in U.S. Dep't of

Health & Human Servs., Reducing Tobacco Use[:]  A Report of the Surgeon General (2000),

*available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2000/index.htm.

          (14)    2001:  Drs. Benowitz, Henningfield, Samet, and Burns, as shown

in U.S. Dep't of Health & Human Servs., Women and Smoking[:]  A Report of the Surgeon

General (2001), *available at* http://www.cdc.gov/tobacco/data_statistics/sgr/2001/index.htm.

          (15)    2004:  Drs. Samet and Burns, as shown in U.S. Dep't of Health &

Human Servs., The Health Consequences of Smoking[:]  A Report of the Surgeon General

(2004), *available at* http://www.surgeongeneral.gov/library/smokingconsequences/index.html.

(16)    2006:  Drs. Benowitz, Samet, and Burns, as shown in U.S. Dep't of

Health & Human Servs., The Health Consequences of Involuntary Exposure to Tobacco Smoke:

A Report of the Surgeon General (2006), *available at*

http://www.surgeongeneral.gov/library/secondhandsmoke/index.html.

(17)    For the most recent Surgeon General's report, in 2010, the

contributing editors included Drs. Benowitz, Hatsukami, Henningfield, and Samet; the authors of

chapters included all of them and also Dr. Burns; and the reviewers, whom one would have

expected to be independent of the editors and authors, included Drs. Benowitz, Hatsukami,

Henningfield, and Burns – as shown in U.S. Dep't of Health & Human Servs., How Tobacco

Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease[:]

A Report of the Surgeon General vi-x (2010), *available at*

http://www.surgeongeneral.gov/library/tobaccosmoke/report/full_report.pdf.

(b)    Drs. Benowitz, Henningfield, Samet, and Burns were among the editors,

authors, reviewers, or other contributors to the following tobacco-related monographs issued by

the NCI (and once by the Environmental Protection Agency):

(1)    Monograph 1 (1991):  Drs. Samet and Burns, as shown in NCI,

Strategies to Control Tobacco Use in the United States: A Blueprint for Public Health Action in

the 1990's (Dec. 1991), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/1/index.html.

(2)    Monograph 2 (1992):  Drs. Benowitz, Henningfield, and Burns, as

shown in NCI, Smokeless Tobacco or Health: An International Perspective (Sept. 1992), *available*

*at* http://cancercontrol.cancer.gov/tcrb/monographs/2/index.html.

(3)     Monograph 4 (1992):  Drs. Benowitz, Samet and Burns, as shown in EPA, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders (Dec. 1992), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/.

(4)     Monograph 5 (1994): Dr. Burns, as shown in NCI, Tobacco and the Clinician: Interventions for Medical and Dental Practice (Jan. 1994), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/5/index.html.

(5)     Monograph 6 (1995): Dr. Burns, as shown in NCI, Community-Based Interventions for Smokers: The COMMIT Field Experience (Aug. 1995), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/6/index.html.

(6)     Monograph 7 (1995):  Drs. Benowitz, Henningfield, and Samet, as shown in NCI, The FTC Cigarette test Method for Determining Tar, Nicotine, and Carbon Monoxide Yields of U.S. Cigarettes (no date), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/7/index.html.

(7)     Monograph 8 (1997):  Drs. Samet and Burns, as shown in NCI, Changes in Cigarette-Related Disease Risks and Their Implications for Prevention and Control (Feb. 1997), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/.

(8)     Monograph 9 (1998):  Drs. Benowitz, Henningfield, and Burns, as shown in NCI, Cigars: Health Effects and Trends (Feb. 1998), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/9/index.html.

(9)     Monograph 10 (1999):  Dr. Benowitz, as shown in NCI, health Effects of Exposure to Environmental Tobacco Smoke (Aug. 1999), *available at* http://cancercontrol.cancer.gov/tcrb/monographs/10/index.html.

(10)    Monograph 11 (2000):  Dr. Burns, as shown in NCI, State and

Local Legislative Action to Reduce Tobacco Use (June 2000), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/11/index.html.

(11)     Monograph 12 (2000):  Drs. Benowitz and Burns, as shown in

NCI, Population Based Smoking Cessation (Nov. 2000), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/12/index.html.

(12)     Monograph 13 (2001):  Drs. Benowitz, Henningfield, Samet, and

Burns, as shown in NCI, Risks Associated with Smoking Cigarettes with Low Machine-

Measured Yields of Tar and Nicotine (Oct. 2001), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/13/index.html.

(13)     Monograph 14 (2001): Dr. Burns, as shown in NCI, Changing

Adolescent Smoking Prevalence (Nov. 2001), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/14/index.html.

(14)     Monograph 15 (2003): Drs. Henningfield and Burns, as shown in

NCI, Those Who Continue to Smoke (Sept. 2003), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/15/index.html.

(16)     Monograph 17 (2006), Drs. Samet and Burns, as shown in NCI,

Evaluating ASSIST: A Blueprint for Understanding State-level Tobacco Control (Oct. 2006),

*available at* http://cancercontrol.cancer.gov/tcrb/monographs/17/index.html.

(17)     Monograph 18 (2007):  Dr. Henningfield, as shown in NCI,

Greater Than the Sum: Systems Thinking in Tobacco Control (May 2007), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/18/index.html.

(18)     Monograph 20 (2009):  Dr. Benowitz, as shown in NCI,

Phenotypes and Endophenotypes: Foundations for Genetic Studies of Nicotine Use and

57

Dependence (Sept. 2009), *available at*

http://cancercontrol.cancer.gov/tcrb/monographs/20/index.html.

123.    By appointing these frequently testifying expert witnesses to the TPSAC and its

Constituents Subcommittee, the Defendants are perpetuating the practice of these witnesses in

influencing federal committees to issue reports that bolster the testimony they give on behalf of

parties suing tobacco-product manufacturers, including Lorillard Tobacco Company and

Reynolds.

**Additional Injury to Lorillard from the Composition of the TPSAC**

124.    Lorillard already has been harmed by the fact that the TPSAC is composed of

individuals with pre-existing, well-defined anti-tobacco stances.  For example, on November 18,

2010, the TPSAC held a formal meeting.  At that meeting, Dr. Connolly – whom observers had

generally considered one of the most outspoken anti-tobacco advocates on the TPSAC –

presented his personal view that menthol is a so-called "starter" product for young individuals.

Over the next five days, through November 23, 2010, Lorillard's share price plunged $3.10 from

$86.89 to $83.79.  Further, on December 8, 2010, the FDA held a discussion with tobacco

manufacturers and growers, at which industry stakeholders voiced their concerns that the TPSAC

is composed of anti-tobacco activists.  Even though the FDA explained that it would make its

final decision based upon its own view of the relevant science, Lorillard's stock fell $1.73 the

very next day.  During the November 2010 - January 2011 time period, reports filed by financial

analysts who cover the tobacco industry consistently noted the TPSAC members' anti-tobacco

bias.  The growing recognition in this time period that the TPSAC included members with an

anti-tobacco bias caused a continuing decline in Lorillard's share price, which dropped to $74.20

on Jan. 21, 2011, $15.02 below its price of $89.22 on Nov. 8, 2010, less than two and a half

months earlier.   This drop in the stock price represented a loss of more than $2 billion in shareholder value.  The importance to Lorillard shareholders and prospective shareholders of the anti-tobacco bias on the TPSAC is underscored by the sudden increase in Lorillard's share price on January 10, 2011, the day it was confirmed that Dr. Connolly had resigned from the Committee.  But that increase proved fleeting, because Dr. Connolly's resignation did not eliminate concerns about the anti-tobacco bias of the TPSAC.  To the contrary, the TPSAC's continuing anti-tobacco bias – expressed during a public meeting that concluded the next day, January 11, 2011 and covered extensively in analyst reports – caused the stock to plummet more than $3.50 in the ensuing week and a half.

### Traceability of the Plaintiffs' Injuries to the Defendants' Actions

125.    The injuries alleged herein are directly traceable to Defendants' actions in appointing the current voting members of the TPSAC.  Those injuries arise from the bias in favor of special interest groups and the lack of fair balance on the Committee as currently composed, which will cause the Committee to ignore or not fairly consider scientific information relating to menthol in cigarettes, a possible current role for smokeless tobacco products in reducing the harm from tobacco in the United States, and other matters that will come before the Committee. The appointment of these members, who have conflicts of interest as described herein, also has created the risk that they will use the Plaintiffs' confidential information improperly and, advertently or inadvertently, will reveal such confidential information to other parties that, like them, are adverse to the Plaintiffs.

126.    The injuries alleged herein with respect to constituents of tobacco products are also directly traceable to the Defendants' actions in appointing the current members of the Constituents Subcommittee.  Those injuries arise from the risk that bias in favor of special

interest groups will cause the Subcommittee to ignore or not fairly consider scientific

information relating to constituents that is contrary to the views that Drs. Burns and Farone (and

Henningfield) express as paid expert witnesses for plaintiffs in litigation against tobacco-product

manufacturers.  The appointment of Drs. Burns and Farone to the Subcommittee also has created

the risk that they will use the Plaintiffs' confidential information improperly and, advertently or

inadvertently, will reveal such information to other parties that, like them, are adverse to the

Plaintiffs.

**Other Matters**

127.    The relief requested herein would cure future harm from the violations of law

alleged herein.  Because it is highly likely that the Defendants will act in accordance with the law

as declared by this Court and will comply with whatever injunctive relief this Court orders, the

Plaintiffs' injuries alleged herein can be redressed by the relief requested herein.

128.    In view of the Defendants' summary responses to PM-USA's and USSTC's

letters of March 22, 2010 and June 14, 2010 and to Reynolds's letter of June 30, 2010, and in

view of the lack of substantive response by any of the Defendants to PM-USA's and USSTC's

letters of August 26, 2010, January 6, 2011, January 27, 2011, and February 7, 2011, to

Reynolds's letters of September 17, 2010, October 11, 2010, December 3, 2010,  December 17,

2010, January 28, 2010, February 8, 2010, and February 19 (dated February 18), 2010, and to

Lorillard's letter of January 31, 2011, further resort to the FDA's administrative procedures by

the Plaintiffs to obtain the relief requested herein would be futile.  The Plaintiffs and others have

presented to the Defendants, in the first instance, the very same issues as those raised herein; and

the Defendants have made clear that they reject the Plaintiffs' concerns and objections with

respect to (a) the conflicts of interest of Drs. Benowitz, Henningfield, Samet, Burns, and Farone,

(b) the inappropriate influence of special interests on the TPSAC, and (c) the lack of fair balance on the TPSAC.

## FIRST CAUSE OF ACTION

### Financial Conflicts of Interest

**(5 U.S.C. § 706(2)(A); 18 U.S.C. §§ 202(a), 208(a); FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640)**

129.     Paragraphs 1-128, *supra*, are incorporated and re-alleged here.

130.     The Defendants' appointments of Drs. Benowitz, Henningfield, and Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

131.     The Defendants' appointments of Drs. Burns and Farone to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

132.     The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 (2010) because these individuals have financial interests that are disqualifying under these provisions of law.

133.     The presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because these individuals have financial interests that are disqualifying under these provisions of law.

134.   Any report, information, assessment, judgment, recommendation, or other advice developed and/or provided by the TPSAC during the time that members with conflicts of interest served on the Committee must be disregarded and not relied on for any purpose, including the issuance of any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco products, or any other matter.

## SECOND CAUSE OF ACTION

### Appearance Conflicts of Interest

### (5 U.S.C. § 706(2)(A); 18 U.S.C. §§ 202(a), 208(a); FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640)

135.   Paragraphs 1-134 *supra*, are incorporated and re-alleged here.

136.   The Defendants' appointments of Drs. Benowitz, Henningfield, and Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

137.   The Defendants' appointments of Drs. Burns and Farone to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

138.   The presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and their continuing roles as expert witnesses against tobacco-product manufacturers and as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding

their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

139.    The presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their continuing roles as expert witnesses in lawsuits against tobacco-product manufacturers, constitute circumstances that demonstrate their lack of impartiality, or at least raises questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as members of the Constituents Subcommittee; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

140.    Any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC during the time that members with conflicts of interest served on the Committee must be disregarded and not relied on for any purpose, including the issuance of any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco products, or any other matter.

**THIRD CAUSE OF ACTION**

**Violation of the FACA**

**(5 U.S.C. § 706(2)(A), 5 U.S.C. app. 2 § 5)**

141.    Paragraphs 1-140, *supra*, are incorporated and re-alleged here.

142.    The Defendants' appointments of the current voting members of the TPSAC, taken together, are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

143.    The current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to menthol in cigarettes, dissolvable tobacco products and other smokeless tobacco products, and other matters.

(a)    The current voting membership of the TPSAC cannot properly perform its broad statutory function because it has no voting members whose views balance the negative views of menthol in cigarettes previously expressed by Drs. Benowitz and Henningfield.

(b)    The current voting membership of the TPSAC cannot properly perform its broad statutory function because it does not represent the view of those members of the public-health and tobacco-control communities who have no financial or other ties to tobacco-product manufacturers (and so are not industry representatives of tobacco-product manufacturers) but who believe that current scientific knowledge about smokeless tobacco products shows that, now and in the future, at least some smokeless tobacco products can play a beneficial role in reducing the harm from tobacco in the United States.

(c)    The current voting membership of the TPSAC cannot properly perform its broad statutory function because it is dominated by a clique of people with similar viewpoints on smokeless tobacco and other matters, including matters on which they have jointly published articles, and thus does not reflect the diversity of views on tobacco-related issues among the members of the public-health and tobacco-control communities.

64

144.     The current voting membership of the TPSAC is not "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5(b)(2), with respect to the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States, and with respect to issues and topics related to that question, because it does not represent at all one of the viewpoints in the current two-sided controversy over a possible role for smokeless tobacco products in tobacco harm reduction.

145.     Specifically, with respect to dissolvable tobacco products, the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States is at the heart of "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children," which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates be presented to the TPSAC for a report and recommendation.

146.     Specifically, the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States is also at the heart of the TPSAC's review of any claim that a smokeless tobacco product is a modified risk tobacco product.  Such review is mandated by FDCA § 911(f), 21 U.S.C. § 387k(f).

147.     The current voting membership of the TPSAC is not such that the reports, information, assessments, judgments, recommendations, and other advice it provides to the

Defendants "will not be inappropriately influenced . . . by any special interest," 5 U.S.C. app. 2

§ 5(b)(3).  By reason of the current and ongoing financial connections between Drs. Benowitz,

Henningfield, Samet, Burns, and Farone, and lawyers for plaintiffs suing tobacco-product

manufacturers, the TPSAC's consideration of, and its recommendations and other advice as to,

issues relating to many aspects of the regulation of tobacco products will be influenced by the

special interest of those plaintiffs' lawyers.  By reason of the current and ongoing or recent and

possibly to-be-renewed financial connections between Drs. Benowitz, Henningfield, and Samet

and manufacturers of nicotine-replacement-therapy products and other smoking-cessation

products, the TPSAC's consideration of, and its recommendations and other advice as to, issues

relating to menthol in cigarettes and issues relating to the competition between manufacturers of

such products and manufacturers of smokeless tobacco products will be influenced by the

incentives these conflicted members have to advance the special interest of the manufacturers of

nicotine-replacement-therapy products and other smoking-cessation products.  Such incentives

are inappropriate because advisory committees are intended to be impartial and neutral as to

issues that come before them.

148.    Therefore, the current voting membership of the TPSAC violates 5 U.S.C. app. 2

§ 5(b)(2)-(3), (c).

149.    Any report, information, assessment, judgment, recommendation, or other advice

provided by the TPSAC on a subject as to which the Committee is not fairly balanced as to

points of view must be disregarded and not relied on for any purpose, including the issuance of

any rule or order concerning menthol in cigarettes, dissolvable or other smokeless tobacco

products, or any other matter.

**FOURTH CAUSE OF ACTION**

**Additional Violations of the FACA**

**(5 U.S.C. § 706(2)(A), 5 U.S.C. app. 2 §§ 3, 10)**

150.    Paragraphs 1-149, *supra*, are incorporated and re-alleged here.

151.    During the day on Thursday, March 17, 2011, the TPSAC held a public meeting at which it considered parts of its report on menthol in cigarettes.  During at least the late afternoon of Thursday, March 17, 2011, some voting members of the TPSAC, including the Chair, Dr. Samet, conducted a meeting that was not open to the public.  The meeting occurred in a conference room at the Residence Inn in Silver Spring, MD, where FDA had arranged for the members of the TPSAC to stay in connection with the TPSAC meetings on March 17-18, 2011.  Also attending the meeting at the Residence Inn was Caryn Cohen, an employee of FDA and the Designated Federal Official for the TPSAC.  The next morning, Friday, March 18, 2011, in a public meeting, the TPSAC report on menthol in cigarettes, including chapter 8, which contains the report's conclusions and recommendations, was presented as a *fait accompli*, as approved by the TPSAC in effect.  At its public meeting on March 18, the Committee engaged in no public discussion of the report's conclusions and recommendations, and conducted no vote on the conclusions and recommendations or on the report as a whole.  Moreover, chapter 8 was not made available to the nonvoting members of the TPSAC until a few minutes before the meeting on March 18 began.

152.    Under section 3 of the FACA, a subcommittee of an advisory committee is, itself, an advisory committee, and therefore is subject to the requirements that apply to advisory committees.

153.     If and to the extent that the meeting  at the Residence Inn on March 17, 2011 was a  meeting of the TPSAC (or its Menthol Subcommittee), it violated section 10(a)(1) of the FACA because it was not open to the public.

154.     Defendants gave no prior notice to the public that a second meeting of the TPSAC (or a meeting of its Menthol Subcommittee) would occur on March 17, 2011.  If and to the extent that the meeting at the Residence Inn on March 17, 2011 was a  meeting of the TPSAC (or its Menthol Subcommittee), it violated section 10(a)(2) of the FACA because it was held without timely notice published in the *Federal Register*.

155.     If and to the extent that the meeting  at the Residence Inn on March 17, 2011 was a  meeting of the TPSAC (or its Menthol Subcommittee), it violated section 10(a)(3) of the FACA because the Defendants did not provide interested persons an opportunity to attend, or to appear before, or file statements with, the TPSAC.

156.     The TPSAC's approval of the report and its recommendations without a vote by each voting member on each recommendation and on the report as a whole was a serious departure from the manner in which FDA advisory committees make recommendations to FDA, and a serious departure from the manner in which the TPSAC, itself, made recommendations to FDA with respect to constituents by voting on specific questions, as reflected at pages 171-87 of the transcript of the TPSAC meeting on August 30, 2010, *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM229747.pdf.

157.     The report on menthol in cigarettes, which is the product of a process that includes a non-public meeting of committee members and which has not been the subject of a

committee vote must be disregarded and not relied on for any purpose, including the issuance of

any rule or order concerning menthol in cigarettes.

### FIFTH CAUSE OF ACTION

### Additional Violations of FACA

### (5 U.S.C. § 706(2)(A), (D), 5 U.S.C. app. 2 §§ 3, 10)

158.    Paragraphs 1-157, *supra*, are incorporated and re-alleged here.

159.    Section 10(b) of FACA provides: "Subject to section 552 of title 5, United States

Code, the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies,

agenda, or other documents which were made available to or prepared for or by each advisory

committee shall be available for public inspection and copying at a single location in the offices

of the advisory committee or the agency to which the advisory committee reports until the

advisory committee ceases to exist."  5 U.S.C. app. 2 § 10(b) (2006).  The term "advisory

committee" in section 10(b) "means any committee, board, commission, council, conference,

panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . ,

which is . . . established or utilized by one or more agencies . . . in the interest of obtaining

advice or recommendations for . . . one or more agencies or officers of the Federal Government .

. . ."  FACA § 3(2), 5 U.S.C. app. 2 § 3(2) (2006).

160.    Defendants have a duty to make all nonexempt TPSAC-related documents that

are within the scope of FACA § 10(b) available to the public.  That duty is non-discretionary.

161.    The "deliberative process privilege" under 5 U.S.C. § 552(b)(5) does not apply to

the TPSAC or to any subcommittee or other subgroup of the TPSAC.

162.    The language and structure of FACA express unequivocally that the Government

is required to make available all nonexempt section 10(b) materials regardless of whether a FOIA request was filed.

163.    As alleged in paragraph 92, *supra*, on December 3, 2010, Reynolds sent to Defendant Dr. Deyton, in his official capacity, a letter that requested that the FDA (1) instruct the TPSAC members (a) that they shall conduct in writing (hard copy or electronic writing), and not orally, all discussions relating to the report on menthol in cigarettes between any two or more voting members of the Committee; (b) that they shall promptly provide to the Agency a copy of each such writing, and shall not destroy or change any such writing after its initial use; and (c) that they shall promptly provide to the Agency copies of all drafts of the report and all notes, communications, and other working materials that are involved in or relate to the preparation of the report; and (2) make all such materials available to the public sufficiently in advance of the meeting at which the TPSAC will review the report so that interested members of the public will have a fair opportunity to review those materials before the meeting.  The letter included detailed supporting reasons.  A true and correct copy of that letter is attached hereto as Exhibit T.

164.    The Complaint herein was filed on February 25, 2011, and was served on Defendants on February 28, 2011.

165.    On March 3, 2011, Reynolds sent to Dr. Deyton, in his official capacity, a letter requesting, in view of the upcoming meeting of the TPSAC with respect to the report on menthol cigarettes ("Menthol Report"), "that FDA make available to the public for inspection and copying all drafts of the menthol report (or any chapter or other part thereof) and all notes, communications, and other working materials that are involved in or relate to the preparation of the report, (ii) that the Agency do so not later than March 10, 2011**,** and (iii) that any of the working materials that cannot be made available by March l0 be made available as soon

thereafter as possible and, in any event, before March 17." A true and correct copy of that letter

is attached hereto as Exhibit W. Reynolds received no response to the March 3, 2011 letter, and

no documents were made available in response to it.

166. The TPSAC completed its work on the Menthol Report on March 18, 2011. The

report is *available at*

http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoPro

ductsScientificAdvisoryCommittee/UCM247689.pdf. An "annotated" version of the report, as

of March 23, 2011, is *available at*

http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScienti

ficAdvisoryCommittee/ucm259481.htm.

167. The Amended Complaint herein was filed and served on March 21, 2011.

168. On April 11, 2011, RAI Services Company, on behalf of Reynolds, sent to

Defendant Dr. Deyton and to Mr. Fred Sadler, in their official capacities at FDA, a letter that

followed-up the December 3, 2010 letter by requesting that FDA "(i) collect (including from

individual members of the TPSAC, consultants to the TPSAC, and FDA staff assisting the

TPSAC) all of the 'transcripts, minutes, appendixes, working papers, drafts, studies, . . . or other

documents" (other than those already posted on the FDA website) 'which were made available to

or prepared for or by' the TPSAC and/or its Menthol Report Subcommittee, and (ii) within 30

days make all those documents 'available for public inspection and copying at a single location

in the offices of . . . the agency,' FACA § 10(b)." A true and correct copy of the April 11, 2011

letter is attached hereto as Exhibit X.

169. On April 28, 2011, through FDA counsel, Defendants sent by e-mail a document-

preservation letter to "TPSAC members, consultants and contractors." A true and correct copy

71

of that letter is attached hereto as Exhibit Y.  Despite the clear language of FACA § 10(b), the

letter stated, in part:  "Although there has been no decision made at this time to produce these

materials, in light of the document requests and the litigation, we are asking that you preserve

such documents. . . .   The purpose of this email is to provide instructions only about **document**

**retention**, not collection or production.  You do not need to collect or review additional

documents at this time."  Exhibit Y at 1 (emphasis in original).

170.    Thus, Defendants delayed their document-preservation letter until (a) nearly five

months after the December 3, 2010 letter, (b) two months after the service of the Complaint

herein, (c) more than one month after the TPSAC completed its work on the Menthol Report, (d)

more than one month after the service of the Amended Complaint herein, and (e) more than two

weeks after the April 11, 2011 letter.

171.    Moreover, by telling TPSAC members, consultants, and contractors that there was

no need to collect the requested documents, Defendants further delayed the availability of those

documents to the Plaintiffs and the public.

172.    On May 3, 2011, by e-mail letter, counsel for Plaintiffs asked counsel for

Defendants to "do whatever you think appropriate to persuade FDA to make all the requested

documents available promptly.  We will need to understand in full the fate of the requested

documents, by means of either a formal representation by the Government or discovery, *e.g.*, by

deposing a Rule 30(b)(6) witness with full knowledge of, *inter alia*, what FDA did in response to

the December 3 letter, why the document-preservation letter was delayed so long, and the

document-creation and document-retention practices of the members of the TPSAC with respect

to the development of the menthol report."  A true and correct copy of that e-mail is attached

hereto as Exhibit Z.  On May 4, 2011, in an e-mail letter, counsel for Defendants stated that they

were "discussing your letter and email with the agency.  The agency will endeavor to respond in writing by May 11."  A true and correct copy of that e-mail is attached hereto as Exhibit AA.

173.    By letter dated May 11, 2011, Defendants finally responded to Reynolds's letter of April 11, 2011.  A true and correct copy of the letter of May 11, 2011 is attached hereto as Exhibit BB.  Defendants' response is inadequate for many reasons.

(a)    The May 11, 2011 letter neither provides, nor offers to provide, any of the working papers or drafts of the Menthol Report, other than the sanitized drafts on FDA's website.  Despite the 19-page list of materials appended to the May 11, 2011 letter, (i) no document on FDA's website is a marked-up draft or working paper relating to the menthol report; (ii) no document on FDA's website is a draft of chapter 8—which contains the report's conclusions and recommendations—other than the final draft presented at the March 18, 2011 meeting and the March 23, 2011 "annotated" version; and (iii) no document on FDA's website enables the Plaintiffs or the public to identify the contributions of any particular member of the TPSAC to the text of the report.  Thus, Defendants' refusal to make the actual working papers and drafts available defeats here one of the main purposes of FACA: to enable the public to hold advisory committee members accountable for what they do in their official capacities.

(b)    Because, by its plain terms, FACA applies to "any subcommittee or other subgroup" of an advisory committee, it applies to the Menthol Report Subcommittee and to any and all subgroups of the TPSAC and to any and all subgroups of the Menthol Report Subcommittee.  In enacting FACA, Congress did not intend that agencies could evade the statute's requirements by delegating all formulation of committee conclusions and recommendations to subcommittees, and thereby enable advisory committee members to escape

all accountability to the public for their individual participation in the formulation of those conclusions and recommendations.

(c)     In addition, FACA applies to the so-called "Menthol Report Subcommittee" because it was, in reality, the TPSAC, with all of its voting members, except one, participating.

(i)     Dr. Samet, the Chair of the TPSAC and of the Subcommittee, opened the first meeting of the Subcommittee on September 27, 2010 by stating: "Good morning. This is Jonathan Samet speaking here at the TPSAC." Tr. of Mtg. of Menthol Report Subcomm. 9 (Sept. 27, 2010), *available at*

http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoPro ductsScientificAdvisoryCommittee/UCM232885.pdf.

(ii)    The acting Designated Federal Official ("DFO") reminded the attendees that the September 27, 2010 meeting was a meeting of the Subcommittee: "The Food and Drug Administration is convening today's meeting of the Menthol Report Subcommittee of the Tobacco Products Scientific Advisory Committee under the authority of the Federal Advisory Committee Act of 1972." *Id.* at 11. The acting DFO proceeded to explain the role of the Subcommittee and its relationship to the TPSAC:

> The role of the subcommittee is to determine the structure of the menthol report, including chapter topics and the structure of the chapters; to write the menthol report, describing the evidence regarding the impact of menthol cigarettes on public health, and draw conclusions about the strength of the evidence on each topic of interest. And the work of the subcommittee will be referred back to the full TPSAC for discussion and deliberation.
>
> The role of the TPSAC is to discuss and deliberate on evidence that will be presented to the committee in the various meetings; to discuss and deliberate on the work produced by the subcommittee; and to develop the recommendations that will be included in the report.

*Id.* at 19.

> The Menthol Report Subcommittee of the TPSAC was established specifically for the purpose of writing the required report on the issue of the impact of the use of menthol in cigarettes on the public health.  Participation in the Menthol Report Subcommittee was offered to all of the voting TPSAC members, as well as all three of the nonvoting industry representatives.  As you can see from the subcommittee roster in your agenda packet, most of them believed that they had the time and ability to participate.

*Id.* at 20-21 (statement of acting DFO).  These statements show that, in FDA's conception, the

Subcommittee was merely the TPSAC by another name.

        (iii)      Attending the September 27, 2010 Subcommittee meeting as

members were seven of the then-nine voting members of the TPSAC (Drs. Benowitz, Clanton,

Connolly, Hatsukami, Henderson, and Samet, and Ms. DeLeeuw), as well as the three non-

voting industry representatives.  *See id.* at 16-17.  Under 21 C.F.R. § 14.22(d) (2010), a majority

of the TPSAC members was (and is) a quorum for a TPSAC meeting.  Therefore, the

Subcommittee was a quorum of the full TPSAC.  Thus, as a practical matter, this first meeting of

the Subcommittee was a meeting of the full TPSAC (with two voting members absent).

        (iv)      The Subcommittee was not staff to the TPSAC.  All members of

the Subcommittee were also members of the TPSAC.

        (v)      Moreover, the Subcommittee was not created to be an informal or

unstructured working group.  FDA established and utilized it and formally designated it as a

Subcommittee of the TPSAC.  It had a specified fixed membership.  As shown by the statement

by the acting DFO quoted in ¶ (ii) *supra*, FDA initially treated it as subject to FACA.  FDA

formally announced that "the members of this subcommittee are in compliance with the federal

ethics and conflict of interest laws."  Tr. of Mtg. of Menthol Report Subcomm. 12 (Sept. 27,

2010).

(vi)     During the November 18, 2010 meeting of the TPSAC, FDA, through its DFO, stated that it was altering the process for the writing of the Menthol Report :

> As far as the writing work groups, the work groups are starting to meet.  We have made a small change in the process for the writing work groups.  We had originally said that the DFO would be present at all phone calls and meetings;  but in an effort to expedite the process, we have now decided the DFO has to know about every meeting, the meetings [sic] times and the attendees, and has to be copied on all correspondence and exchanges of drafts, but does not necessarily have to be at every single meeting of the writing work groups.

Tr. of Mtg. of TPSAC 27 (Nov. 18, 2010) (statement of Dr. Corinne Husten), *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM251663.pdf.   The DFO's statement reflected FDA's total control over the operations of the Subcommittee and the writing subgroups.

(vii)     Although the Subcommittee started with two TPSAC members (Dr. Henningfield and Dr. Wakefield) absent from its roster, there came a time when Dr. Wakefield joined in the actual drafting of the Subcommittee's Menthol Report.  Thus, as of February 2011, all but one of the TPSAC members were actively participating in the work of the Subcommittee.

(viii)     Although the Subcommittee formally included the three nonvoting industry representatives, their participation was limited to physically sitting with the Subcommittee during its two public meetings.  The nonvoting representatives were excluded from participating in the report-drafting process for which the Subcommittee was formed.  They received no non-public information during the course of their "membership."  Upon information and belief, they were excluded from numerous nonpublic meetings, telephone calls, and email exchanges among the voting TPSAC members on the Subcommittee.

(ix)     The Subcommittee proceeded to draft the Menthol Report. Contrary to the acting DFO's statements on the record during the first Subcommittee meeting, quoted in ¶ (ii) *supra*, however, there was never any substantial discussion of or deliberation about the final conclusions and recommendations in the report when they were presented to the TPSAC on March 18, 2011 (or at any other time in any public meeting of the TPSAC).

(d)     The Menthol Report drafted by the Subcommittee was the TPSAC's report in final form.  Thus, in reality, the Menthol Report Subcommittee reported directly to FDA.

(i)     As Dr. Samet stated with respect to the Menthol Report:  "This is a TPSAC report.  It's being prepared by the Menthol Subcommittee, which includes almost all of TPSAC.  But it's a report of the group. It will do our job of providing a report and making recommendations."  Tr. of Mtg. of TPSAC 319-20 (Jan. 10, 2011), *available at* http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/UCM251634.pdf.

(ii)     The Menthol Report drafted by the Menthol Report Subcommittee went through the TPSAC on March 18, 2011 without any substantial discussion of its conclusions, recommendations, or other contents, without any substantive change by the TPSAC, and without a vote.  The report as issued by the Subcommittee was not a "preliminary effort," Exhibit BB at 2, or merely an exercise in "collecting information and providing preliminary recommendations to [a] parent committee[]," *id.* at 3, but was, rather, the final document, subject only to nominal or *pro forma* approval by the TPSAC and non-substantive changes by FDA (*e.g.*, to ensure protection of trade secrets).  The "deliberations" of the TPSAC at its March 18, 2011 meeting, *id.*, after the report was transmitted to it, added nothing to the report.

(e)     By delegating the actual drafting of the report to a "subcommittee," FDA has thus far hidden from the Plaintiffs and the public all the real discussion and debate about the report's conclusions and recommendations.  At no public meeting of the TPSAC or of the Menthol Report Subcommittee (or any subgroup of the Subcommittee) have any of the specific conclusions and recommendations in chapter 8 of the Menthol Report been debated or any alternatives to their wording been discussed.  Committee discussion of the texts of other draft chapters of the report (apart from presentations of summaries) has been minimal.

(f)     The May 11, 2011 letter provides no information about the document-creation or document-retention practices of the members of the TPSAC.

(g)     Although the May 11, 2011 letter makes various legal arguments, it provides no good reason why the Subcommittee's working papers should not have been preserved and made available, and should not now be available, to Plaintiffs and the public—*i.e.*, no good reason why that form of transparency would not advance the policies of FACA.

(h)     The May 3, 2011 email (Exhibit Z hereto) states:  "To date, RJRT has not received a written response to the December 3 letter or to the April 11 letter.  It did receive a telephone call, in which it was told to go to FDA's website for the documents.  Of course, the documents at issue are not on FDA's website."  The May 11, 2011 letter states:

> The April 11 letter followed a December 3, 2010 letter from you on the same topic.  In an email dated May 3, 2011 from your outside counsel Richard Cooper to Christopher Hardee and Patrick Nemeroff of the United States Department of Justice, Mr. Cooper stated that FDA responded to your December letter with a phone call in which you were informed that FDA had made the documents subject to disclosure publicly available on its website. You apparently did not communicate with FDA further about these issues until your April 11 letter.

Exhibit BB at 1 n.1.  In fact, the telephone call was in response to the April 11, 2011 letter (Exhibit X hereto), and occurred on or about April 21, 2011.

174.    On June 3, 2011, FDA announced in the Federal Register that a meeting of TPSAC would be held on July 21 and 22, 2011.  Tobacco Products Scientific Advisory Committee; Notice of Meeting, 76 Fed. Reg. 32,219 (June 3, 2011) (Exhibit CC).  According to the Notice, at the July 21 meeting the Committee "will discuss changes proposed by committee members to the [TPSAC] Menthol Report submitted to the Agency on March 18, 2011[,] . . .and adopt amendments that constitute the advice of the committee."  *Id.* at 32,219.  Redacted versions of the report, "reflecting changes to the report proposed by the committee members," will be made available by June 22, 2011.  *Id.*  Redacted background material relating to the meeting will not, however, be made available to the public until "2 business days before the meeting," and perhaps later.  *Id.* at 32,220.

175.    On June 6, 2011, Lorillard and Reynolds sent to Defendant Dr. Deyton and to Mr. Fred Sadler, in their official capacities at FDA, a letter that followed-up the December 3, 2010, March 3, 2011,  and April 11, 2011 letters by reiterating the request that FDA "collect (including from individual voting members of the TPSAC and FDA staff assisting the TPSAC) 'transcripts, minutes, appendixes, working papers, drafts, studies, . . . or other documents (other than those already posted on the FDA website) which were made available to or prepared for or by' any of the voting members of the TPSAC and/or its Menthol Report Subcommittee or any subgroup of the Menthol Report Subcommittee ***prior to*** March 18, 2011" (emphasis in original).  A true and correct copy of the June 6, 2011 letter is attached hereto as Exhibit DD.  In the June 6, 2011 letter, Plaintiffs also made a new request that "FDA collect the materials described in the previous sentence that were created ***on or after*** March 18, 2011."  *Id.* at 3 (emphasis in original).  This new request effectively covered all documents related to the proposed amendments to the Menthol Report.  In view of the pendency of the July 21, 2011 TPSAC meeting, Plaintiffs

requested that FDA make all the documents described in the letter "available for public inspection and copying at a single location in the offices of . . . the agency," FACA § 10(b), by June 16, 2011, and that it supplement those documents accordingly "in the weeks preceding that meeting." *Id.* In an email dated June 16, 2011, counsel for Defendants indicated that FDA would respond to Plaintiffs' June 6 letter by the end of the following week; *i.e.*, by June 24, 2011. A true and correct copy of the June 16, 2011 email is attached hereto as Exhibit EE.

176.    By letter dated June 24, 2011, Dr. Deyton—in response to Plaintiffs' June 6 letter—reiterated the Agency's refusal to make available any documents beyond those "already made publicly available" on FDA's website. A true and correct copy of the June 24, 2011 letter is attached hereto as Exhibit FF. That letter purported to "further explain" the Agency's conclusion "that disclosure of these documents under FACA is not required." *Id.* at 1. FDA's June 24, 2011 response, and refusal to reconsider its position on the requested documents, is inadequate for many reasons, including but not limited to the reasons stated in ¶ 173, *supra*.

177.    Under FACA § 3(2), the Menthol Report Subcommittee is an "advisory committee," and is subject to FACA § 10; and each and every subgroup of the Menthol Report Subcommittee is an "advisory committee," and is subject to FACA § 10.

178.    At TPSAC meetings, FDA routinely instructs TPSAC members that they are not to discuss Committee business at lunch (*i.e.*, out of the hearing of the public). That instruction reflects the Defendants' control over, and responsibility for, the manner in which the TPSAC does its work. Such control is further evidenced by the letter of April 28, 2011 (Exhibit Y hereto). At all relevant times, all of the TPSAC-related documents that are within the scope of FACA § 10(b) have been within the Defendants' possession, custody, and/or control.

179.     Under FACA § 10(b), Defendants have a duty to make available to Reynolds and the public forthwith all existing nonexempt documents within their possession, custody, and/or control that are "working papers, drafts, studies, . . . or other documents which were made available to or prepared for or by each advisory committee," *i.e.*, the TPSAC, the Menthol Report Subcommittee of the TPSAC, and any subcommittee or other subgroup of the Menthol Report Subcommittee.  Although aware of FACA § 10(b) and on notice since December 3, 2010 of Reynolds's request for all the documents relating to the Menthol Report that are required to be disclosed under FACA § 10(b), Defendants have delayed in their efforts to ensure such documents are preserved, and have failed and refused to make almost all the documents available to Plaintiffs and the public.  Thereby, Defendants have violated FACA § 10(b).

180.     The documents requested in Reynolds's letters of December 3, 2010, March 3, 2011, and April 11, 2011, and Plaintiffs' letter of June 6, 2011, are relevant to all future administrative, judicial, and other proceedings to which the Menthol Report is relevant.  Plaintiffs do not know with certainty that documents created within the scope of the request in the December 3, 2010 letter were destroyed between December 3, 2010 and April 28, 2011.  As a matter of common sense, however, it is very probable that many such documents were destroyed during that period.  If some such documents were destroyed during that period, Defendants' delay in requesting the preservation of all such documents and failure to make all of them available to the public, as required by FACA § 10(b), prevent Reynolds, Lorillard, and others from using the missing documents as a basis for comments on that report in administrative, judicial, and other proceedings, and thereby severely impair the general ability of Reynolds and others to comment on the report.  The unavailability of the requested documents is a continuing informational injury to Reynolds and Lorillard in particular (by reason of their

being subject to regulation by Defendants with respect to their menthol cigarettes), and to other members of the public in general.

181.    Some of the documents requested in the letters of December 3, 2010, March 3, 2011, April 11, 2011, and June 6, 2011 are relevant to issues in this civil action, including (a) documents reflecting the activities of Drs. Benowitz, Henningfield, and Samet in influencing the content of the Menthol Report, and (b) documents discussed at, or otherwise relating to, the nonpublic meeting on March 17, 2011 referred to in ¶ 151, *supra*, and/or discussed at, or otherwise relating to, other nonpublic meetings or communications within the scope of ¶ 92, *supra*.

182.    Defendants had and have a duty to ensure the preservation of all documents within their possession, custody, and/or control that are potentially relevant to any issue in this civil action.  If some such documents were destroyed during the period December 3, 2010 to April 28, 2011, Defendants have violated that duty by their delay in issuing the preservation letter.  The violation of that additional duty is an aggravating factor in Defendants' violation of FACA § 10(b).

183.    If such documents were destroyed during the period December 3, 2010 to April 28, 2011, Defendants' violation of that duty imposes a serious continuing injury on Plaintiffs in the conduct of this civil action because it prevents them from gaining access to those documents and using them to assess, and inform the Court of, (a) the activities of Drs. Benowitz, Henningfield, and Samet in influencing the content of the Menthol Report, and (b) what occurred during the nonpublic meeting on March 17, 2011 and during other nonpublic meetings or communications within the scope of ¶ 92, *supra*.

184.    Defendants' delay in issuing the preservation letter and their continuing failure

and refusal to make available all the documents requested in the letters of December 3, 2010,

March 3, 2011, April 11, 2011, and June 6, 2011 violated, and continue to violate, the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (D).

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Court, pursuant to 28 U.S.C §§ 1361, 2201-

02, and Rule 65, Fed. R. Civ. P.:

1.    Declare:

(a)    That the Defendants' appointments of Drs. Benowitz, Henningfield, and

Samet to serve as voting members of the TPSAC are arbitrary, capricious, an abuse of discretion,

and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

(b)    That the Defendants' appointments of Drs. Burns, Farone, and

Henningfield to serve on the Constituents Subcommittee of the TPSAC are arbitrary, capricious,

an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to

5 U.S.C. § 706(2)(A).

(c)    That the presence of Drs. Benowitz, Henningfield, and Samet as voting

members of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a),

208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 (2010) because these

individuals have financial interests that are disqualifying under these provisions of law.

(d)     That the financial conflicts of interest of Drs. Benowitz, Henningfield, and Samet incapacitate the TPSAC from preparing a report on menthol in cigarettes that is unbiased and untainted by financial conflicts of interest.

(e)     That the presence of Drs. Burns, Farone and Henningfield on the Constituents Subcommittee of the TPSAC creates financial conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA § 712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because these individuals have financial interests that are disqualifying under these provisions of law.

(f)     That the financial conflicts of interest of Drs. Burns, Farone, and Henningfield incapacitate the Constituents Subcommittee from providing a report, information, assessment, judgment, recommendation, or other advice on constituents that is unbiased and untainted by financial conflicts of interest.

(g)     That the presence of Drs. Benowitz, Henningfield, and Samet as voting members of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA §712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their views, expressed publicly and in testimony in lawsuits against tobacco-product manufacturers, and their continuing  roles as consultants to manufacturers of nicotine-replacement-therapy products and other smoking-cessation products constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as voting members of the TPSAC; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict of interest.

(h)     That the appearance conflicts of interest of Drs. Benowitz, Henningfield, and Samet incapacitate the TPSAC from preparing a report on menthol in cigarettes that is unbiased and untainted by appearance conflicts of interest.

(i)     That the presence of Drs. Burns and Farone on the Constituents Subcommittee of the TPSAC creates appearance conflicts of interest that violate 18 U.S.C. §§ 202(a), 208; FDCA §712, 21 U.S.C. § 379d-1; and 5 C.F.R. pts. 2635, 2640 because their roles as expert witnesses in lawsuits against tobacco-product manufacturers constitute circumstances that demonstrate their lack of impartiality, or at least raise questions regarding their impartiality, in particular matters that have been, are, and/or will be presented to them as members of the Constituents Subcommittee; and as to those circumstances, a reasonable person with knowledge of the relevant facts would perceive the appearance of a conflict.

(j)     That the appearance conflicts of interest of Drs. Burns, Farone, and Henningfield incapacitate the Constituents Subcommittee from preparing a report, information, assessment, judgment, recommendation, or other advice on constituents that is unbiased and untainted by appearance conflicts of interest.

(k)     That the Defendants' appointments of the current voting members of the TPSAC, taken together, are arbitrary, capricious, an abuse of discretion, and otherwise not in compliance with law, and therefore are contrary to 5 U.S.C. § 706(2)(A).

(l)     That the current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to menthol in cigarettes because the TPSAC has no voting members whose views balance the negative views of menthol previously expressed by Drs. Benowitz and Henningfield

(m)     That the current voting membership of the TPSAC prevents the TPSAC from properly performing its broad statutory function of advising the Defendants with respect to issues relating to dissolvable tobacco products and other smokeless tobacco products because it does not represent the view of those members of the public-health and tobacco-control communities who have no financial or other ties to tobacco-product manufacturers (and so are not industry representatives of tobacco-product manufacturers), but who believe that current scientific knowledge about smokeless tobacco products shows that, now and in the future, at least some smokeless tobacco products can play a beneficial role in reducing the harm from tobacco in the United States.

(n)     That the current voting membership of the TPSAC cannot properly perform its broad statutory function because it is dominated by a clique of people with similar viewpoints on smokeless tobacco and other matters, including matters on which they have jointly published articles, and thus does not reflect the diversity of views on tobacco-related issues among the members of the public-health and tobacco-control communities.

(o)     That the current voting membership of the TPSAC is not "fairly balanced in terms of the points of view represented," 5 U.S.C. app. 2 § 5, with respect to the question whether current scientific knowledge about smokeless tobacco products shows that, now and in the future, dissolvable and/or other smokeless tobacco products, or some of them, can play a beneficial role in tobacco harm reduction in the United States, and with respect to issues and topics related to that question, because it does not represent at all one of the viewpoints in this two-sided controversy.

(p)     That, specifically with respect to dissolvable tobacco products, the question whether current scientific knowledge about dissolvable tobacco products shows that,

86

now and in the future, they, or some of them, can play a beneficial role in tobacco harm reduction in the United States is at the heart of "the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children," which FDCA § 907(f)(1), 21 U.S.C. § 387g(f)(1), mandates be presented to the TPSAC for a report and recommendations.

(q)     That the current voting membership of the TPSAC is not such that its recommendations and other advice "will not be inappropriately influenced . . . by any special interest," 5 U.S.C. app. 2 § 5.  By reason of the current and ongoing financial connections between, on one side, Drs. Benowitz, Henningfield, Samet, Burns, and Farone, and, on the other side, lawyers for plaintiffs suing tobacco-product manufacturers, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to many aspects of the regulation of tobacco products will be influenced by the special interest of those plaintiffs' lawyers.  By reason of the current and ongoing or recent and possibly to-be-renewed financial connections between Drs. Benowitz, Henningfield, and Samet and manufacturers of smoking-cessation products, the TPSAC's consideration of, and its recommendations and other advice as to, issues relating to the competition between manufacturers of smoking-cessation products and manufacturers of smokeless tobacco products will be influenced by the special interest of the manufacturers of smoking-cessation products; and that such influences are inappropriate because advisory committees are intended to be impartial and neutral as to issues that come before them.

(r)     That the nonvoting members of the TPSAC cannot provide fair balance to Drs. Benowitz, Hatsukami, Henningfield, and Samet because (a) the nonvoting members have no vote and the Defendants exclude them from drafting the committee's reports and

87

recommendations; (b) the nonvoting members bear the stigma of being industry representatives to whose views the FDA will give less weight.

(s)     That, therefore, the current voting membership of the TPSAC violates 5 U.S.C. app. 2 § 5.

(t)     That the Defendants' exclusion of the nonvoting members of the TPSAC from participation in the preparation of the Committee's report on menthol in cigarettes is arbitrary, capricious, an abuse of discretion, and not in accordance with law because the exclusion violates FDCA § 917(b)(1)(B), 21 U.S.C. § 387q(b)(1)(B).

(u)     That the practice of having government reports written by committees that include special government employees who continue to testify as expert witnesses in litigation and are likely to use such reports in support of their future testimony is contrary to the ethics rules applicable to special government employees and to the FACA.

(v)     That FACA applies to the Menthol Report Subcommittee, and to each subcommittee and other subgroup thereof; and, further, that Defendants have violated 5 U.S.C. app. 2 § 10(b) by not making available to Plaintiffs and the public all drafts, working papers, and other documents which were made available to or prepared for or by the voting members of the TPSAC, the Menthol Report Subcommittee, and/or any subcommittee or other subgroup of the Menthol Report Subcommittee.

2.     Order:

(a)     That the Defendants are enjoined from receiving, considering, or relying on any report, information, assessment, judgment, recommendation, or other advice provided by the TPSAC, except a report, information, assessment, judgment, recommendation, or other

advice provided by the TPSAC when it and, as applicable, its Constituents Subcommittee are composed and operating in accordance with the law.

(b)     That the Defendants are enjoined from transmitting, or otherwise making available, to the TPSAC or to its Constituents Subcommittee any of the Plaintiffs' trade secret or confidential commercial documents or other trade secret or confidential commercial information provided heretofore by any of the Plaintiffs to any of the Defendants unless and until the TPSAC or the Constituents Subcommittee, as relevant, is lawfully composed; and that the Plaintiffs need not produce to any of the Defendants any trade secret or confidential commercial documents or other trade secret or confidential commercial information that otherwise would be provided to the TPSAC or to its Constituents Subcommittee unless and until the TPSAC and/or the Constituents Subcommittee, as relevant, is lawfully composed.

(c)     That the Defendants are enjoined from excluding nonvoting members of the TPSAC from activities of the Committee in which the nonvoting members would not have access to trade secret or confidential commercial information (other than trade secret or confidential commercial information submitted by a party that has consented to such access).

(d)     That, until the TPSAC is properly composed in accordance with the applicable ethics requirements and the FACA, the Defendants shall attach to the cover of any final report or other final document prepared by the TPSAC a disclaimer stating that the report or other document, as applicable, was prepared by a committee constituted in violation of applicable ethics rules and the Federal Advisory Committee Act.

(e)     That Defendants make a thorough inquiry, and report to the Court in writing within 90 days, (i) what "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents" relating to the Menthol Report were created

89

by any voting member or members of the TPSAC (including any voting member or members participating in the work of the Menthol Report Subcommittee and/or any subgroup of the Menthol Report Subcommittee) since December 3, 2010; (ii) which of the documents within the scope of clause (i) of this paragraph remain in existence; and (iii) to the extent applicable, what happened to the documents that are within the scope of clause (i) of this paragraph but are not within the scope of clause (ii) of this paragraph.

(f)     That within 100 days Defendants make available to Plaintiffs and the public, in accordance with 5 U.S.C. app. 2 § 10(b), all existing documents within the scope of paragraph (e)(i), *supra*, other than documents that are exempt from disclosure under 5 U.S.C. § 552.

(g)     That FDA is preliminarily enjoined from (i) revising or amending the Menthol Report that was in existence as of March 18, 2011, or (ii) from using or relying on the Menthol Report in any manner, until it makes available existing documents within the scope of paragraph (e)(i), *supra*, other than documents that are exempt from disclosure under 5 U.S.C. § 552.

3.     Provide such further and other relief as the Court deems just and proper.

Respectfully submitted,

Alan Mansfield, DC Bar # NY0127
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
Phone: (212) 801-9200
FAX: (212) 801-6400

Richard M. Cooper, DC Bar # 92817
Amer S. Ahmed, DC Bar # 500630
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5466
Phone: (202) 434-5288

MansfieldA@gtlaw.com

FAX:  (202) 434-5029
rcooper@ wc.com
aahmed@wc.com

Laura Metcoff Klaus, DC Bar # 294272
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Phone:  (202) 533-2362
FAX:  (202) 261-0137
KlausL@gtlaw.com

Attorneys for Plaintiffs                    Attorneys for Plaintiff
Lorillard, Inc. and                         R.J. Reynolds Tobacco Company
Lorillard Tobacco Company


Dated:  June 30, 2011